UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ABHIJIT RAMACHANDRAN, § § *Plaintiff*, § § v. § § § Civil Action No. 3:18-CV-00811-X VINAY JAIN; § AROG PHARMACEUTICALS, INC.; § JAIN INVESTMENTS LLC; and § VIDERA PHARMACEUTICALS § § *Defendants*. § | |

### MEMORANDUM OPINION AND ORDER

Abhijit Ramachandran alleges that he was wrongfully terminated from his employment at AROG Pharmaceuticals, Inc. (AROG) and sued AROG, Videra Pharmaceuticals, Jain Investments, and Vinay Jain for violations of the Texas Payday Law, fraud, declaratory judgment, civil conspiracy, quantum meruit, unjust enrichment, and several counts of breach of contract and breach of fiduciary duty. The defendants filed a motion to dismiss counts 4, 5, 6, 7, 8, and 11[1] for lack of subject matter jurisdiction [Doc. No. 82]. For the reasons discussed below, the Court **GRANTS** the motion to dismiss and **DISMISSES WITHOUT PREJUDICE** counts 4, 5, 6, 7, 8, and 11 of the complaint.

---

[1] Count 4 seeks to correct the designation of inventorship on several patents developed by AROG. Counts 5, 6, 7, 8, and 11 are various civil conspiracy, breach of fiduciary duty, and breach of contract claims related to AROG's Long Term Incentive Unit Plan.

1

## I. Factual Background

AROG is a start-up pharmaceutical company that was formed to develop a drug for treating cancer with an anticancer agent known as Crenolanib. AROG is wholly owned by three business entities, who are each controlled by Vinay Jain. AROG hired Ramachandran in 2010, and sponsored his H-1B visa, to coordinate the testing efforts required to ferry its Crenolanib Cancer Drug through the Food & Drug Administration's approval process. Ramachandran began on an employment-at-will basis, but AROG later offered him term-of-year contracts. The most recent contract began in 2015 and would expire in 2019. The Crenolanib development process was largely successful and resulted in the creation of several patented methods and drug treatments. Each patent listed Jain as the sole inventor. But Ramachandran alleges he was a co-inventor of the patents and was the first person to consider using Crenolanib to treat leukemia and gastrointestinal cancer.

AROG maintained a Long-Term Incentive Unit Plan where it issued Units, which are worth some percentage of the company's worth if it is ever sold, to employees as an award for meeting goals. AROG awarded Ramachandran 250,000 Units during his employment. In 2017, AROG demoted Ramachandran. Afterwards Jain and AROG management allegedly threatened to terminate Ramachandran's employment unless he agreed to relinquish his 250,000 Units. Because AROG was Ramachandran's visa sponsor, termination could force him and his family to return to India. Jain allegedly used this fact and misrepresented the details of the visa process to pressure Ramachandran into compliance. Ramachandran refused, and

AROG terminated his employment in late February 2017. Ramachandran then sued the defendants, seeking performance or the value of his employment contract, performance or the value of his 250,000 Units, and a declaration that he is an inventor of the Crenolanib Cancer Drug patents.

## II. Legal Standards

Federal Rule of Civil Procedure 12(b)(1) authorizes the Court to dismiss a case for lack of subject-matter jurisdiction.[2] "When a Rule 12(b)(1) motion to dismiss is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."[3] This is so because it prevents a court without jurisdiction from prematurely dismissing a plaintiff's claim with prejudice.[4] A court may find lack of subject-matter jurisdiction in any of three instances: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."[5] The party asserting jurisdiction bears the burden of proof to establish that subject-matter jurisdiction exists.[6]

---

[2] FED. R. CIV. P. 12(b)(1).

[3] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Because the Court finds that it lacks subject-matter jurisdiction, it need not reach the 12(b)(6) motion to dismiss. Accordingly, the 12(b)(6) legal standard is omitted.

[4] *Id.*

[5] *Id.*

[6] *Id.*

3

A federal court's Article III jurisdiction is limited to "Cases" and "Controversies."[7] The doctrine of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.[8] Standing includes three elements.

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[9]

Similarly, the doctrine of ripeness is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."[10] Determining whether an issue is ripe for adjudication requires the court to evaluate "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."[11]  "[A] claim is not ripe for adjudication if it or a purported injury rests upon contingent future events that may not occur as anticipated or may not occur at all."[12]

### III. Analysis

#### A. Long-Term Incentive Plan

---

[7] U.S. Const. art. III, § 1.

[8] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[9] *Id.* at 560–61 (quotation marks and citations removed).

[10] *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993).

[11] *Nat'l Park Hosp. Ass'n v. Dept. of Interior*, 538 U.S. 803, 808 (2003).

[12] *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation marks removed).

The Long-Term Incentive Plan is an alternate compensation mechanism that awards "Units" to employees for meeting certain objectives. Each Unit entitles the holder to a payout "following the consummation of a Sale of the Company" equal to some percent of the sale price.[13] Unit holders are only eligible for a payout if they are continuously employed from the date credits were granted through the date the Units' final value is determined.[14] Exceptions to the continuous employment requirement only include instances of a bona fide leave of absence, simultaneous termination and reemployment, or death of the employee.[15] Any Participant who is not eligible for payment of a Unit forfeits their right to receive payment.[16] In instances of employee death, disability, or termination without cause, AROG has the option to cancel any vested Units and pay the holder the fair market value of the Units at the time of cancellation.[17] However, a termination for cause operates to automatically cancel the holder's Units without further consideration.[18]

The defendants argue that counts 5, 6, 7, 8, and 11, which revolve around alleged cancellation of Ramachandran's interest in or otherwise failure to pay according to the Plan, are not ripe because a "Sale of the Company" or "Public Offering" has not occurred and may never occur. Ramachandran maintains that a

---

[13] Doc. No. 83 at 51. Unit holders are also entitled to payment if the company undergoes a "Public Offering." *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.* at 53.

[18] *Id.*

"Sale of the Company" did occur during his employment, when AROG converted from a Limited Liability Company to a Corporation, or, alternatively, he is entitled to payment under the cancellation provision for terminations without cause.

> Under the Plan, a "Sale of the Company" occurs in the event of:
>
> (i) a change in ownership of the Company through a transaction or series of transactions, such that any Person other than a Member (as defined in the Limited Liability Company Agreement) is or becomes the beneficial owner (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of Capital Securities of the Company representing 50% or more of Capital Securities of the combined voting power of the Company's then outstanding securities; provided that, for such purposes, any initial public offering of or acquisition by the Company shall be disregarded;
>
> (ii) the sale or other disposition of all or substantially all of the Company's assets (determined on a consolidated basis) including by way of transfer of Capital Securities of, or merger or consolidation of or other similar event with respect to, its Affiliates or Subsidiaries, as applicable.[19]

The parties agree that proportional ownership in AROG never changed, rendering subsection (i) inapplicable. But because AROG's conversion into a corporation involved an "exchange" of membership interests in the LLC for common stock in the new corporation, Ramachandran argues the conversion amounts to a "transfer of Capital Securities of, or merger or consolidation of or other similar event."[20]

Even if this were true, subsection (ii) is not fulfilled simply when any transfer of securities occurs; it triggers when a "*sale* . . . of all or substantially all of the

---

[19] *Id.* at 57.

[20] *See* Doc. 101 at 11 ("In the 2014 conversion documents, AROG declares that the conversion involved an 'exchange' of ownership units: 'each outstanding membership interest of the Company [in AROG Pharmaceutical, LLC] shall . . . be converted into and exchanged for shares of common stock of the Corporation [in AROG Pharmaceuticals, Inc.].'").

Company's assets" occurs "*by way of* transfer of Capital Securities of, or merger or consolidation of or other similar event."[21]  Ramachandran provides no authority to suggest that a business conducting a proportional exchange of interests with its owners for the purpose of facilitating a shift in business form engages in a sale of assets under Delaware law.[22]  Because the sale requirement did not occur during Ramachandran's employment, he was not entitled to payment.

Nonetheless, Ramachandran contends that he was terminated without cause and was therefore entitled to payment equal to fair market value of his credits.  But this again misconstrues the terms of the plan.  The Plan states that Units issued to employees who are terminated by death, disability, or without cause remain outstanding for a period of time, but AROG has the option to cancel the Units within 18 months and pay the holder the fair market value.[23]  It is undisputed that AROG did not cancel Ramachandran's Units under this provision, and the time to do so

---

[21] Doc. 83 at 57 (emphasis added).  Further, transfers and exchanges are not substantially the same events.  To transfer is to "[t]o convey or remove from one place or one person to another; to pass or hand over from one to another, [] to change over the possession or control of."  *Transfer*, BLACK'S LAW DICTIONARY (11th ed. 2019).  An exchange, on the other hand, is "[t]he act of transferring interests, each in consideration for the other," but also "[t]he interchange or conversion of money" or "[t]he payment of a debt using a bill of exchange or credit rather than money."  *Exchange*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Transfers involve conveying ownership or interest from one person to another, whereas exchanges are focused on converting the subject into something with equivalent value.  An exchange might involve transfers, but the two are not the same.  In other words: all squares are rectangles, but not all rectangles are squares.

[22] Ramachandran's support this argument with a single case, which involves dissimilar facts, from a South Carolina state trial court opining on an essentially equitable application of Delaware corporate law.  The Court considers this authority to have no weight.

[23] Doc. 83 at 53.

expired.[24] Even if AROG terminated him without cause, Ramachandran's Units would remain outstanding.

Ramachandran has not yet suffered an injury because no event occurred that would trigger payment for his Units. Further, Ramachandran has not demonstrated that an injury is likely to occur soon or at all. Even if he retains ownership of his Units, they remain outstanding until a "Sale of the Company" occurs. There is no indication that the qualifying sale will happen soon or ever. And unless he is denied payment that he is rightfully due, Ramachandran will not have a concrete injury.[25] Because this contingent future event might never occur, Ramachandran's claims related to the Plan are not ripe and the Court lacks subject matter jurisdiction to adjudicate them.[26] Therefore, the Court GRANTS the motion to dismiss counts 5, 6, 7, 8, and 11.

## B. Patent Inventorship

35 U.S.C. § 256 "provides a cause of action to interested parties to have the inventorship of a patent changed to reflect the true inventors of the subject matter claimed in the patent."[27] The plaintiff must still meet the requirements for

---

[24] AROG never affirmatively cancelled the Units because it believed it terminated Ramachandran for cause, which would automatically terminate all Units without recourse. *Id.*

[25] Further, the Plan indicates that Ramachandran will never be entitled to a payment. In order for a Unit holder to be eligible for payment, they must be continuously employed by AROG from the time the Unit is awarded through the date the Units' value is determined, after a qualifying event. Doc. 83 at 51. Even if Ramachandran retains his Units and a sale of the company occurs, he will not meet this eligibility requirement. Thus, there is likely no state of the world where Ramachandran will be entitled to a payment related to the Plan.

[26] *See Texas*, 523 U.S. at 300.

[27] *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1471 (Fed. Cir. 1997).

standing.[28] Employees who assign inventions and patents to their employers do not have standing to sue under section 256 unless the assignment is rescinded or the employee reserved some related interest.[29] Mere claims of rescission, however, are not sufficient to create standing.[30]

The defendants argue that Ramachandran irrevocably assigned to AROG all his interest in any intellectual property created during his employment in a 2010 Nondisclosure and Intellectual Property Agreement.[31] Ramachandran argues that the 2010 agreement was illusory and unenforceable at its creation or was otherwise revoked by novation via a merger clause in his 2012 employment contract, and that the intellectual property assignment in his 2015 contract did not automatically assign his interests to AROG.

The Federal Circuit has established that a plaintiff who previously assigned his interests in a patent, without reserving some collateral interest, does not have Article III standing to seek correction of the patent's inventorship until the assignment is judicially rescinded.[32] *Larson v. Correct Craft, Inc.* involved a plaintiff seeking correction of inventorship because the patent assignments were allegedly

---

[28] *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1326 (Fed. Cir. 2009).

[29] *Id.* at 1327.

[30] *Id.* at 1326–27.

[31] Doc. 82 at 23.

[32] *Larson*, 569 F.3d at 1326. *See also Nolen v. Lufkin Indus., Inc.*, 466 F. App'x 895, 899 (Fed. Cir. 2012) (determining that plaintiffs claiming patent infringement and false marketing lacked standing because the claims were contingent on a court first rescinding the related assignment agreements); *Shum v. Intel Corp.*, 629 F.3d 1360, 1366 n.7 (Fed. Cir. 2010) (distinguishing from *Larson*, because no transfer or assignment occurred).

9

fraudulently induced.[33]  But because the plaintiff already transferred all of his interest in the inventions, he could not hold any interest in the patents unless a court first rescinded the assignment agreement.[34]  Because his ability to hold any cognizable interest in the patents was contingent on judicial rescission of the assignment agreement, the Federal Circuit determined that the plaintiff lacked standing to correct inventorship, and the district court was incapable of even exercising supplemental jurisdiction over the rescission claim itself.[35]  Here, Ramachandran's interest in the Crenolanib patents is similarly contingent on his ability to judicially rescind the 2010 Nondisclosure and Intellectual Property Agreement.[36]

Ramachandran nonetheless argues that the Federal Circuit's holding in *James v. J2 Cloud Services, LLC*[37] establishes standing in this case because he disputes the 2010 assignment.  But *James* is clearly distinguishable.  *James* involved an ostensibly factual dispute as to what interests a valid assignment agreement specifically did or

---

[33] *Id.* at 1322.

[34] *Id.* at 1326–27.

[35] *Id.  Contra Chou v. Univ. of Chicago*, 254 F.3d 1347, 1355–59 (Fed. Cir. 2001) (determining that, despite a valid assignment of her inventions to the university, the plaintiff possessed standing to seek correction of inventorship because she reserved a "concrete financial interest" within the agreement that the inventorship designation affected).

[36] Ramachandran also argues that the intellectual property assignment on his 2015 employment contract was not an automatic assignment of ownership and instead was merely a promise to assign ownership later, an obligation that Ramachandran never performed and now maintains he is free from obligation to perform.  But this issue is still contingent on rescinding the 2010 Assignment.  Otherwise the 2010 Assignment automatically assigned to AROG his interest in any intellectual property created after the 2015 Employment Agreement.

[37] 887 F.3d 1368 (Fed. Cir. 2018).

did not assign.[38] Here, however, Ramachandran only disputes the legal validity or enforceability of an assignment agreement that undisputedly assigned all his intellectual property interests to AROG. This falls squarely in the ambit of the rule detailed in *Larson*, and Ramachandran consequently lacks Article III standing to challenge inventorship under section 256 until he first obtains rescission of the 2010 Assignment. Accordingly, the Court GRANTS the motion to dismiss count 4.

## IV. Conclusion

For the foregoing reasons the Court **GRANTS** the motion to dismiss for lack of jurisdiction. The Court **DISMISSES WTHOUT PREJUDICE** counts 4, 5, 6, 7, 8, and 11 of the complaint.

**IT IS SO ORDERED** this 15th day of December, 2020.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[38] *Id.* at 1373–75.