IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
(DALLAS DIVISION)

| | | |
|---|---|---|
| ABHIJIT RAMACHANDRAN | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:18–cv–00811 |
| | § | |
| VINAY JAIN | § | |
| AROG PHARMACEUTICALS, INC. | § | |
| JAIN INVESTMENTS, LLC | § | |
| | § | |
| Defendants. | § | |

JOINT PRE-TRIAL ORDER

Pursuant to this Court's Pre-Trial Order, the plaintiff, Abhijit Ramachandran ("**Abby,**" "**Abhijit,**" and "**Plaintiff**"), and the defendants, Dr. Vinay Jain ("**Dr. Jain**") and AROG Pharmaceuticals, Inc. ("**AROG**")[1] (Dr. Jain and AROG are collectively the "**Defendants**"), hereby file this Joint Pretrial Order.[2] The parties have sought to organize this document in a manner that will make it easy for the court and the attorneys to separate out the different components into separate sections that are easy to separate and reference during the trial. Any contested issues to resolve before the trial are highlighted below.

### A. Summary of Claims and Defenses

a. **Plaintiff's Position**. Plaintiff's summary of claims and defenses is attached hereto as Exhibit 1.

---

[1] AROG believes that summary judgment was granted in its favor for fraud by the Court on January 11, 2022. [Dkt. No. 172]. Therefore, AROG does not believe it is a party to this lawsuit. Should the Court find that it did not grant summary judgment in AROG's favor as to the fraud claim, AROG submits this Joint Pre-Trial Order.

[2] Defendants file this Joint Pre-Trial Order subject to the Court's rulings on Defendants' Motions in *Limine*, which are being filed on August 1, 2022 per the Court's Amended Scheduling Order. Defendants are not intending to waive any of their arguments as to the exclusion of any evidence, statements, testimony or arguments contained within their Motion in *Limine*.

    b. **Defendant's Position**. Defendants' summary of claims and defenses is attached hereto as Exhibit 2.[3]

    c. **Issue for Court to Resolve**. There is an issue about which claims and parties have survived the various motions to dismiss related to Plaintiff's claims.

        i. **Plaintiff's Position**. Plaintiff contends that he has his fraud claim against both Dr. Jain and AROG. Plaintiff's argument to support his position is attached hereto as Exhibit 3.

        ii. **Defendant's Position**. Given the Court's ruling on the Motion for Summary Judgment, Defendant contends that Plaintiff has only his fraud claim against Dr. Jain.

B. **Statement of Stipulated Facts**. The agreed statement of stipulated facts is attached hereto as Exhibit 4.

C. **Witness List**. Plaintiff submits its witness list as Exhibit 5. Defendants submit their witness list as Exhibit 6.

D. **List of Contested Issues of Fact**. The list of contested facts is attached hereto as Exhibit 7.

E. **List of Contested Issues of Law**. The list of contested issues of law is attached hereto as Exhibit 8.

F. **Estimated Time of Trial**. This Court has already set the time for each party to present its case before the jury at 10 hours for each side, including opening statements and closing arguments. Plaintiff would respectfully request an opportunity to discuss this matter briefly with the Court at the pre-trial hearing.

G. **List of Additional Matters that May Aid the Court**.

    a. **Procedural History**. Defendants wish to submit a history of the procedural matters ruled on in this case, which is attached hereto as Exhibit 9.

    b. **Matters of Judicial Notice**. Plaintiff would submit a list of matters that it will request the Court to take judicial notice of related to certain exhibits and stipulated facts. This list is attached hereto as Exhibit 10.

---

[3] Defendants will be nonsuiting its two (2) breach of contract claims for breach of intellectual property agreement breach of the 2015-2017 Employment Agreement.

Joint Status Report

H. **Proposed Jury Charge**. The parties submit their **agreed** proposed jury charge as Exhibit 11. The Plaintiff's contested jury charges are attached hereto as Exhibit 12 (Plaintiff's Contested Charge) and the Defendant's contested jury charges as attached hereto as Exhibit 13 (Defendants Contested Charge). Defendants' objections to Plaintiff's contested jury charge as attached hereto as Exhibit 14. The parties agree to continue working on the agreed jury charges as the case progresses. As outlined in Defendants' Pre-Trial filings herein, Defendants believe that all issues related to AROG's Declaratory Judgment counterclaim have been decided by the Court as a matter of law in its December 15, 2020 Memorandum and Order on Defendants' Motion to Dismiss [Dkt. No. 153] and the January 11, 2022 Memorandum Opinion and Order on Defendants' Motion for Summary Judgment [Dkt. No. 172]. To the extent that Court determines otherwise, the parties will work together to form the appropriate jury charge on AROG's declaratory judgment counterclaim.

I. **Interrogatories/Voir Dire Questions.** Plaintiff submits his interrogatories as Exhibit 15 and Defendants submit their interrogatories as Exhibit 16.

J. **Status of Settlement Negotiations.** The parties have mediated this case and engaged in multiple settlement conferences. They have been unable to reach a settlement in this matter.

K. Trial Briefs. Defendants submit their trial brief as Exhibit 17.

**Number of Jurors: 8**. The parties would respectfully request <u>eight jurors</u> for its civil jury trial.

*Respectfully submitted jointly by the following,*

---

**Jennifer L. Graf, Esq.**
State Bar No. 24043699
Gilbert, Graf & Hindman, P.C.
209 E. Main Street
Waxahachie, Texas 75165
Phone: (972) 330-2775
Fax: (214) 960-4140
Email: Jennifer@GGHLaw.com
**COUNSEL FOR DEFENDANTS**

**John P. Walsh, Esq.**
Texas Bar No. 24048867
jwalsh@wadelaw.com
12700 Preston Road, Suite 265
Dallas, Texas 75230
C. 214-773-9167
T. 214.346.2946
F. 214.346.2947
**ATTORNEY FOR THE PLAINTIFF**

---

**Judge Bradtley Starr**

August 12, 2022

Joint Status Report

EXHIBIT 1

## SUMMARY OF PLAINTIFF'S CLAIMS AND DEFENSES

*Plaintiff's Affirmative Claim*

### A.  PLAINTIFF'S FRAUD CLAIM AGAINST DR. JAIN AND AROG

1.  **Fraudulent Inducement Claim**. Abby contends that Dr. Jain falsely promised him a share of the long-term growth in AROG—via 250,000[4] units under AROG's 2010 Long Term Incentive Units Plan (the "**2010 LTIU Plan**")—once AROG reached Phase III of the FDA Approval Process. Relying on these promises by Dr. Jain, Abby worked tirelessly to get AROG into Phase III by October 2016. When AROG attended the annual American Society of Hematology (ASH) Conference in December 2016, AROG announced to the cancer world that AROG had a cancer drug in Phase III. Dr. Jain, who missed most of the event due to sickness, thanked Abby for picking up the slack and making it "AROG's greatest ASH." Shortly after this conference, AROG notified immigration officials that Abby was a "valuable employee" who continually took on "additional responsibilities and duties" and that AROG intended to employ him through July 2020. But everything changed over the next 45 days when Abby refused to relinquish his 250,000 LTIU units after Dr. Jain and AROG threatened to terminate him unless he gave up the units for nothing. When Abby refused to give up his financial stake in AROG, Dr. Jain terminated Abby without cause and effectively canceled his 250,000 LTIU units. Dr. Jain intentionally and maliciously dishonored his promises to Abby shortly after Abby got AROG into Phase III.

2.  ~~**Vicarious Liability**. Dr. Jain is personally liable for his fraudulent statements to Abby. Because Dr. Jain made these statements in his capacity as AROG's CEO and for the benefit of AROG, Abby can establish, as a matter of law, his fraud claim against both Dr. Jain personally and AROG vicariously.[5] Defendants have argued that Plaintiff's fraud claim against AROG was dismissed on summary judgment. But this is not true. The~~

---

[4]    The 250,000 units were given at four separate times. Most of these units—185,000 units—were given when Dr. Jain made his false promises to Abby in 2012 to induce him to remain at AROG to get it into Phase III.

[5]    The fraud claim against both Dr. Jain and AROG was made clear in Abby's **first** paragraph of his Third Amended Petition: "Since AROG's formation in 2010, Jain, AROG's founder and majority shareholder, has made false representations to Abby that, inter alia, AROG would provide Abby with a piece of the financial upside associated with Abby's work on developing AROG's new cancer drug...In making these false representations, Jain induced Abby to work endless hours to obtain the requisite approval for this cancer drug through the U.S. Food and Drug Administration's arduous approval process.... To effectuate this false promise, AROG ostensibly awarded Abby 250,000 units pursuant to the AROG LTIU Plan... But neither Jain nor AROG ever intended to honor their promises associated with the issuance of these 250,000 Investment Units; they were false representations from the instant they were uttered by Defendants. Relying on these fraudulent misrepresentations, Abby worked tirelessly over the next seven years—oftentimes more than 80 hours in a week—to successfully maneuver this new drug into the critical 'Phase 3' of the FDA Approval Process."

~~Court dismissed the fraud claim related to Plaintiff's employment contract. The Court did not dismiss the fraud claim related to AROG's 2010 LTIU Plan: "The Court DENIES the motion as to Ramachandran's fraud claim concerning the 2010 LTIU Plan." There was no issue about AROG's liability because Plaintiff can show, as a matter of law, that AROG is vicariously liable for the fraudulent actions of Dr. Jain.~~

3. **No Intention to Honor Promises.** As part of his claim, Abby must prove that Dr. Jain never intended to honor his promises related to the 2010 LTIU Plan when he made those promises. Under Texas law, Abby can present Dr. Jain's actions taken after the promises were made to show that he never intended to honor them. Abby intends to offer the following evidence to prove this:

   (a) **Dr. Jain's Lack of Knowledge in 2012 re: Vesting Rights and IPO Trigger**. When Dr. Jain made his false promises to Abby, he had limited knowledge about the terms and conditions of the 2010 LTIU Plan. While he understood how the plan would trigger a payout from the proceeds from a "Sale of the Company" and that the units would take five years to vest, he was unfamiliar with many of the other key provisions in the 2010 LTIU Plan. To illustrate, when Dr. Jain was pressed on his understanding about whether Abby's "vested" units "remained outstanding" if he was terminated "without cause," Dr. Jain claims testified he never thought about it: "It was absolutely not something I even thought for one second." When he spoke about the trigger on the plan, he repeatedly testified that the plan was intended to trigger a payout in the event of a Sale of the Company. In 2012, he did not know that an IPO would also trigger a payout.

   (b) **False Pretext About Adopting the 2014 LTIU Plan**. Dr. Jain adopted a new long-term incentive unit plan in 2014 to replace the 2010 plaintiff (the "**2014 LTIU Plan**"). After Dr. Jain adopted the 2014 LTIU Plan, Greg Fisher, an employee of Jain Investments, spoke with Abby to convince Abby that he needed to convert his units under the 2010 LTIU Plan to units under the 2014 LTIU Plan. Fisher told Abby that he would face tax consequences unless he made the conversion. Indeed, both Dr. Jain and AROG's general counsel, Edward McDonald, have testified that the only material change between the 2010 and 2014 plans were the changes necessary to eliminate a tax issue for Abby. But a review of the 2014 LTIU Plan shows that it is materially different from the 2010 LTIU Plan in the following ways: to wit, (1) the 2014 LTIU Plan eliminated all special rights applicable to the "vested" units, including the explicit right under the 2010 LTIU Plan that such "vested" units shall "remain outstanding" if Abby was terminated without cause; (2) the 2014 LTIU Plan eliminated the public offering trigger that was contained in section 6 of the 2010 LTIU Plan; (3) the 2014 LTIU Plan eliminated Abby's right to a payout based on an "assumed" Sale of the Company; (4) the 2014 LTIU Plan eliminated the set mathematical formula for calculating a payout by

Joint Status Report

authorizing Dr. Jain complete discretion to determine a calculation formula at the time of a sale that could be fully offset; and (5) the 2014 LTIU Plan allowed Dr. Jain absolute authority to materially modify the plan without Abby's consent. There is practically nothing in common between the 2010 LTIU Plan and the 2014 LTIU Plan. Even the purpose for each plan is exceedingly different. For instance, if Abby had converted his units to the 2014 LTIU Plan, he would have forfeited his right to a payout in the event of an IPO that sold less than 50% of AROG's equity. By falsely telling Abby that the only change between the plans was related to a tax issue, Abby can show that Dr. Jain and AROG never intended to honor their promises to him under the 2010 LTIU Plan.

(c) **Real Reason Dr. Jain adopted the 2014 LTIU Plan**. To prove that Dr. Jain's pretext for the 2014 LTIU Plan was false, Abby can present the real reason why Dr. Jain adopted a new LTIU Plan in 2014: the DeMaggio Lawsuit. In February 2013, Dr. Jain was sued by Annemieke DeMaggio after Dava Oncology, a company founded by Dr. Jain and DeMaggio, terminated her without cause and canceled her "vested" LTIUs without paying her for the units. After litigating this matter for almost a year, Dr. Jain eventually agreed to pay DeMaggio's $220,000 for the right to cancel her vested LTIUs. Dr. Jain made this payment in the early part of 2014. Within months of paying this settlement, Dr. Jain adopted the 2014 LTIU Plan. This is not a coincidence. If DeMaggio's LTIU units were issued under a plan that corresponded to the terms and conditions of the 2014 LTIU Plan, DeMaggio's claims would have failed as a matter of law because the 2014 LTIU Plan permits AROG to terminate an employee without cause to effectively cancel the employee's LTIU units. In other words, if Dr. Jain terminated Abby without cause, the 2014 LTIU Plan would prevent Abby from making the same claims that DeMaggio made. Because Dr. Jain never intended to honor his promises to Abby, the 2014 LTIU Plan provided Dr. Jain with significant leverage to push Abby out once AROG got into Phase III.

(d) **Dr. Jain's Deceitful Intent for Adopting 2014 LTIU Plan**. Abby can show that the only intent for the adoption of the 2014 LITU Plan was to trick Abby into accepting a new plan that eliminated two key provisions of the 2010 LTIU Plan: (1) Abby's right to have his "vested" units remain outstanding if he was terminated without cause; and (2) Abby's right to recover payment in the event of an IPO. When Dr. Jain made his promises to Abby, he claimed that he was not familiar with Abby's rights to retain his vested units after he was terminated without cause. But Dr. Jain learned about these rights when he was sued by Annemieke DeMaggio in 2013. In her complaint, DeMaggio claimed that Dr. Jain made false promises to her about her vested units under an LTIU Plan when she was fired without cause and had her units canceled. After a year of litigation, Dr. Jain agreed to pay DeMaggio $220,000 for the right to cancel her LTIU units. Within a few months,

Joint Status Report

Dr. Jain adopted a new LTIU Plan for AROG that eliminated any post-contractual rights in vested units and the IPO trigger. Because it was the DeMaggio lawsuit that prompted Dr. Jain to adopt the 2014 LTIU Plan—and not his concern for Abby's potential tax liability—this lawsuit is highly probative to prove Dr. Jain's deceitful intent.

(e)   **Attempt to get Tyler Brous to Trick Abby**. In addition to Fisher's attempt to get Abby to convert to the 2014 LTIU Plan, Dr. Jain spoke with Tyler Brous and requested that Brous talk with Abby about accepting the terms of a different LTIU plan that did not contain an IPO trigger. Dr. Jain essentially wanted Brous to do what Fisher failed to do. According to Brous, Dr. Jain did not want Abby to get a payout in the event of an IPO. But Brous refused to "trick" Abby because he felt it was very unfair.

(f)   **Threats tied to his H-1B Visa.** At the end of January 2017, Dr. Jain met with Abby to discuss his status with AROG. According to Abby, Dr. Jain told him that Abby was on "thin ice" because he was too concerned with his financial stake in AROG. He reminded Abby that his "life in the United States" was all because of Dr. Jain. After this meeting, Fisher and Kohler met with Abby and told him that he needed to convince Dr. Jain that he cared more about AROG and his LTIU, suggesting that Abby prove his loyalty to AROG by relinquishing his 250,000 units for nothing. Abby rebuffed their suggestion.

(g)   **Offer that he Cannot Refuse**. Within a week of Abby refusing to give up his LTIU units, Fisher and Kohler met Abby outside the office to tell him that AROG would terminate his employment. If Abby agreed to relinquish his 250,000 LTIU units for nothing, AROG would agree to honor the last six months of his term employment contract, paying him the salary and benefits that he was already owed. AROG would also "allow" him to spend the remaining six months of the contract looking for a new employer to sponsor his work visa. If, however, Abby refused to give up his 250,000 LTIUs, AROG would terminate him immediately, report him to immigration officials, and effectively force him and his wife back to India immediately. On this last point, AROG stressed that Abby would only have a 10-day "buffer" period to return to India, not enough time to find a new employer. But six months, they argued, would give him the time necessary to find a new employer so that he could stay in the United States. The cost for these six months was his financial stake in AROG. This evidence is sufficient to show that Dr. Jain and AROG never intended to honor their promises with the 2010 LTIU Plan.

(h)   **Other Acts Evidence**. Abby can present other acts of fraud to show that Dr. Jain intentionally and maliciously defrauded Abby. This evidence is outlined in greater detail in Plaintiff's Motion in Limine.

**Plaintiff's Defense to AROG's Declaratory Judgment: 2010 LTIU Plan**

    (i)   **Summary of AROG's Claim**:

        (i)   **No Recovery without a Sale of the Company**. "AROG contends that Ramachandran has no current right to receive payment in connection with the long-term incentive units because there is no right to receive payment with respect to the long-term incentive units until after there has been a Sale of the Company.

        (ii)  **No Right to Recovery after Termination Without Cause**. Moreover, AROG contends that Ramachandran cannot receive payment in the future with respect to the long-term incentive units upon a Sale of the Company because the termination of Ramachandran's employment rendered him ineligible to participate in the distribution of Available Funds at any point in the future."

        (iii) **Units were Canceled because Abby was Terminated for Cause**. "While there are limited circumstances in which payment of Fair Market Value may be required upon the cancellation of a Participant's long term incentive units, those circumstances do not arise when there has been a termination for Cause."

    (j)   **Defenses**.

        (i)   **Sale Company is <u>not</u> the Sole Trigger for Payment**. In its declaratory judgment claim, AROG argues that Abby has not "present right to receive payment for the long term incentive units because there has not been a Sale of the Company, which is a condition precedent to recipient of payment for the long term incentive units." This is false. Under the 2010 LTIU Plan, Abby could be paid under three scenarios: (1) Sale of the Company; (2) an IPO, and (3) cancellation of "vested" units after termination without cause. Before Abby was terminated, there were two triggers in place for Abby to be paid: Sale of the Company and IPO. After Abby was terminated without cause, he remained eligible to be paid on his units under all three triggers. AROG's declaration sought would misrepresent Abby's full rights earned under the 2010 LTIU Plan because it would deny his rights to recover after his termination in the event of an IPO or a post-contractual termination.

        (ii)  **There is no Eligibility Requirement for Payment for Vested Units.** AROG argues that Abby's rights to recover under the 2010 LTIU

Plan were "forfeited" after he was terminated, even if he was terminated without cause. AROG's argument hinges on their claim that section 5(b) holds that all "**granted units**" are "forfeited" unless the employee is continuous employed upon to the Determination Date upon which the proceeds of a Sale of the Company are paid. But this construction of the contract would nullify a number of other express provisions that provide specific protections for "granted units" that "vest" over time. For these vested units, there is no requirement for continued employment. Yet, while AROG's general counsel, Edward McDonald, acknowledges that vested units have specific protections, he claims that Section 5(b) nullifies all those protections. Because AROG's interpretation of the 2010 LTIU Plan would nullify all the rights associated with "vested" units, this Court should reject that argument because Texas courts are charged with interpreting contracts to the extent permissible to give all provisions some effect. Here, this Court should hold that Section 5(b) applies only to "granted units" in the event of a Sale of the Company, while section 10(a) applies to "vested" units. Moreover, the provisions of section 5(b) should not apply to the IPO trigger provisions in Section 6 because section 5 specifically excludes any application to IPO: "Except for payments which may be made in the Administrator's discretion pursuant to Section 6 below, no payments shall accrue or be made in respect of any Units unless and until the Determination Date following the consummation of a Sale of the Company." Because of this provision, Defendant cannot apply section 5(b) to section 6.

Joint Status Report

EXHIBIT 2

**Ramachandran's Remaining Claim Against Defendants According to Defendants**

Dr. Jain, AROG's founder and Chief Executive Officer, first met Ramachandran in February 2010 when Ramachandran applied for an internship.  At that time, Ramachandran was only 24 years old and had just completed a degree in December of 2009 in biomedical engineering focused on molecular modeling and gene sequencing at University of Texas at Arlington through a temporary academic student visa, formally known as the F-1 Nonimmigrant Student Visa, following his initial studies in India.

Ramachandran began his internship with Dr. Jain on February 2, 2010 earning Fifteen Dollars per hour ($15.00/hr.) under a temporary extension of his student visa for Optional Practical Training ("OPT"), which allows foreign students to stay in the United States and obtain practical, hands-on experience following the classroom portion of their education.  OPT for students with similar educational backgrounds as Ramachandran could extend for up to 29 months at the company's election.  This training was essential for Ramachandran, who lacked any prior education or work experience in oncology drug development or the pharmaceutical industry in general.

Ramachandran remained in this training extension of his student visa until Dr. Jain and AROG retained Fragomen, a leading global immigration law firm, to facilitate the sponsorship and of Ramachandran's his first temporary work visa – referred to as an "H-1B" visa – that became effective on January 31, 2011.  Importantly, AROG and Dr. Jain elected to complete this filing within the 2010 calendar year instead of waiting until the training period was closer to expiring in 2011.

Indeed, AROG sponsored the initial and subsequent extensions of Ramachandran's temporary (non-immigrant) work visa within the H-1B category while simultaneously sponsoring

Ramachandran's lawful permanent residency in the United States, which is commonly referred to as becoming a "Green Card" holder. AROG obtained the market wage paid to similarly employed workers – known as the "prevailing wage" – for Ramachandran's positions during his employment with AROG from the Department of Labor (which utilized the Occupational Employment Statistics (OES) survey) by virtue of Labor Condition Applications for Nonimmigrant Workers (ETA Form 9035). Ramachandran carefully reviewed, consented, understood the prevailing market wage for his position as established by the Department of Labor, and where required, signed each of these applications that AROG filed on his behalf.

In January 2011, approximately 13 months after Ramachandran completed his classroom studies and as he was completing his initial hands-on training through OPT, the Department of Labor determined that the prevailing wage for Ramachandran's position for the first three years of his employment with AROG would be $42,619 (i.e., from January 2011 to January 2014) as AROG filed for Ramachandran's initial temporary work visa (H-1B). AROG had already raised Ramachandran's salary to $45,000 per year as of December 1, 2010 and was already providing Ramachandran an above-market wage.

Following AROG's initial securing of Ramachandran's temporary work visa, Ramachandran returned to India where he was married on November 11, 2011. Dr. Jain and AROG were supportive of Ramachandran and his family's personal goals, and with this in mind, began discussing engaging in a lengthy and costly process to sponsor Permanent Residency (commonly referred to as a "Green Card") for Ramachandran which could also be extended to his spouse. Through this endeavor, not only would Ramachandran no longer need to maintain a temporary work visa, but his wife could also pursue educational and vocational pursuits through a temporary visa known as

Joint Status Report

an "H4 Visa."  Ramachandran's spouse moved to the United States in March 2012 and, over the following years, obtained an advanced business degree and gained meaningful employment with a US-based employer through an Employment Authorization Document that was enabled by the successful submission of a Permanent Residency application for Ramachandran.

In parallel with discussions on initiating a Permanent Residency filing, AROG also engaged Ramachandran in discussions concerning his personal goals, professional goals, and compensation that would be captured in a multi-year employment agreement.  Two iterations of these "wish lists" have been discovered by AROG on automatic file backups from Abhijit's work computer.  The final iteration was developed in June 2012 where Ramachandran envisioned modest annual salary increases not to exceed 3%, performance-driven cash bonuses, AROG's continued sponsorship of his Permanent Residency process and, importantly, another grant of 50,000 LTIUs to be followed by subsequent performance-driven LTIU grants. As you will see below, AROG greatly exceeded Abhijit's most ambitious requests over the next five years.

Ramachandran's initial annual salary in the July 2012 Employment Agreement was $85,000 and his annual salary and bonus as of at the conclusion of the temporary work authorization period in January 2014 was $113,000, as agreed upon in a new employment agreement on May 1, 2013, approximately 2.5 times the established prevailing wage established by the Department of Labor and far more than the modest 3% raise from his wishlist.  In addition to the above-market salary provided to Ramachandran in the July 2012 Employment Agreement, he also received 185,000 LTIUs in the Agreement, more than three times the number of LTIUs he had envisioned for himself in his wishlist.

Joint Status Report

Through the same methodology on September 18, 2013, the Department of Labor again accessed the prevailing wage for Ramachandran's position and found that it would be $89,835 for Ramachandran's 3rd – 6th years of employment with AROG (i.e., from January 2014 through January 2017) as AROG filed to extend Ramachandran's temporary work visa (H-1B). Ramachandran's initial annual salary in the July 2014 Employment Agreement was $113,000. Ramachandran's annual salary and bonus as of January 2017 was $170,000, nearly 2 times the established prevailing wage. Ramachandran again received additional LTIUs of 50,000 in addition to above market salary in this agreement.

In June of 2014, the Department of Labor accessed the prevailing wage for Ramachandran's position and found that it would be $115,520 when AROG initiated sponsorship of Ramachandran's lawful permanent residency, or Green Card, in the United States. Ramachandran's annual salary and bonuses in 2014 amounted to $134,000. Ramachandran began dual-master degrees in business and finance in the Spring of 2014 at the University of Texas at Dallas and did not inform Dr. Jain or any other management at AROG.

In 2016 the Department of Labor utilized the same methodology to access prevailing wage for Ramachandran one last time and determined an appropriate annual wage of $147,118 from the period of January 2017 through January 2020 as AROG filed for what would be the final extension of Ramachandran's temporary work visa (H-1B). As provided above, Ramachandran's annual salary and bonus for 2016 was $170,000 total ($154,000 and $16,000, respectively), significantly above even the projected future market rate for his position.

As provided above, in the seven years after beginning his career as an intern, Defendants gave Ramachandran the American Dream, including an expedited pathway for employer-sponsored

U.S. citizenship for Ramachandran and his wife, a six-figure salary when Ramachandran was only 27 years old, additional annual raises that consistently and significantly exceeded the market wage established by the U.S. Department of Labor, and large annual bonuses.  Defendants also generously provided Ramachandran with Long Term Incentive Units ("LTIUs") in AROG subject to the AROG 2010 Long Term Incentive Plan (the "Plan") in excess of his written desires.

Ramachandran filed this lawsuit on April 3, 2018, over a year after he was terminated on February 21, 2017. [Dkt. No. 1].  Initially, Ramachandran simply sued for breach of his employment contract.  [Id.].  Ramachandran subsequently filed his First Amended Petition on May 16, 2018, his Second Amended Petition on February 19, 2019, culminating in his Third Amended Petition on March 5, 2019, in each of which he added more claims, defendants, and alleged "facts".  [Dkt. No. 46][6].  The Third Amended Petition named four (4) defendants and asserted eleven (11) causes of action.  [Id.].  The Court, through Defendants' Motion to Dismiss for Summary Judgement has dismissed eight (8) causes of action and the Ramachandran has voluntarily dismissed two (2) causes of action.

Now, more than four years after Ramachandran filed his lawsuit, all that remains of his tortured attempts to try to conjure up legal theories of how Dr. Jain, AROG, Jain Investments, LLC ("Jain Investments") and/or Videra Pharmaceuticals, LLC ("Videra") were liable is a single cause of action for fraud against Dr. Jain, individually, related to the grant of LTIUs in AROG subject to the Plan.

---

[6] Plaintiff's motion requesting leave to file his Fourth Amended Complaint was denied by the Court on August 12, 2019.

Joint Status Report

Ramachandran signed four separate agreements where he received LTIUs subject to the Plan: (1) January 28, 2011; (2) September 16, 2011; (3) July 30, 2012; and (4) July 30, 2014. Despite clear contractual terms that Ramachandran accepted before issuance of the LTIUs, Ramachandran now claims that Dr. Jain committed fraud in 2012 when he (1) told Ramachandran that the LTIUs could provide a piece of the financial upside of AROG, (2) told Ramachandran about the Plan, and (3) used examples of difference scenarios on the potential value of each LTIU.

Ramachandran asserts this spurious claim of fraud in 2012 despite signing two Long Term Incentive Plan Award Agreements in 2011 where he twice acknowledged that he had "received a copy of the Plan, [the] opportunity to review the Plan and agree[d] to be bound by all of its terms and provisions." Ramachandran's wish list from June 22, 2012 – approximately one month before the July 30, 2012 grant – also envisioned an immediate grant of a substantial number of LTIUs *and* the opportunity to earn more LTIUs over time linked to successful performance of his duties. Moreover, the supposed fraud in 2012 did not deter Ramachandran from bargaining for an additional large grant of LTIUs in his 2014 Employment Agreement, despite the passing of two years to cure, address, or event attempt to investigate the alleged previous fraud. Rather than committing fraud, Dr. Jain fulfilled and exceeded Ramachandran's desire for additional LTIUs in 2012 and again in 2014 when he bargained for, and received, his final tranche of LTIUs.

In addition, any allegedly fraudulent statements made by Dr. Jain concerning AROG's projected current and future potential value would have been weighed by Ramachandran against his actual knowledge of the valuation of AROG. In 2012, AROG engaged Joachim Gruel, Ph.D., MBA, a biotech valuation expert who founded Bioscience Valuation BSV GmbH ("Bioscience") to provide a net present value, or NPV, of AROG. Due to Ramachandran's diligent work with Bioscience, this

Joint Status Report

exercise was completed in February 17, 2012, approximately five months before the Effective Date of Ramachandran's 2012 Employment Agreement.  Indeed, not only did Ramachandran have a copy of the completed valuation when negotiating his 2012 Employment Agreement, he coordinated the project for AROG and was the primary point of contact for all necessary information to complete the valuation exercise.  Therefore, Ramachandran was aware that AROG had a projected net present value of $41 million for crenolanib's development in glioma, $24 million for crenolanib's development in AML, and $16 million for crenolanib's development in glioma which, together with assumptions regarding the valuation for non-major markets, made AROG worth approximately $100 million when he bargained for his 2012 Employment Agreement and LTIUs.  He was also aware that the experts at BSV forecasted (i) a 30% chance that AROG's drug candidate, crenolanib, would fail in its leading indication, Acute Myeloid Leukemia, before it entered human clinical trials (i.e., no patients had been treated) and (ii) another 50% - 65% chance that crenolanib would fail early clinical studies in AML and other types of cancer).  Moreover, the Bioscience's valuation details that securing outside funding to develop crenolanib is not guaranteed, regardless of stage of development, and *does not* state that a Sale of the Company or even an initial public offering (whereby the administrator would have the option to convert LTIUs into capital securities) be ensured or even more probable if crenolanib were to reach Phase 3 clinical studies.

Furthermore, Ramachandran has admitted that the allegedly fraudulent statements made by Dr. Jain were consistent with the written language of the Plan itself, and Ramachandran has also admitted that he did not think there was anything false about Dr. Jain's statements.

Despite his consistent above-market compensation, first-hand knowledge of the independent valuation and risks of AROG and crenolanib in 2012, bargaining for a large amount of additional

LTIUs two years later after the purported fraud occurred, and these damaging and potentially dispositive admissions by Ramachandran, he nonetheless maintains this fraud claim[7] against Dr. Jain and will now seek to have a jury award him millions of dollars, even though a triggering event for such payout has not occurred and he fails to meet the eligibility requirements even if such an event were to occur.

Defendants incorporate by reference their Trial Brief and all arguments contained therein as if incorporated with this Joint Pre-Trial Order.

Defendants also assert affirmative defenses that Plaintiff's claims are barred in whole or in part on/by (1) ripeness grounds, the doctrine of estoppel, laches, waiver, fraud, unclean hands, offset, accord and satisfaction, ratification, mitigation of damages and failure to mitigate damages.

### b.    AROG's Counterclaim According to AROG.

AROG maintains an active counterclaim against Ramachandran for declaratory judgment regarding disposition of the 250,000 LTIUs at issue in this case.  During Ramachandran's employment, AROG issued to him a total of 250,000 Units under the Plan that was promulgated when AROG was still an LLC.  The Plan contains specific language regarding monetization of the LTIUs as follows: (1) the Plan's administration is in the sole discretion of the Administrator; (2) triggering events for a payment; (3) eligibility requirements for payout; (4) definition of the sale of AROG; (5) definition of the date on which payout shall be made; (6) employment requirements for payout; (7) examples of how payout occurs; (8) specific provisions about when a payout shall be made

---

[7] While asserted as a fraud claim, the Plaintiff subsequently characterized his fraud claim as a "fraudulent inducement claim" centering around the alleged promises that, Ramachandran says, Dr. Jain had no intention of performing in connection with a contract, specifically, the Plan.  As such, the Court interpreted Ramachandran's fraud claim as a fraudulent inducement claim.

Joint Status Report

if AROG is sold; (9) the administrator's option to convert LTIUs into capital securities in the event of an Initial Public Offering ("IPO") of AROG; (10) effect of termination for cause on LTIUs; and (11) effect of cancellation of LTIUs.

After AROG converted to an S-corporation, it issued a new Long Term Incentive Unit Plan (the "2014 Plan") that was calculated to cure potential negative tax consequences for Participants in the Plan. This 2014 Plan did not obviate the 2010 LTIU Plan and both continued forward at AROG. Seemingly suspicious of the conversion to a new plan, Ramachandran refused to exchange his Units under the original 2010 Plan for new units under the new 2014 Plan. As such both the 2010 Plan and 2014 Plan existed at AROG. Ramachandran elected to keep his LTIU Units under the 2010 Plan.

As this Court has already ruled "the Plan indicates that Ramachandran will never be entitled to a payment. In order for a Unit holder to be eligible for payment, they must be continuously employed by AROG from the time the Unit is awarded though the date the Units' value is determined, after a qualifying event. [Docs. 83 and 51]. Even if Ramachandran retains his units and a sale of the company occurs, he will not meet this eligibility requirement. Thus, there is likely no state of the world where Ramachandran will be entitled to a payment related to the Plan." (Dkt. No. 153 at note 25).

In as much as Ramachandran labors under the mistaken assumption that his long-term incentive units impose present or future obligations on AROG or confer present or future rights to Ramachandran, declaratory relief is necessary to resolve that controversy.

Joint Status Report

   As noted in the footnote above, Defendants are dismissing their counterclaims for breach of the intellectual property agreement and the breach of the 2015-217 employment agreement.

   Defendants will also seek their fees and expenses in this matter.

# EXHIBIT 3

The Plaintiff's fraud claim against AROG remains an operable claim. While Dr. Jain committed the actual fraud by making false promises to Abby, AROG is vicariously liable for his fraudulent conduct.[8] Given Dr. Jain's position with AROG, there is no dispute that AROG is liable for Dr. Jain's fraudulent statements. This explains why the summary judgment briefs were focused on whether Plaintiff submitted sufficient evidence to establish a disputed material fact about whether Dr. Jain committed fraud. Once the Plaintiff established sufficient evidence to prove fraud against Dr. Jain, the claim against AROG was also made as a matter of law. Indeed, Defendants did not even challenge the issue about whether AROG was vicariously liable for the fraud committed by Dr. Jain. This explains why the court held that: the **"Court DENIES the motion as to Ramachandran's fraud claim concerning the 2010 Long Term Incentive Plan."**

As for whether Plaintiff plead sufficient facts to put AROG on notice about its potential liability for Dr. Jain's fraud, Plaintiff's Third Amended Petition makes it clear in the **first paragraph** that Plaintiff's fraud claim involving the Long Term Incentive Plan applies to both Dr. Jain and AROG:

> Since AROG's formation in 2010, Jain, AROG's founder and majority shareholder, has made false representations to Abby that, *inter alia*, AROG would provide Abby with a piece of the financial upside associated with Abby's work on developing AROG's new cancer drug...In making these false representations, Jain induced Abby to work endless hours to obtain the requisite approval for this cancer drug through the U.S. Food and Drug Administration's arduous approval process.... To effectuate this false promise, AROG ostensibly awarded Abby 250,000 units pursuant to the AROG LTIU Plan....**But neither Jain nor AROG ever intended to honor their promises associated with the issuance of these 250,000 Investment Units; they were false representations from the instant they were uttered by Defendants**. Relying on these fraudulent misrepresentations, Abby worked tirelessly over the next seven years—oftentimes more than 80 hours in a week—to successfully maneuver this new drug into the critical 'Phase 3' of the FDA Approval Process. (Third Amended Petition) (emphasis added).

Unless AROG can present an order that expressly holds that Plaintiff's fraud claim against AROG is dismissed, Plaintiff's claim against AROG must move forward at the trial.

---

[8]     O'Connor's Texas Causes of Action, Ch. 12-A, § 2.1.1(1), p. 320 (2022 ed.) ("A principal may be vicariously liable for the fraudulent conduct of its agent if the agent acted with actual or apparent authority or if the principal ratified the conduct."); *see also Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 201 (Tex. App. 2014) ("A corporate officer who knowingly participates in tortious or fraudulent acts may be held individually liable to third persons even though he performed the act as an agent of the corporation. "). Moreover, a "person may be vicariously liable for the fraudulent act of another if the person benefited from a fraudulent transaction and had knowledge of the fraud." O'Connor's Texas Causes of Action, Ch. 12-A, § 2.1.1(3), p. 320 (2022 ed.).

Joint Status Report

EXHIBIT 4

## Stipulation of Facts

1. **The Parties to the Lawsuit**. The plaintiff in this case is named Abhijit Ramachandran. He is generally referred to as "Abby," "Abhijit" or "Ramachandran." During deposition testimony in this case, a reference to Abby will mean the Plaintiff. While the Plaintiff has been referred to as "Abby," he has also been referred to as "Ramachandran" in other parts of this case. Therefore, any reference to "Abby" or "Ramachandran shall mean the Plaintiff. The defendant, Dr. Vinay Jain, is referred to as Dr. Jain or, in some instances, as "Jain." So any reference to Dr. Jain or Jain shall mean the Defendant, Dr. Vinay Jain. The defendants, AROG Pharmaceutical, LLC and AROG Pharmaceutical, Inc., are generally referred collectively to as "AROG."

2. **Formation of AROG**. AROG is a start-up pharmaceutical company that was formed to develop a drug for treating cancer with an anticancer agent known as Crenolanib. Crenolanib is an investigational medication that is not approved for commercial sale in by any regulatory authority in the world.

3. **The 2010 LTIU Plan**. On March 30, 2010, AROG adopted the 2010 Long Term Incentive Plan, which is generally referred to as the "2010 LTIU Plan."

4. **AROG's Affiliated Companies**. Since its formation, AROG has engaged with other companies controlled or owned by Dr. Jain, including Dava Oncology,.

5. **Dava Oncology**: Dava Oncology, LP ("Dava Oncology") is a separate entity from AROG. Dava Oncology does not develop cancer drugs; rather, it assists pharmaceutical companies accelerate their drug development timelines.

6. **Abby's Education**. Ramachandran graduated with a degree in biomedical engineering from the University of Texas at Arlington in December 2009.

7. **Abby's Engagement with Dava**. Ramachandran initially joined Dava Oncology on February 22, 2010 as an hourly intern when he was 24 years old on a temporary student visa (F-1) to receive Optional Practical Training ("OPT").

8. **Abby's Engagement with AROG**. AROG employed Abby in March 2010 as an at will employee. Abby was AROG's first employee.

9. **AROG Sponsors Abby's Work Visa**. AROG sponsored Ramachandran's temporary (non-immigrant) work visa (H-1B) and application for permanent residency in the United States (also known as a "Green Card"). Simultaneously to the sponsoring Ramachandran's temporary work visas, AROG also sponsored Ramachandran's lawful permanent residency in the United States, which is commonly referred to as being a "Green Card" holder.

10. **Abby's Award of LTIUs**. Between 2011 and 2014, AROG awarded Abby 250,000 units under the 2010 LTIU Plan. On January 28, 2011, Dr. Jain and Abby executed an award agreement wherein AROG awarded Abby 5,000 units under the 2010 Long Term Incentive Plan. On September 16, 2011, Dr. Jain and Abby executed an award agreement wherein AROG awarded Abby 10,000 units under the 2010 Long Term Incentive Plan. On July 30, 2012, Dr. Jain and Abby executed an award agreement wherein AROG awarded Abby 185,000 units under the 2010 Long Term Incentive Unit Plan. On July 30, 2014, Dr. Jain and Abby executed an agreement wherein Abby was awarded 50,000 units.

11. **Abby's Employment Contracts—At Will Contracts**. Abby signed multiple employment contracts as an at-will employee. On December 1, 2010, Abby signed an at-will employment contract and again on January 28, 2011.

12. **Abby's 2012 Employment Contract—Three Year Contract**. On July 30, 2012, Dr. Jain and Abby executed a two-year employment contract. On May 1, 2013, Dr. Jain and Abby executed an amendment to the 2012 Employment Contract.

13. **Abby's 2014 Employment Contract—Three Year Contract**. On July 30, 2014, Dr. Jain and Abby executed a three-year employment contract. On July 30, 2014, as part of the 2014 Employment Contract, AROG awarded Abby an additional 50,000 units under the 2010 Long Term Incentive Plan. On December 3, 2014, Michael Ball, Chief of Staff for AROG, and Abby executed a document entitled First Amendment to Employment Agreement.

14. **Conversion to Corporation**. On September 29, 2014, AROG adopted a unanimous written consent of all members that approved a conversion of AROG Pharmaceutical, LLC, a Delaware limited liability company, to AROG Pharmaceutical, Inc., a Delaware corporation.

15. **2015 Employment Contract—Three Year Contract**. On July 30, 2015, Dr. Jain and Abby executed a three-year employment contract that was set to expire on July 30, 2017.

16. **Visa Letter**. On September 16, 2015, Edward McDonald executed a letter referencing "Invitation Letter to Continue Employment with  **AROG**." This document contains a typographical error. In the first sentence of the third paragraph, while it states, "...which contemplates your employment with AROG until July 2019...," that should actually read July 2017.

17. **Visa Letter**. On December 16, 2016, Edward McDonald executed a letter referencing "Invitation Letter to Continue Employment with AROG." This document contains two typographical errors. First, the date at the top of the letter should be December 16, 2016 instead of 2015. Second, in the first sentence of the third paragraph, while it states, "...which contemplates your employment with AROG until July 2019...," that should actually read July 2017.

Joint Status Report

18. **August Confidential Draft of S-1 Filed with SEC**. On August 30, 2018, AROG filed a "Confidential Draft No. 3" with the Securities and Exchange Commission. This document was intended to be confidential. There was no reference in this document to the lawsuit filed by Abby against Dr. Jain and AROG in April 2018.

19. **September S-1 Filed Publicly with the SEC**. On September 28, 2018, AROG filed a Form S-1 Registration Statement under the Securities Act of 1933. In this document, AROG does reference the lawsuit filed by Abby against Dr. Jain and AROG.

20. **60 Day Rule**. On or about January 17, 2017, the Department of Homeland Security rules and regulations concerning grace period for an H-1B visa holder to find new employment in the event that his current employment was terminated went into effect. Under these revised rules and regulations, an H-1B visa holder was permitted up to 60 days to find a new employer in the event that his current employment was terminated.

21. **Days of Week**. November 16, 2016 was a Wednesday. November 19, 2016 was a Saturday. November 20, 2016 was a Sunday. December 3, 2016 was a Saturday. December 4, 2016 was a Sunday. January 8, 2017 was a Sunday.

Joint Status Report

EXHIBIT 5

| Trial Witness List | | |
| :---: | :---: | :---: |
| By *Plaintiff Abhijit Ramachandran* | | |
| | **Narrative Summary** | **Notes** |
| **Abhijit Ramachandran** | The Plaintiff will testify about his factual allegations contained in his Third Amended Petition; he will also testify to refute the allegations contained in the Defendants Counterclaim. | He is **<u>definitely</u>** going to testify as a fact witness. He was deposed in this case. |
| **Poonam Patil** | Ms. Patil is the wife of the Plaintiff. She will testify about the facts known to her concerning Plaintiff's actions taken in reliance on the promises made by Defendants. | She is **<u>probably</u>** going to testify as a fact witness. While her deposition was scheduled by Defendants, they cancelled it and never re-scheduled it. |
| **Tyler Brous** | Tyler Brous, an agent for Lennox Capital Partners, LP, was engaged by AROG in 2015 to prepare AROG for an IPO in 2016. He will testify about his interactions with Dr. Jain and AROG; he will testify about his plaining and recommendations for AROG on the 2016 IPO; he will testify about his interactions with Plaintiff and Defendant Dr. Jain concerning the 2016 IPO and the Plaintiff's allegations; he will testify about Plaintiff's Long Term Incentive Units; he will testify about Dr. Jain's attempts to eliminate Abby's rights under the 2010 Plan to avoid a payout in the event of an IPO; he will testify about the value of AROG between 2015 and 2017, which was within the scope of his engagement with AROG and within his expertise as a valuation expert. | He is **<u>definitely</u>** going to testify. He will testify as both a fact witness and an **<u>expert witness.</u>** He was deposed in the case and designated as an expert. |
| **Karl Schwabauer** | Mr. Schwabauer, a damage expert, will testify about the damages incurred by Plaintiff as a result of the common law fraud. | He is **<u>probably</u>** going to testify. He will testify as an expert witness. He was deposed in this case. |

Joint Status Report

| | | |
|---|---|---|
| **Dr. Neil Shah** | Dr. Shah's testimony will establish the extent of Abby's work on developing certain ideas that were incorporated into AROG's three Crenolanib Patents. Dr. Shah will also testify about his interactions with Dr. Jain concerning these ideas, including his conversations with Dr. Jain to convince him that it was viable to utilize Crenolanib to target FLT3. Before this conversation, Dr. Jain was reluctant to use Crenolanib to target FLT3 because the industry consensus at the time was that molecule like Crenolanib could not effectively target FLT3. Specifically, he will testify about Dr. Jain's lack of involvement in this process to develop an effective idea to target FLT3 until after the idea was developed and tested; and he will testify about Dr. Jain's actions to conceal his involvement with Abby in discovering and developing this idea incorporated into the AROG patents. He will also testify that Dr. Jain was not trustworthy to deal with. | He is **<u>unlikely</u>** going to testify in person because he is in California and beyond the subpoena power of this Court. His attorney has notified counsel for Plaintiff that he will not travel to Dallas for the case. He was deposed in this matter. Plaintiff will designate portions of his deposition testimony. Plaintiff will present his testimony via video. His video has been identified as Exhibit 78. |
| **Dr. Vinay Jain** | Defendant Dr. Jain will testify about Plaintiff's allegations in Plaintiff's Third Amended Petition. | He is **<u>probably</u>** going to testify as a fact witness and possible as a record custodian. He was deposed in this case. |
| **Edward McDonald** | Mr. McDonald will testify about AROG's work policies; he will testify about Abby's termination; he will testify about the cancellation of Abby's LTIUs; he will testify about the revocation of the 2010 IP Agreement; and he will testify about Abby's trip to India at the end of 2016. | He is **<u>probably</u>** going to testify as a fact witness. He may also testify as record custodiam. He was deposed in this case. |

| | | |
|---|---|---|
| **Greg Fisher** | Mr. Fisher will testify about his role in the termination of Plaintiff; he will testify about the letter he delivered to Plaintiff to force Plaintiff to relinquish his LTIUs in AROG for nothing; he will testify about how the cancellation of Abby's LTIUs would benefit the Defendants; and he will testify about the value of AROG, as determined by an independent appraisal known as Bioscience. | He is <u>**unlikely**</u> to testify in person. Pursuant to Fed. R. Civ. P. 32(a)(3), Plaintiff is offering Greg Fisher's 30(b)(6) deposition testimony. His deposition designations will be filed with the Court. His anticipated video testimony is attached as Exhibit 80. |
| **Edwin Flores** | Mr. Flores, a patent attorney, will testify about the facts related to the decision by Dr. Jain to take sole credit for all ideas incorporated into the Crenolanib Patents, including the ideas developed during the collaboration between Dr. Shah and Abby. Mr. Flores will also testify about the information that Dr. Jain concealed from him to hide Dr. Shah and Abby's ideas that would qualify them as inventors. | He is <u>**unlikely**</u> going to testify in person. He was deposed. Pursuant to Fed. R. Civ. P. 32(a)(3), Plaintiff is offering Edwin Flores' 30(b)(6) deposition testimony given as a corporate representation of AROG. |
| **Taizoon Khokhar** | Taizoon will testify concerning Abby's written files on his termination. | He is <u>**unlikely**</u> going to testify in person. Pursuant to Fed. R. Civ. P. 32(a)(3), Plaintiff is offering Taizoon Khokhar's. 30(b)(6) deposition testimony given as a corporate representation of AROG. His video testimony is attached as Exhibit 81. |
| **Richard Squires** | Mr. Squires, who is a partner in the firm Lennox Capital Partners, will testify about the work done by Lennox on behalf of AROG and his interaction with Dr. Jain and Abby during the IPO process. | At this point, it is <u>**unlikely**</u> that he will testify. It will depend on whether Mr. Brous testifies. If Mr Brous testifies, Mr. Squires will |

Joint Status Report

| | | not testify. He was deposed in this case. |
|---|---|---|
| **Annemieke DeMaggio** | Ms. DeMaggio will testify about her lawsuit against Dr. Jain, asserting allegations that Dr. Jain terminated her without cause and cancelled her LTIU units. She will also testify about the resolution of that matter. | Ms. DeMaggio is **<u>probably</u>** going to testify in this case. She was not deposed in this case. |

Joint Status Report

EXHIBIT 6

**Defendants' Proposed Witness List**

1. Abhijit Ramachandran

   Mr. Ramachandran was deposed in this matter.  It is probable that he will testify at trial.

   Mr. Ramachandran is the Plaintiff in this matter.  It is expected that he will testify as to the following: (1) his work and educational background; (2) the ASH conference in 2016; (3) his work at AROG; (4) the 2010 Nondisclosure and Intellectual Property Agreement; (5) employment agreements with AROG; (6) the 2010 LTIU Plan; (7) Dr. Jain's alleged statements regarding the Long Term Incentive Units ("LTIU") plan; (8) his termination from AROG and communications regarding the same; (9) Visa applications; and (10) his work on the valuations performed by Bioscience in 2012 and 2014.

2. Dr. Vinay Jain

   Dr. Jain was deposed in this matter.  It is probable that he will testify at trial.

   Dr. Jain is the controlling member though his entities or family trusts of AROG.  It is expected that he will testify as to the following: (1) formation and capitalization of AROG; (2) Mr. Ramachandran's employment with AROG; (3) employment agreements between AROG and Mr. Ramachandran; (4) the 2010 and 2014 LTIU Plans and reasons behind the establishment of the 2014 Plan; (5) clinical trials for Crenolanib; (6) funding of AROG; (7) termination of Ramachandran; (8) AROG's application for Ramachandran's H-1B Visa and Permanent Residency in the United States (i.e., his "Green Card"); (9) the conversion of AROG from a limited liability company to an S Corp and the reasons for the same; (10) the 2010 Nondisclosure and Intellectual Property Agreement; (11) Mr. Ramachandran's work on the valuations performed by Bioscience in 2012 and 2014; and (12) the contents of Ramachandran's work-provided laptops, emails, and associated equipment and communications platforms.

3. Edward McDonald

Joint Status Report

Edward McDonald was deposed in this matter.  It is probable that he will testify at trial.

Edward McDonald is the General Counsel of AROG.  It is expected that he will testify on the following: (1) formation and capitalization of AROG; (2) Mr. Ramachandran's employment with AROG; (3) employment agreements between AROG and Mr. Ramachandran; (4) the 2010 and 2014 LTIU Plans and reasons behind the establishment of the 2014 Plan; (5) clinical trials for Crenolanib; (6) funding of AROG; (7) termination of Ramachandran; (8) AROG's application for Ramachandran's H-1B Visa and Permanent Residency in the United States (i.e., his "Green Card"); (9) the conversion of AROG from a limited liability company to an S Corp and the reasons for the same; (10) the 2010 Nondisclosure and Intellectual Property Agreement; (11) responsibilities of running a clinical trial; (12) Mr. Ramachandran's responsibilities for running clinical trials; (13) Mr. Ramachandran's failure at running clinical trials and the reasons for those failures; (14) status of LTIUs after termination; and (15) the contents of Ramachandran's work-provided laptops, emails, and associated equipment and communications platforms

4.  Taizoon Khokhar

Mr. Khokhar was deposed in this matter.  It is possible that he will testify at trial.

Mr. Khokhar works as the Chief Operating Officer for Jain Investments, LLC ("Jain Investments"), which is the primary shareholder in AROG.  More specifically, Jain Investments provides operational support for Jain Investments and subsidiaries associated with Jain Investments including, but not limited to, AROG.  These services include human resources support, budgeting and financial decisions to AROG.  Mr. Khokhar was involved and may offer testimony as to the following: (1) conversations with Dr. Jain about Mr. Ramachandran's job performance; (2) Mr. Ramachandran's job performance; (3) Mr. Ramachandran's termination and reasons for termination from AROG including multiple communications with others about his termination; (4) responsibilities of running a clinical trial; (5) Mr. Ramachandran's responsibilities for running clinical trials; (6) Mr. Ramachandran's failure at running clinical trials and the reasons for those failures; (7) communications with Mr. Ramachandran regarding his work performance; and (8) status of LTIUs after termination.

5.  Greg Fisher

Joint Status Report

Mr. Fisher was deposed in this matter. It is possible that he will testify at trial.

Mr. Fisher works for Jain Investments that is the primary shareholder in AROG. Mr. Fisher was the Chief Financial Officer for AROG from 2014 until 2018. Mr. Fisher is CFO of Jain Investments. Mr. Fisher was involved and may offer testimony as to the following: (1) conversion of AROG from a limited liability company to an S Corp and the result on the 2010 Long Term Incentive Plan (the "Plan"); (2) reassignment of positions for Mr. Ramachandran within AROG; (3) termination of Mr. Ramachandran from AROG including multiple communications with others about his termination; (4) reasons why there was a new LTIU plan in 2014 and effect on the 2010 Plan, and (5) Mr. Ramachandran's work on the valuations performed by Bioscience in 2012 and 2014.

6.  Jennifer L. Graf

Ms. Graf was not deposed in this matter. It is probable that she will testify at trial.

Ms. Graf is expected to testify as to the attorney's fees incurred by Defendants in this matter.

7.  Bradley Parker

Mr. Parker was not deposed in this matter. It is probable that he will testify at trial.

Mr. Parker is Defendants' Rebuttal Expert witness as to damages. Mr. Parker is expected to testify that as follows: (1) Plaintiff's expert erroneously relies upon the 2014 Bio Science Valuation to in his damages report because (a) the 2014 Bio Science Valuation is not a "fair market valuation" of AROG, (b) the 2014 Bio Science Valuation does not appear to have been performed under a Fair Market Value ("FMV") standard of value as provided in the LTIU Agreement; (c) the Plaintiff's expert appears to take the 2014 Bio Science Valuation at face value and, despite fully relying upon the value indication contained within, does not disclose the performance of or results from an evaluation of the relied-upon source materials, and (d) the 2014 Bio Science Valuation uses a discount rate/cost of capital of 15.0%, which is not an appropriate discount rate for use in FMV business enterprise valuation of a pre-revenue biotech/pharmaceutical firm; (2) Plaintiff's expert

Joint Status Report

damages estimate is based on an erroneous calculation of "Available Funds" at the valuation date." At the valuation date, no such funds were available for distribution to common shareholders or holders of LTIUs, (3) rebuttal analysis: calculation of damages: alleged breach of the LTIU report because (a) the Plaintiff's expert used an incorrect level of value in computing the alleged damages given the minatory, non-marketable nature of the interest; (b) Plaintiff's expert erroneously relies upon a more than two-year old valuation of a highly speculative, risky asset to value the interest as of the 2017 alleged breach, with only speculative qualitative commentary on the potential change in value in the Subject Interest since the date of the November 2014 valuations. Defendants refer Plaintiff to the Rebuttal Report of Bradley Parker.

8.  Gregory Pynes

Gregory Pynes was not deposed in this matter. It is possible that he will testify at trial.

Gregory Pynes is a current long-term employee of Dava Oncology, LP and was an employee of Dr. Jain's before Dr. Jain sold a previous company, Physician's Education Resource. It is expected that he will testify on his personal opinion as to Dr. Jain's character as a business executive based on ˜20 years of their working relationship.

9.  Amit Patel, MD, MPH

Amit Patel was not deposed in this matter. It is possible that he will testify at trial.

Amit Patel is a current long-term employee of Jiv Daya Foundation and is responsible for Dr. Jain's charitable initiatives in the United States and abroad. It is expected that Dr. Patel will testify on his personal opinion as to Dr. Jain's character as a business executive based on the previous ˜8 years of their working relationship.

10. Any witness designated by the other party and/or parties.

Joint Status Report

EXHIBIT 7

**Exhibit 8**

**LIST OF DISPUTED FACTS**

**Plaintiff's List of Disputed Facts:**

1. There is a factual dispute about whether Dr. Jain intended to honor his promises concerning Abby's financial stake in AROG pursuant to the terms and conditions of AROG's 2010 Long Term Incentive Plan.

2. There is a factual dispute about whether Dr. Jain acted in good faith in regard to Abby's units awarded under the 2010 LTIU Plan.

3. There is a factual dispute about whether Dr. Jain cancelled AROG's plans to make a public offering to avoid triggering Abby's rights under section 6 of the 2010 LTIU Plan.

4. There is a factual dispute about whether AROG failed to comply with the 2010 LTIU Plan when it adopted the 2014 LTIU Plan without Abby's consent.

5. There is a factual dispute about Abby's damages in the event that Dr. Jain and/or AROG is found liable for fraud.

6. There is a factual dispute about whether Dr. Jain and/or AROG is liable for punitive damages.

7. There is a factual dispute about whether Dr. Jain's actions violate Tex. Pen. Code § 32.46, which would nullify the punitive damages cap.

**Defendants' List of Disputed Facts**

8. Dr. Jain, through AROG and Dava Oncology, has hired more than 400 U.S.-based full-time employees since 2007. On April 28, 2010, AROG secured an exclusive global license with Pfizer, Inc., where it received exclusive development and commercialization rights to a suite of benzimidazole-backboned compounds, including a compound known as CP868-596, which was named Crenolanib on December 20, 2010 by the World Health Organization (WHO) International Nonproprietary Names (INN) Expert Committee.

9. May 24, 2010, Ramachandran's Optional Practical Training under his temporary student visa was transferred to AROG.

10. On November 30, 2010, Dr. Jain commissioned a Primary Screen Report from KinomeScan, a division of DiscoveRX, to screen Crenolanib for activity against other cancer targets not previously identified by Pfizer. AROG discovered crenolanib's FLT3 mechanism of action at this time and has since obtained additional patent protection based on this invention.

11. On December 1, 2010, during his Optional Practical Training period, AROG made Ramachandran an offer of at-will employment where he would earn $45,000 per year.

Joint Status Report

12. On January 3, 2011, Dr. Jain emailed Randall Hulme, Partner at Fragomen, Del Rey, Bernsen & Loewy, LLP, a leading immigration law firm, to initiate the sponsored Ramachandran's temporary (non-immigrant) work visa (H-1B). Dr. Jain requested that the filing be made under the 2010 H1B quota and that the application to be filed "in the next 5-7 days." AROG paid Fragomen $5,388 to complete this expedited filing.

13. On January 24, 2011, AROG received notice from the Department of Homeland Security that Ramachandran's initial temporary (non-immigrant) employment-based visa (H-1B) was approved and would be effective on January 31, 2011.

14. This employer-sponsored temporary work visa was valid for 3 years and contained a prevailing wage determination as established by the Department of Labor ETA Form 9035 of $42,619.00. Ramachandran was aware of this prevailing wage determination and of the extension of this visa.

15. On January 31, 2011, Ramachandran's temporary work visa (H1-B) became effective and his Optional Practical Training Period through his temporary student visa (F-1) concluded.

16. Ramachandran was married to Poonam Patil in Mumbai, India on November 11, 2011.

17. On December 12, 2011, Dr. Jain initiated a valuation of AROG with Bioscience Valuation BSV GmbH. In the ensuing months, Ramachandran worked with Joachim Gruel, Ph.D., MBA, to secure a valuation for AROG. In particular, Ramachandran provided necessary clinical and commercial strategy information for Crenolanib's use for the treatment brain tumors, sarcoma, and acute leukemia.

18. With Ramachandran's efforts and coordination, the valuation report was completed and effective as of February 17, 2012. This valuation concluded that Crenolanib's value in major markets for glioma was $41 million, for AML was $24 million, and for GIST was $16 million (with the remaining ~$19 million constituting potential value in non-major markets).

19. Ramachandran had a copy of the Bioscience valuation of AROG when he negotiated his 2012 employment agreement.

20. Poonam Patil, Abhijit's wife, joined Ramachandran in the United States in March of 2012 on a temporary dependent (H4) visa only enabled by AROG's sponsorship of Ramachandran's work visa.

21. On May 22, 2012, Ramachandran developed a "wishlist" on his work-issued computer where he sought: (1) an annual salary raise to $65,000, to be reviewed annually; (2) to enroll in an accredited MBA program; (3) an annual salary increase to $100,000 once he completed said MBA; (4) additional LTIUs based on study initiation or outcomes; (5) annual bonus opportunities; (6) AROG's sponsorship of his permanent residency; and (7) the opportunity to attend conferences on AROG's behalf.

22. On June 22, 2012, Ramachandran amended this "wishlist" to specify that he was seeking: (1) 50,000 additional LTIUs; (2) additional bonuses and LTIU grants based on meeting certain performance goals; (3) 0.1% of the gross proceeds of an out licensing transaction; (4) annual raises to his base salary not to exceed 3% per year, and maintained his request for AROG to sponsor his permanent residency (Green Card).

23. On July 30, 2012, Ramachandran negotiated and accepted an Employment Agreement as a Senior Project Manager earning $85,000 per year and was issued 185,000 LTIUs.  (Dkt. No. 172).

24. On August 12, 2012, AROG treated the first patient to receive crenolanib AML at UT Southwestern in Dallas, Texas.  Before this date, there was no clinical experience for crenolanib in the treatment of humans with AML.

25. Simultaneously to the sponsoring Ramachandran's temporary work visas, AROG also sponsored Ramachandran's lawful permanent residency in the United States, which is commonly referred to as being a "Green Card" holder.

26. On February 6, 2013, AROG retained Garry Davis of Davis & Associates Immigration Law to begin the lengthy process and substantial investment of securing Ramachandran's lawful permanent residency in the United States (known as the "Green Card" application).

27. On September 18, 2013, AROG applied to renew Ramachandran's temporary (non-immigrant) work visa (H-1B).  AROG was successful and secured an extension from July 17, 2014 to July 16, 2017 with a prevailing wage determination as established by the Department of Labor ETA Form 9035 of $89,835.00.  Ramachandran was aware of this prevailing wage determination and of the extension of this visa.

28. On November 26, 2013, AROG granted Ramachandran a discretionary bonus of $10,000.

29. On December 5, 2013, AROG completed necessary preparations and submitted  a permanent residency application for Ramachandran's permanent residency in the United States (Green Card).

30. On or before January 9, 2014, Ramachandran applied to pursue a Master of Business Administration (MBA) degree with the University of Texas at Dallas. Ramachandran did not disclose this application to Dr. Jain or AROG's management.

31. Ramachandran took 4 courses (9 credit hours) towards his MBA in Spring of 2014 and achieved a term GPA of 3.5.

32. Poonam Patil, Ramachandran's wife, began her MBA at Texas Women's University in Denton, Texas on January 2014.

33. Ramachandran took 2 courses (6 credit hours) towards his MBA in Summer of 2014 and achieved a term GPA of 4.0.

34. On July 30, 2014, Ramachandran negotiated and accepted a revised Employment Agreement with AROG in 2014 as a Senior Project Manager earning a salary of $113,000 a year, additional bonuses of $21,000 (for a total annual compensation of $133,000) and 50,000 additional LTIUs. Pursuant to the 2014 Employment Agreement, Ramachandran would remain a Senior Project Manager and earn a salary of $123,000 a year in 2015 and a salary of $133,000 a year in 2016.

35. Ramachandran signed his July 30, 2014 Employment Agreement while he was enrolled at the University of Texas at Dallas for graduate studies.

36. On August 5, 2014, AROG received notice that Ramachandran's I140 Immigrant Petition for Alien Worker was approved with priority date for Ramachandran's permanent residency of December 5, 2013.

37. Ramachandran took 4 courses (10 credit hours) in the Fall of 2014 with a term GPA of 3.9.

38. During the 2014 academic year, Ramachandran completed 10 courses, and 25 credit hours, towards his MBA.

39. On September 30, 2014, AROG adopted a second employee incentive plan, known as the "2014 Change in Control and Long Term Incentive Plan." This plan co-existed with the 2010 LTIU plan.

40. On November 21, 2014, AROG engaged The Trout Group for investor relations and introductions.

41. On or around December 10, 2014, AROG also engaged Bank of America Merrill Lynch for corporate strategy and to explore potential transactions.

42. Ramachandran expanded his graduate studies to include a dual MBA and Master of Science in Finance in the Spring of 2015.

43. Ramachandran took 2 courses (6 credit hours) in the Spring of 2015 with a term GPA of 3.5.

44. Ramachandran took 1 course (3 credit hours) in the Summer of 2015 with a term GPA of 4.0.

45. Ramachandran did not take any courses during the Fall of 2015. During the 2015 calendar year, Ramachandran completed 3 courses, and 9 credit hours, towards his dual MBA and Master of Science in Finance.

46. On June 29, 2015, Tyler Brous became a consultant to AROG under a Consultant Services Agreement, earning a flat rate of $5,000 per month. His consulting services concluded in January of 2016.

47. On July 30, 2015, Ramachandran negotiated and accepted a revised Employment Agreement with AROG, whereby Ramachandran would become a Director of Clinical Operations and earn a salary of $144,000. Under the July 30, 2015 Employment Agreement, Ramachandran would remain a Director of Clinical Operations and earn a salary of $154,000 a year in 2016.

48. On or before July 2015, AROG initiated initial steps to explore if becoming a public company through an initial public offering would be in the company's best interest. In the subsequent months, AROG interviewed and hired Davis Polk (a leading law firm), PricewaterhouseCoopers (a leading auditing firm), in addition to continued engagement of the Trout Group (a leading investment relations firm), and Bank of America Merrill Lynch (a leading investment bank) to evaluate this possibility. AROG also pitched investment opportunities to leading healthcare investors.

49. The registration document for an IPO, known as an "S1," was developed in part by Ramachandran during the months of August, September, and October 2015.

50. Financial statements from PricewaterhouseCoopers, AROG's auditing firm in 2015, confirm that the 2010 LTIU Plan and the 2014 Change in Control employee incentive plans co-existed.

51. From September 10, 2015 to October 27, 2015 (47 days), Ramachandran visited India with the partial purpose of obtaining a visa stamp.  On September 16, 2015, Ramachandran received a request for evidence from the local consulate which necessitated AROG's attention before he would be able to reenter the United States. On or around November 2015, AROG determined that an IPO would not be in the company's best interest at the time mainly due to ˜40% drop in the major biotech index (XBI) from its peak earlier that year.

52. In the Spring of 2016, Ramachandran took 2 courses (6 credit hours) towards his dual graduate degrees with a term GPA of 3.8.

53. In the Summer of 2016, Ramachandran took 2 courses (6 credit hours) towards his dual graduate degrees with a term GPA of 3.0.

54. In the Fall of 2016, Ramachandran took 1 course (3 credit hours) towards his dual graduate degrees with a term GPA of 4.0.

55. During the 2016 academic year, Ramachandra completed 5 courses, and 15 credit hours, towards his dual MBA and Master of Science in Finance.

56. In August of 2016, AROG launched its first Ph. III study of crenolanib in a rare cancer known as D842V GIST.

57. On September 14, 2016 AROG secured another extension of Ramachandran's temporary (non-immigrant) work visa (H1-B) to extend his temporary work status from January 17, 2017 to January 15, 2020

58. From December 8, 2016 (2 days after the American Society of Hematology annual meeting) to January 23, 2017 (46 days), Ramachandran visited India with the partial purpose of obtaining a visa stamp.  Ramachandran received his full salary for the duration of his visit in India, even beyond his expended PTO.

59. On December 16, 2016, Ramachandran received a request for evidence from the U.S. Consulate in Mumbai, rejecting his visa application, and required . correspondence from AROG attention before Ramachandran would be able to reenter the United States.

60. At 6:37am Dallas time, and 6pm in India, on Friday, December 16, 2016, Ramachandran requested, via email from AROG, (i) an updated "invitation letter from Edward McDonald, Staff Counsel of AROG Pharmaceuticals;" (ii) an updated "consulate letter by John Eckardt;" (iii) Employment verification letter; and (iv) H1b renewal submission packet. Ramachandran advised that he desired to "submit the documents tonight if possible." AROG returned the requested documents to Ramachandran at 12:27pm on Friday, or 6 hours after receiving Ramachandran's request.

61. On January 9, 2017, AROG contacted Pete Sessions, U.S. Representative for Texas's 17th Congressional District, to expedite the H1-B stamping process.

62. Ramachandran secured a stamped visa on January 22, 2017, and returned to AROG's offices in Dallas on January 24, 2017.

63. In the Spring of 2017, Ramachandran took 2 courses (6 credit hours) towards his dual graduate degrees with a term GPA of 3.5.

64. AROG terminated Ramachandran's employment on February 21, 2017. (Dkt. No. 153).

65. Approximately one month later on March 24, 2017, Ramachandran obtained employment at Theravance.

66. Ramachandran's initial employment offer from Theravance provided him an annual salary of $165,000, a $10,000 signing bonus, an annual performance bonus, 4,500 equity options, and relocation / moving expenses. This compensation was higher than what Ramachandran earned at AROG.

67. After his termination, in the Fall and Summer of 2017, Ramachandran completed the three remaining courses (9 hours) necessary to complete his dual graduate degrees.  His final GPA was 3.687.

68. Approximately 85% of Ramachandran's dual graduate degrees were completed when he was a full time employee of AROG.

69. Ramachandran then sued the Defendants approximately 13 months later on April 3, 2018. .

70. In June and August of 2018, AROG initiated Ph. III studies in AML.

71. Ramachandran's claims against Videra Pharmaceuticals and Jain Investments have been dismissed.  (Dkt. No. 153).

72. Ramachandran's claims for breach of contract against AROG has been dismissed.  (Dkt. 172).

73. Ramachandran's claim against AROG and Dr. Jain for violation of the Texas Payday Law has been voluntarily dismissed by Ramachandran.  (Dkt. No. 172).

74. Ramachandran's claim for fraud against AROG has been dismissed.  (Dkt. No. 172).

75. Ramachandran's claim for declaratory judgment against AROG concerning ownership of the patents has been dismissed.  (Dkt. No. 153).

76. Ramachandran's claim breach of fiduciary duty against Dr. Jain has been dismissed.  (Dkt. No. 153).

77. Ramachandran's claims for aiding and abetting breach of fiduciary duty against Jain Investments, AROG and Videra Pharmaceuticals have been dismissed.  (Dkt. No. 153).

78. Ramachandran's claim for civil conspiracy against AROG, Dr. Jain, Jain Investments and Videra Pharmaceuticals has been dismissed.  (Dkt. No. 153).

79. Ramachandran's claim against AROG for breach of contract has been dismissed.  (Dkt. No. 153).

80. Ramachandran's claim against AROG for quantum meruit has been voluntarily dismissed by Ramachandran.  (Dkt. No. 172).

81. Ramachandran's claim against AROG and Dr. Jain for unjust enrichment has been dismissed.  (Dkt. No. 172).

82. Ramachandran's claim against AROG for breach of contract has been dismissed.  (Dkt. No. 153).

83. The payment of the LTIUs is governed by the Plan and not the employment agreements.

84. AROG did not guarantee Ramachandran continuous employment because he was awarded LTIUs.

85. AROG maintained the Plan whereby it issued LTIUs, which are worth some percentage of the company's worth if it is ever sold, to employees as an award for meeting goals.  (Dkt. No. 153).

86. The Plan is an alternate compensation mechanism that awards "Units" or LTIUs to employees for meeting certain objectives. (Dkt. No. 153).

87. Each LTIU entitles the holder to a payout "following the consummation of a Sale of the Company" equal to some percent of the sale price.  (Dkt. No. 153).

88.  Unit holders are only eligible for a payout if they are continuously employed from the date LTIUs were issued through the date the LTIUs' final value is determined.  (Dkt. No. 153).

89. Exceptions to the continuous employment requirement only include instances of a bona fide leave of absence, simultaneous termination and reemployment, or death of the employee. (Dkt. No. 153).

90. Any Participant who is not eligible for payment of a LTIU forfeits their right to receive payment.  (Dkt. No. 153).

91. In instances of employee death, disability, or termination without cause, AROG has the option to cancel any vested LTIUs and pay the holder the fair market value of the LTIUs at the time of cancellation.  (Dkt. No. 153).

92. However, a termination for cause operates to automatically cancel the holder's LTIUs without further consideration.  (Dkt. No. 153).

93. A sale of AROG has not occurred.  (Dkt. No. 153).

94. A public offering of AROG securities has not occurred.  (Dkt. No. 153).

95. A consummated public offering or sale of AROG did not occur before Ramachandran was terminated in February 2017, and has not occurred after Ramachandran was terminated in February 2017.

96. Until there is a consummation of a public offering, the administrator did not have the ability to choose the option of converting it to capital securities or cancel any or all of the vested units in connection with the public offering upon payments to the participants of an amount equal to the fair market value of such vested units.

97. Ramachandran received a copy of the Plan, and knew that if he was terminated for cause, all of his vested units would be canceled without further consideration.

98. This Court has ruled that the conversion of AROG from a limited liability company to a corporation did not constitute a sale. (Dkt. 153)Ramachandran never told Dr. Jain before the lawsuit that he thought the entity converting from an LLC to an S Corp was a sale.

99. An IPO would not be a sale of the company.

100.     Under the Plan, a "Sale of the Company" occurs in the event of: (i) a change in ownership of the Company through a transaction or series of transactions, such that any Person other than a Member (as defined in the Limited Liability Company Agreement) is or becomes the beneficial owner (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of Capital Securities of the Company representing 50% or more of Capital Securities of the combined voting power of the Company's then outstanding securities; provided that, for such purposes, any initial public offering of or acquisition by the Company shall be disregarded; (ii) the sale or other disposition of all or substantially all of the Company's assets (determined on a consolidated basis) including by way of transfer of Capital Securities of, or merger or consolidation of or other similar event with respect to, its Affiliates or Subsidiaries, as applicable.  (Dkt. No. 153).

101.     The parties agree that proportional ownership in AROG never changed, rendering subsection (i) inapplicable.  (Dkt. No. 153).

102.     Subsection (ii) is not fulfilled simply when any transfer of securities occurs; it triggers when a "sale . . . of all or substantially all of the Company's assets" occurs "by way of transfer of Capital Securities of, or merger or consolidation of or other similar event." (Dkt. No. 153).

103.     The sale requirement did not occur during Ramachandran's employment, he was not entitled to payment.  (Dkt. No. 153).

104.     The Plan states that Units issued to employees who are terminated by death, disability, or without cause remain outstanding for a period of time, but AROG has the option to cancel the Units within 18 months and pay the holder the fair market value.  (Dkt. No. 153).

105.     AROG did not cancel Ramachandran's Units under this provision, and the time to do so expired.  (Dkt. No. 153).

106.     Ramachandran has not yet suffered an injury because no event occurred that would trigger payment for his Units. (Dkt. No. 153).

107.     Further, Ramachandran has not demonstrated that an injury is likely to occur soon or at all. (Dkt. No. 153).

108.     Even if Ramachandran retains ownership of his Units, they remain outstanding until a "Sale of the Company" occurs. (Dkt. No. 153).

109.     There is no indication that a qualifying sale will happen soon or ever. (Dkt. No. 153).

110.     And unless he is denied payment that he is rightfully due, Ramachandran will not have a concrete injury.  (Dkt. No. 153).

111.       AROG did not provide Ramachandran any communications that his LTIU units were cancelled.

112.       Ramachandran admits that if he was terminated for cause from AROG, his LTIUs are canceled automatically.

113.       The Court previously ruled that in February 2017 when he was terminated, Ramachandran did not tell anyone that he thought the conversion from an LLC to a S Corp was a sale of the company and thought payment was due under the Plan. (Dkt. No. 153)

114.       Ramachandran is the owner of the personal email abhi.cogent@gmail.com.

115.       Ramachandran received everything he was promised by Defendants.

116.       Defendants met all their obligations to Ramachandran.

117.       Defendants did not induce Ramachandran to remain at AROG with promises of 185,000 long term incentive units and a two-year employment agreement that would address Ramachandran's concerns about the vulnerability of an at will employee while working under an H-1B visa that required employer sponsorship.

118.       Ramachandran failed to prove any damages against Defendants for fraud.

Joint Status Report

## EXHIBIT 8

## LIST OF DISPUTED/CONTESTED LAW

**Plaintiff's List of Dispute Law Matters**

1.  **Fraud**. Did Dr. Jain commit fraud against Abby when he made promises to him that he never intended to keep, including promises to provide Abby a share of the long-term growth of AROG via units under the 2010 Long Term Incentive Unit Plan once AROG reached Phase III of the FDA Approval Process?

2.  ~~**Vicarious Liability**. If Dr. Jain committed fraud against Abby, was AROG vicariously liable for this fraud?~~

3.  **Direct Damages**. Did Abby suffer direct damages as a result of Dr. Jain's fraud?

4.  **Mental Damages**. Did Abby suffer mental damages that were proximately caused by Dr. Jain's fraud?

5.  **Exemplary Damages**. Where the actions of Dr. Jain shown to be fraudulent or malicious to support a claim for exemplary damages? Likewise, were the actions of Dr. Jain, on behalf of AROG as a Vice Principal, sufficiently malicious to justify a claim for exemplary damages?

6.  **No Cap on Exemplary Damages**. Did Dr. Jain's fraud against Abby violate Tex. Pen. Code § Tex. Pen. Code § 32.46?

7.  ~~**Unjust Enrichment**. Depending on the evidence of the case, there may be a legal issue about whether Abby can recover unjust enrichment for the fraud committed by Dr. Jain. While Abby recognizes that this Court has already dismissed his Unjust Enrichment cause of action, Abby may still have a legal right to claim unjust enrichment as a separate damage category from direct damages. To ensure that this issue is not waived, Abby includes it herein so that it can be raised during the charge conference, if applicable.~~

8.  **Termination for Cause**. There is a dispute about whether AROG terminated Abby for Cause in accord with the terms and conditions of the 2015 Employment Contract.

9.  **Ambiguity of 2010 LTIU Plan**. There is a dispute about whether there is an ambiguity in the 2010 LTIU Plan related to the treatment of "vested" units after a Participant (like Abby) is terminated without cause. AROG agrees with Abby that section 10(a) of the 2010 LTIU Plan holds that "vested" units shall remain outstanding until the units are terminated or cancelled in accord with the provisions of this section. But AROG contends that such units were nonetheless "forfeited" and effectually cancelled on the date of Abby's termination without cause based on the "eligibility requirements" delineated in section 5(b) of the 2010 LTIU Plan concerning "granted units." Abby disputes AROG's interpretation of the 2010

Joint Status Report

LTIU Plan for two reasons. First, section 5, which outlines the calculation of a payout after a Sale of the Company, specifically excludes payment made in section 6 related to Public Offerings: "Except for payment which may be made in Administrator's discretion pursuant to Section 6 below, no payments shall accrue or be made in respect of any Units unless and until the Determination Date following the consummation of a Sale of the Company." Given that section 5 expressly excluded payments made pursuant to an IPO, any vested units that remained outstanding under section 10(a) could, at the very least, be eligible for payments triggered by a Public Offering. Second, the eligibility requirements in section 5(b) apply only to "granted" units. It does not apply to vested units. Under the 2010 LTIU Plan, "Units granted under the Plan shall vest" in accord with a set schedule. Once these units "vest," the Participant obtains additional protections under the 2010 LTIU Plan that are not afforded to units when they are just "granted." To allow section 5(b)'s eligibility requirements to apply to both granted units and vested units would eviscerate and nullify the provisions of section 10(a). The only way to harmonize these two provisions is to apply section 10(a) to vested units and to apply section 5(b) to "granted" units subject to an actual Sale of the Company. In the event this Court determines that this issue is ambiguous, it should submit the issue to the jury to determine.

**Defendant's List of Disputed Law Issues**

10. Did AROG fully comply with the three written employment agreements and written award agreements for LTIUs?
11. Did Defendants satisfy all contractual obligations to Ramachandran?
12. Did Defendants make any material, false statement to Ramachandran with regard to his LTIUs or the Plan?
13. Did Defendants make a material misrepresentation to Ramachandran regarding his issuance of LTIUs or the Plan with knowledge of its falsity?
14. Did Defendants make a material misrepresentation to Ramachandran regarding his issuance of LTIUs or the Plan without knowledge of its truth?
15. Did Defendants make a material misrepresentation regarding the issuance of LTIUs or the Plan that Ramachandran acted upon?
16. Did Defendants make a material misrepresentation regarding the issuance of LTIUs or the Plan that Ramachandran relied upon?
17. Did the Defendants make material misrepresentations regarding the issuance of LTIUs or the Plan that caused injury to Ramachandran?
18. Were the statements made by Defendants to Plaintiff about the potential value of the LTIUs or the Plan "pure expressions of opinions?"
19. What were the facts surrounding the valuation of AROG in 2012 when Plaintiff alleges the fraud accrued?  Did Plaintiff have equal access to and knowledge of the evaluations of AROG by third parties in 2012?

20. Did Defendants alleged statements about the potential monetary value of the LTIUs or the Plan constitute merely speculation about monetary value in the future that is not actionable for fraud?

21. Were the alleged statements by Defendants in 2012 about the value of the LTIUs or the Plan speculative about the future and an expression of opinion that are not representations of material fact, thus are not a basis for a fraud claim.

22. Did the Defendants make any material statements of fact that were knowingly false when made?

23. Did Ramachandran act in reliance on Defendants' representations?

24. Did Ramachandran justifiably rely on Defendants' alleged false statements?

25. Did Ramachandran actually rely on Defendants' alleged false statements?

26. Did Defendants commit fraud by knowingly or recklessly making a false statement?

27. When Defendants made the alleged representations, did they know it was false or make it recklessly without knowledge of its truth?

28. Did Defendants make the alleged representations with the intent that Ramachandran would act upon it?

29. Did Ramachandran act in reliance in the alleged misrepresentation?

30. Whether Ramachandran's fraud claim is barred by the merger clause in his 2015 Employment Contract.

31. Does Texas law recognize a claim for fraudulent breach of contract?

32. Is there an existing controversy concerning the parties' respective rights and obligations regarding the LTIUs that Ramachandran contends are presently worth millions of dollars?

33. Did termination of Ramachandran in 2017 render him ineligible to participate in the distribution of Available Funds to pay for the LTIUs at any point in the future.

34. Are Defendants entitled to a declaratory judgment that: 1) Ramachandran's long term incentive units were automatically cancelled because his Termination for Service was for Cause; 2) Ramachandran has no present right to receive payment for the LTIUs because there has not been a Sale of the Company, which is a condition precedent to receipt of payment for the long term incentive units; and 3) Ramachandran has no future right to receive payment after a Sale of the Company because the termination of Ramachandran's employment on February 21, 2017 renders him ineligible to participate in distribution of Available Funds to be realized from a Sale of the Company?

35. Did Defendants terminate Ramachandran's LTIU's or did they expire pursuant to the terms of the agreement?

Joint Status Report

EXHIBIT 9

Plaintiff filed this lawsuit after he was terminated by AROG on February 21, 2017. [Dkt. No. 1]. Initially, Plaintiff simply sued for breach of his employment contract. [Id.]. Since then, he has filed a series of amended petitions in which he has added more claims, defendants, and alleged "facts" culminating in his Third Amended Petition filed on the pleading amendment deadline of March 5, 2019. [Dkt. No. 46]. The Third Amended Petition named four (4) defendants and asserted eleven (11) causes of action. [Id.]. On August 14, 2019, Defendants filed a Motion to Dismiss for Lack of Jurisdiction and Brief in Support ("Motion to Dismiss") [Dkt. No. 82]. The Motion to Dismiss sought dismissal of certain causes of action for lack of jurisdiction because: 1) claims concerning the Plan were not ripe because there can be no payment for long term incentive units until there has been a Sale of the Company or consummation of a Public Offering, neither of which had occurred; 2) Plaintiff lacked standing to recover under the Plan because he is no longer employed by AROG, which is a condition precedent to receipt of any payment for any long term incentive units; 3) Plaintiff lacked standing to seek correction of inventorship as to AROG's issued patents because he assigned any and all patent rights to AROG; and 4) one patent application was still pending with the United States Patent & Trademark Office which has exclusive jurisdiction to resolve inventorship claims for pending applications. [Id.]. On December 15, 2020, the Court granted Defendants' Motion to Dismiss as to six (6) of the eleven (11) causes of action[4] brought by Plaintiff and as to two (2) of the four (4) named Defendants. [Dkt. No. 153]. Effectively, the Court eliminated over half of the named Defendants and causes of action brought by Plaintiff. [Id.]. As to the Plan, the Court ruled "there is likely no state of the world where Plaintiff will be entitled to payment related to the Plan." [Id. p. 8 footnote 25].

On June 30, 2021, AROG and Dr. Jain filed a Motion for Summary Judgment as to the remaining claims asserted by Plaintiff. The Court granted the summary judgment as to the breach of contract claim against AROG, common law fraud against AROG, and unjust enrichment against Dr. Jain and AROG. (Dkt. No. 172). Plaintiff voluntarily dismissed his claims for alleged violation of Texas Payday Law against AROG and Dr. Jain and quantum meruit claim against AROG.

For ease of reference, below is a summary of the claims in Plaintiff's Third Amended Complaint and the status of each claim:

1. Breach of Contract against AROG. The Court granted summary judgment as to this claim on January 11, 2022 (Dkt. No. 172).

2. Violation of the Texas Payday Law against AROG and Dr. Jain. Plaintiff voluntarily abandoned this claim.

3. Common Law Fraud against AROG and Dr. Jain. Dr. Jain believes that the Court granted summary judgment as to the fraud claim against AROG. As such, Dr. Jain believes the only cause of action Plaintiff has been against him individually for fraud.

4. Declaratory Judgment concerning Plaintiff's Ownership of the Crenolanib Patents against AROG. The Court dismissed this claim on December 15, 2020. (Dkt. No. 153).

5. Breach of fiduciary duty against Dr. Jain. The Court dismissed this claim on December 15, 2020. (Dkt. No. 153).

6.   Aiding and abetting breach of fiduciary duty against Jain Investments, AROG and Videra Pharmaceuticals.  The Court dismissed this claim on December 15, 2020.  (Dkt. No. 153).

7.   Civil Conspiracy against Dr. Jain, AROG, Jain Investments and Videra Pharmaceuticals.  The Court dismissed this claim on December 15, 2020.  (Dkt. No. 153).

8.   Breach of Contract against AROG.  The Court dismissed this claim on December 15, 2020.  (Dkt. No. 153).

9.   Quantum Meruit against AROG.  Plaintiff voluntarily abandoned this claim.

10. Unjust enrichment against AROG and Dr. Jain.  The Court granted summary judgment as to this claim on January 11, 2022 (Dkt. No. 172).

## EXHIBIT 10

**JUDICAL NOTICE.**

Plaintiff requests this Court to take judicial notice of pleading from other cases that are located on the Pacer Docket system, including the pleadings from the case styled DeMaggio v. Jain, 3:13-cv-807.

Plaintiff requests this Court to take judicial notice of any administrative rules concerning immigration matters, including the rule that took effect on or about January 17, 2017 that permitted a 60 day grace period for H-1B workers to find new employment.

Plaintiff request this Court to take judicial notice of any documents filed with the SEC, including any S-1 documents filed by the Defendants.

<u>EXHIBIT 11</u>

<u>EXHIBIT 12</u>

PLAINTIFF'S PROPOSED JURY INSTRUCTIONS

PART ONE: GENERAL INSTRUCTIONS

THE FIFTH CIRCUIT'S PATTERN JURY INSTRUCTIONS (CIVIL CASES)

**Stipulated Testimony**

A "stipulation" is something that the attorneys agree is accurate. When there is no dispute about certain testimony, the attorneys may agree or "stipulate" to that testimony.

Stipulated testimony must be considered in the same way as if that testimony had been received here in court.

**Stipulations of Fact**

A "stipulation" is an agreement. When there is no dispute about certain facts, the attorneys may agree or "stipulate" to those facts. You must accept a stipulated fact as evidence and treat that fact as having been proven here in court.

**Judicial Notice**

You must accept as proved facts of which the court takes judicial notice. The court has taken judicial notice that: [insert matters].

**Discontinuance as to Some Parties**

Certain parties are no longer involved in this trial. As jurors, it is your duty to consider the issues among the remaining parties.

**Limiting Instruction**

When testimony or an exhibit is admitted for a limited purpose, you may consider that testimony or exhibit only for the specific limited purpose for which it was admitted.

**Charts and Summaries**

Certain charts and summaries have been shown to you solely to help explain or summarize the facts disclosed by the books, records, and other documents that are in evidence. These charts and summaries are not evidence or proof of any facts. You should determine the facts from the evidence.

**Demonstrative Evidence**

Exhibit [specify] is an illustration. It is a party's [description/picture/model] used to describe something involved in this trial. If your recollection of the evidence differs from the exhibit, rely on your recollection.

Joint Status Report

**Similar Acts**

Evidence that an act was done at one time or on one occasion is not any evidence or proof whatsoever that the act was done in this case.

Then how may you consider evidence of similar acts?

You may consider evidence of similar acts for the limited purpose of showing Dr. Jain's motive, opportunity, intent, knowledge, plan, or absence of mistake or accident, which is at issue in this case.

Such evidence may not be considered for any other purpose whatsoever. You may not use the evidence to consider or reflect Dr. Jain's character.

**Deposition Testimony**

Certain testimony has been presented to you through a deposition. A deposition is the sworn, recorded answers to questions a witness was asked in advance of the trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, that witness's testimony may be presented, under oath, in the form of a deposition. Some time before this trial, attorneys representing the parties in this case questioned this witness under oath. A court reporter was present and recorded the testimony. The questions and answers have been read or shown to you via video. This deposition testimony is entitled to the same consideration and weighed and otherwise considered by you in the same way as if the witness had been present and had testified from the witness stand in court.

**Burden of Proof: Preponderance of The Evidence**

Unless otherwise told that a different standard of proof applies, Plaintiff Abhijit Ramachandran has the burden of proving his case by a preponderance of the evidence. To establish by a preponderance of the evidence means to prove something is more likely so than not so. If you find that Plaintiff Ramachandran has failed to prove any element of his claim by a preponderance of the evidence, then he may not recover on that claim.

**Evidence**

The evidence you are to consider consists of the testimony of the witnesses, the documents and other exhibits admitted into evidence, and any fair inferences and reasonable conclusions you can draw from the facts and circumstances that have been proven.

Generally speaking, there are two types of evidence. One is direct evidence, such as testimony of an eyewitness. The other is indirect or circumstantial evidence. Circumstantial evidence is evidence that proves a fact from which you can logically conclude an- other fact exists. As a general rule, the law

Joint Status Report

makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.1

**Witnesses**

You alone are to determine the questions of credibility or truthfulness of the witnesses. In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case, that he or she may have, and the consistency or inconsistency of his or her testimony considered in the light of the circumstances. Has the witness been contradicted by other credible evidence? Has he or she made statements at other times and places contrary to those made here on the witness stand? You must give the testimony of each witness the credibility that you think it deserves.

Even though a witness may be a party to the action and therefore interested in its outcome, the testimony may be accepted if it is not contradicted by direct evidence or by any inference that may be drawn from the evidence, if you believe the testimony.

You are not to decide this case by counting the number of witnesses who have testified on the opposing sides. Witness testimony is weighed; witnesses are not counted. The test is not the relative number of wit- nesses, but the relative convincing force of the evidence. The testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses testified to the contrary, if after considering all of the other evidence, you believe that witness.

**Expert Witnesses**

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely on it.

## PART II: PLAINTIFF'S FRAUDULENT INDUCEMENT CLAIM

**Jury Question Number 1**: Did Dr. Jain commit fraud against Abby?[9]

**Answer "Yes" or "No"**: _____

**"Fraud"** occurs when—

1.     A party makes a material misrepresentation, and

2.     The misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and

3.     The misrepresentation is made with the intention that it should be acted on by the other party, and

4.     The other party justifiably relies on the misrepresentation and thereby suffers injury.[10]

**"Misrepresentation"** means—

A false statement of fact,[11] **or**

A promise of future performance made with an intent, at the time the promise was made, not to perform as promised.[12]

> **False Statement of Fact**. A false statement of fact is an untrue, deceptive, or misleading statement concerning a past or present fact.[13]

> **False Promise of Future Performance**. To prove a false promise of future performance, the plaintiff must establish the defendant made a promise with no intention of performing it.[14] The plaintiff must show that the defendant had no intention of performing when the defendant made the promise.[15] Although intent may be inferred from the acts of the party after the representation is made, proof that the defendant breached the agreement is not sufficient by itself.[16] Slight circumstantial

---

[9]      Texas Patter Jury Charges—Business, Consumer, Insurance & Employment (2020) ("**PJC**") § 105.1 ("PJC 105.1 is a broad-form question designed to be accompanied by one or more appropriate instructions")

[10]     PJC § 105.2.

[11]     PJC § 105.3A

[12]     PJC § 105.3B

[13]     O'Connor's Texas Causes of Action, Ch. 12-A, § 2.3.1, p. 321 (2022 ed.) ("A false statement of fact is an untrue, deceptive, or misleading statement concerning a past or present fact.").

[14]     O'Connor's Texas Causes of Action, Ch. 12-A, § 2.3.3, p. 323 (2022 ed.) (". To prove a false promise of future performance, the plaintiff must establish the defendant made a promise with no intention of performing it.")

[15]     Id.

[16]     Id.

Joint Status Report

evidence of fraud, when considered with the breach of a promise to perform, is enough to find intent not to perform.[17] A defendant's attempt to force a plaintiff to accept a new, lesser agreement is some evidence that the defendant never intended to honor the original agreement.[18] A defendant's denial that he made the promise is also some evidence that the defendant never intended to honor the original promise.[19] And if you find that the defendant shows no pretense of performance, that is also evidence that the defendant never intended to honor the promise.[20]

**"Material Misrepresentation"** is defined as a misrepresentation that is important to the plaintiff in making a decision—that is, if a reasonable person would attach importance to and be induced to act on the information in determining whether to make a transaction.[21]

**Personal Liability**. An officer of a company may be individually liable for his own act of fraud performed for his company.[22]

---

[17]      Id.

[18]      *See Leon's Fine Foods, Inc. v. Merit Inv. Partners, Ltd.*, 2000 Tex. App.  LEXIS 5083 * 9 (Tex. App.—Dallas, July 31, 2000).

[19]      *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) ("Courts have held a party's denial that he ever made a promise is a factor showing no intent to perform when he made the promise.").

[20]      *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) ("No pretense of performance by the defendant has also been held to be a factor showing lack of intent."); (*citing C. T. M. C. Ry. Co. v. Titterington*, 84 Tex. 218, 219 (Tex. 1892).

[21]      O'Connor's Texas Causes of Action, Ch. 12-A, § 2.1.1(4), p. 320 (2022 ed.) ("A false representation is material if it is important to the plaintiff in making a decision—that is, if a reasonable person would attach importance to and be induced to act on the information in determining whether to make a transaction.")

[22]      O'Connor's Texas Causes of Action, Ch. 12-A, § 2.1.1(4), p. 320 (2022 ed.) ("An agent may be individually liable for its own act of fraud performed for its principal.").

Joint Status Report

If you answered "Yes" to Question 1, then answer the following question. Otherwise, do not answer this question.

**Jury Question Number 2:** Did AROG commit fraud against the plaintiff?

**Answer "Yes" or "No":** _____

**Vicarious Liability**. AROG is liable for the fraudulent conduct of Dr. Jain so long as: (1) Dr. Jain acted with actual **or** apparent authority **or** if AROG ratified the conduct of Dr. Jain; and (2) Dr. Jain was acting within the scope of his authority when he committed fraud.[23]

**Actual Authority.** Authority for Dr. Jain to act for AROG must arise from Dr. Jain's agreement that he has the authority to act on behalf and for the benefit of AROG. If AROG so authorizes Dr. Jain to perform an act, Dr. Jain is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized.[24]

**Apparent Authority**. Apparent authority exists if AROG (1) knowingly permits Dr. Jain to hold himself out as having authority or, (2) through lack of ordinary care, bestows on Dr. Jain such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exits.[25]

---

[23]     PJC § 101.4 ("A party's conduct includes the conduct of another who acts with the party's authority or apparent authority"); *see also* O'Connor's Texas Causes of Action, Ch. 12-A, § 2.1.1(1), p. 320 (2022 ed.) ("A principal may be vicariously liable for the fraudulent conduct of its agent if the agent acted with actual or apparent authority or if the principal ratified the conduct.").

[24]     In its section on Principal-Agent Liability, O'Connor's notes that PJC § 101.4 is appropriate to define actual and apparent authority, even though this instruction in § 101.4 notes that vicarious liability may require more to establish vicarious liability for a tort like fraud. Here, the addition of acting within the scope of authority is the additional instruction required to establish vicarious liability for fraud. Moreover, Plaintiff's proposed jury instruction is taken from the Pattern Jury Instructions with the only change being the insertion of the parties to make it more accessible for the jury to follow. PJC § 101.4 ("Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a Party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized.)

[25]     Similar to the previous instruction, Plaintiff's proposed jury instruction is taken from the Pattern Jury Instructions with the only change being the insertion of the parties to make it more accessible for the jury to follow. PJC § 101.4 ("Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exits.")

**Scope of Authority**. Dr. Jain must have been acting within the scope of his authority when he committed the fraudulent conduct. Dr. Jain's authority is generally limited to certain acts that are incident to the management of AROG.[26]

---

[26]     O'Connor's Texas Causes of Action, Ch. 38-A, § 2.2.2 ("The agent must have been acting within the scope of its authority. An agent's authority is generally limited to certain acts that are incident to the management of the particular business with which it is entrusted.")

Joint Status Report

**Jury Question Number 3:** Did Dr. Jain fail to act in good faith in regard to Abby's units awarded under the 2010 LTIU Plan?[27]

**Answer "Yes" or "No":** _____

Under the 2010 LTIU Plan, the plan's administrator was obligated to act in good faith when administering the plan for the benefit of the plan's participants like Abby. Because Dr. Jain was the administrator under the 2010 LTIU Plan, he was obligated to act in good faith when administering this plan for the benefit of Abby.

       **Good Faith means—**

       a state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing **or** (4) absence of intent to defraud or to seek unconscionable advantage. Good faith requires conduct that is honest in fact and is free of both improper motive and willful ignorance of the facts at hand.[28] A party who hokes up a phony defense to the performance of his contractual duties and then when that defense fails tries another defense for size is not acting in good faith.[29]

---

[27]     PJC 103.3 (noting that, in the event of a contractual obligation to act in good faith, the "basic question in PJC 101.2 should be used…").

[28]     The Texas Pattern Jury Charges and the Fifth Circuit Jury Charges do not include a definition of "good faith." Consequently, this jury instruction relies on the common law definition of good faith, as defined by the Texas Supreme Court. *Janvey v. GMAG, LLC*, 592 S.W.3d 125, 129 (Tex. 2019) (defining "good faith" for a statute that does not contain a definition by determining the word's "plain or common meaning."). In doing this, the Texas Supreme Court defined good faith as follows:

     [Good faith is] defined as '[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing …, or (4) absence of intent to defraud or to seek unconscionable advantage.' We have explained that good faith 'requires conduct that is honest in fact and is free of both improper motive and willful ignorance of the facts at hand.' And we have recognized "reasonableness" as a component of good faith. *Wichita County v. Hart*, 917 S.W.2d 779, 786 (Tex. 1996) (combining "honesty in fact" with "reasonableness" to define what constitutes good faith under the Whistleblower Act).

     *Janvey v. GMAG, LLC*, 592 S.W.3d 125, 129 (Tex. 2019) (citing, inter alia, Black's Law Dictionary (11th Ed. 2019).

[29]     *Market Street Assoc. Ltd. Partnership v. Frey*, 941 F.2d 588, 595 (7th Cir. 1991) ("A party who hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries an another defense for size can properly be said to be acting in bad faith.") (*citing Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 363 (7th Cir. 1990) and *Larson v. Johnson*, 1 Ill.App.2d 36, 46, 116 N.E.2d 187, 191-92 (1953)).

Joint Status Report

**Jury Question Number 4:** Did Dr. Jain cancel or forgo AROG's plans to make a "Public Offering" to avoid triggering Abby's rights under Section 6 of the 2010 LTIU Plan?

**Answer "Yes" or "No":** _____

Under the 2010 LTIU Plan, there were two primary events that would trigger a payout to Abby: (1) a Sale of the Company under Section 5 and (2) a public offering under section 6. Section 6 of the 2010 LTIU Plan reads as follows:

> **"Public Offering.** Immediately following the consummation of a Public Offering, all or any portion of the vested Units held by the Participants may, at the option of the Administrator, be converted into Capital Securities with such conversion ratio as the Administrator shall determine based upon the Fair Market Value of the Company at the time of the Public Offering and subject to any restrictions or requirements as the Administrator may deem necessary or appropriate. If any vested Units held by the Participants are not so converted, the Administrator may elect to cancel all or any portion of such vested Units in connection with a Public Offering upon payment to the Participants of an amount equal to the Fair Market Value of such vested Units assuming a Sale of the Company occurred as of the date of such cancellation."[30]

**Initial Public Offering** means a "company's first public sale of stock; the first offering of an issuer's equity securities to the public through a registration statement"[31] An initial public offering (IPO) is the event that makes a corporation's transition from private to public ownership.

**S-1 Statement** means the SEC form that a company usually must file before listing and trading its securities on a national exchange. This form is used primarily by first-time issuers of securities. This form is the basic, full-length registration statement that requires a great deal of information about the issuer and the securities being sold.[32]

**S-1 Required Disclosures re Pending Litigation.** An S-1 form requires a party to disclose, among other things, any pending litigation against the company.

---

[30]     2010 LTIU Plan, § 6.
[31]     Black's Law Dictionary, p. 1254 (Garner, 10th Ed.).
[32]     Black's Law Dictionary, p. 1535 (Garner, 10th Ed.).

Joint Status Report

**Jury Question Number 5:** Did AROG fail to comply with the 2010 LTIU Plan when it adopted the 2014 LTIU Plan without Abby's consent?

**Answer "Yes" or "No":** _____

**Prior Written Consent of Abby.** The 2010 LTIU Plan holds that, "No amendment, supplement, modification or waiver of the Plan will be effective without the prior written consent of [Dr. Jain] and [Abby] if such amendment, supplement, modification or waiver would **materially _and_ adversely** modify in **any respect** the rights of [Abby] under the Plan."[33]

**Material** means of such a nature that knowledge of the item would affect a person's decision making; significant; essential.[34]

**Adverse action** means a decision or event that unfavorably affects a person, entity, or association.[35]

---

[33]      2010 LTIU Plan, § 12.
[34]      Black's Law Dictionary, p. 1254 (Garner, 10th Ed.)
[35]      Black's Law Dictionary, p. 1254 (Garner, 10th Ed.)

If you answered "Yes" to Question 1 about whether Dr. Jain committed fraud on the Plaintiff, then answer the following question. Otherwise, do not answer the following question.

**Direct Damages**

**Question Number 6:** What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the plaintiff for his damages, if any, that resulted from Dr. Jain's fraud?

> **Direct Damages.** Direct damages are the damages that are the necessary and usual result of the wrongful act. This case presents a fraud claim based on an inducement of a binding contract. Consequently, there are two types of direct damages that are available for this type of fraud claim: (1) out-of-pocket damages; and (2) benefit-of-the-bargain damages. This case is limited to Benefit-of-the-Bargain Damages.[36]

> **Benefit-Of-The-Bargain Damages** is measured by the difference between the value as represented and the valued received, allowing the injured party to recover money or benefits that would have been made had the bargain been performed as promised.[37]

**Answer Separately**. In answering any questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.[38]

**Benefit of the Bargain Damages** sustained by Plaintiff in the past

Answer: _____

---

[36]     *Zorrilla v. Aypco Construction II, LLC,* 469 S.W.3d 143, 153 (Tex. 2015) ("Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the bargain measure. The former derives from a restitutionary theory while the latter derives from an expectancy theory."); *see also Anderson v. Durant,* 550 S.W.3d 605, 614 (Tex. 2018) ("Two types of direct damages are available for common-law fraud: out-of-pocket damages...and benefit-of-the-bargain damages..."); *see generally* PJC § 115.19 Comment ("In fraud cases, direct damages are sometimes referred to as general damages—that is, damages that are the necessary and usual result of the wrongful act.").

[37]     *Zorrilla v. Aypco Construction II, LLC,* 469 S.W.3d 143, 153 (Tex. 2015) ("Benefit-of-the-bargain damages are measured by the difference between the value as represented and the value received, allowing the injured party to recover profits that would have been made had the bargain been performed as promised.") This jury instruction quotes a definition for "benefit-of-the-bargain" from the Texas Supreme Court virtually word for word with one modification. While the Texas Supreme Court references the right to recover "profits" that would have been realized if the agreement had been performed as promised, this jury instruction inserts the word "money or benefits" in place of "profits" because it is more applicable to the facts of this case. If Dr. Jain had honored his promises, Abby would have received either money or a benefit in the form of public shares in AROG.

[38]     PJC 115.19

Joint Status Report

If you answered "Yes" to Question 1 about whether Dr. Jain committed fraud on the Plaintiff, then answer the following question. Otherwise, do not answer the following question.

**Question Number:** What sum of money, if any, if paid now in cash, would fairly and reasonably equal the unjust enrichment gained by Dr. Jain and/or AROG from resulting from Dr. Jain's or AROG's fraud committed on Abby?[39]

**Separately**. In answering any questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.[40]

**Unjust Enrichment** obtained by either:

Answer: Dr. Jain's Fraud: _____

Answer: AROG' Fraud: _____

---

[39]     Plaintiff recognizes that this Court has already dismiss Plaintiff's unjust enrichment claim. Nevertheless, depending on the facts raised at the trial, there may be a basis to submit an alternative damage instruction based on disgorgement of benefits gained by fraud. Under Texas law, a "party may recover under the theory of unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992); *see also In Team Healthcare/Diagnostics Corp. v. Blue Cross & Blue Shield of Tex.*, 2012 U.S. Dist. Lexis 63760, 2012 WL 1617087 (N.D. Tex. May 7, 2012) (Ramirez, J.). Therefore, in order to preserve such instruction for the jury charge, Plaintiff is submitting this instruction.

[40]     PJC 115.19

Joint Status Report

If you answered "Yes" to Question 1, then answer the following question. Otherwise, do not answer the following question.

**Mental Anguish Damages**

**Question Number 7:** What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the plaintiff for his compensatory damages for mental and emotional distress, if any, that were proximately caused by such fraud?

> **"Proximate Cause"** means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the at or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.[41]

> **Mental Anguish Damages.** To recover compensatory damages for mental and emotional distress, the plaintiff must prove that he has suffered a specific discernable injury with credible evidence. Hurt feelings, anger, and frustration are part of life and are not the types of harm that could support a mental-anguish award. Evidence of mental anguish need not be corroborated by doctors, psychologists, or other witnesses, but the plaintiff must support his claims with competent evidence of the nature, extent, and duration of the harm. Damages for mental or emotional distress must be based on the evidence at trial. They may not be based on speculation or sympathy.[42]

**Answer Separately**. In answering any of the questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

**Mental Anguish sustained by plaintiff in the past**

Answer: _____

---

[41]    PJC §§ 100.13

[42]    Pattern Jury Instructions (Civil Cases), § 10.13, p. 127 (2020). "Mental anguish damages are recoverable for torts that involve intentional or malicious conduct." O'Connor's Texas Causes of Action, Ch. 41-B § 3.1.2(2)(a) p. 1447 (2022 ed.) (*citing City of Tyler v. Likes,* 962 S.W.2d 489, 495 (Tex. 1997) and *SCI Tex. Funeral Servs. V. Nelson,* 540 S.W.3d 539, 544 (Tex. 2018)). "To prove mental anguish damages when there is no physical injury, the plaintiff must (1) offer direct evidence of the nature, duration, and severity of the mental anguish and show how it disrupted the plaintiff's daily routine, or (2) offer other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." O'Connor's Texas Causes of Action, Ch. 41-B § 3.3.1(2), p. 1450 (2022 ed.).

Joint Status Report

Joint Status Report

Answer the following question only if you unanimously answered "Yes" to Question 1. Otherwise, do not answer the following question. To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of six or more jurors. Otherwise, you must not answer the following question.

**Punitive Damages**

**Question Number 8:** Do you find by clear and convincing evidence that the harm to Abby resulted from malice or any fraud found by you in Question No. 1?[43]

**Answer "Yes" or "No":** _____

**"Clear and convincing evidence"** means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.[44]

**"Malice"** means a specific intent by Dr. Jain to cause substantial injury or harm to Abby.[45]

**"Fraud"** occurs when—

      1.     A party makes a material misrepresentation, and

      2.     The misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and

      3.     The misrepresentation is made with the intention that it should be acted on by the other party, and

      4.     The other party justifiably relies on the misrepresentation and thereby suffers injury.[46]

**"Misrepresentation"** means—

      A false statement of fact,[47] **or**

---

[43]     Under Texas law, Dr. Jain may be liable for exemplary damages upon a finding by clear and convincing evidence that Dr. Jain's "aggravated conduct amounted to one of the following: (1) gross negligence; (2) malice, or (3) fraud. See O'Connor's Texas Causes of Action, Ch. 12-A, § 2.3.1, p. 321 (2022 ed.) (collecting cases and authority outlining tenets of Exemplary Damages Under the Damages Act) (*citing* Tex. Civ. Prac. & Rem. Code § 41.003(a)); *see also* PJC § 115.37B Comment ("If fraud is an underlying theory of liability as well as a predicate for recovery of exemplary damages, the question may be modified as follows: 'Do you find by clear and convincing evidence that the harm to [plaintiff] resulted from [malice, gross negligence, or] any fraud found by you in Question ___?")

[44]     **PJC § 115.37B**

[45]     **PJC § 115.37B**

[46]     PJC § 105.2.

[47]     PJC § 105.3A

A promise of future performance made with an intent, at the time the promise was made, not to perform as promised.[48]

> **False Statement of Fact**. A false statement of fact is an untrue, deceptive, or misleading statement concerning a past or present fact.[49]

> **False Promise of Future Performance**. To prove a false promise of future performance, the plaintiff must establish the defendant made a promise with no intention of performing it.[50] The plaintiff must show that the defendant had no intention of performing when the defendant made the promise.[51] Although intent may be inferred from the acts of the party after the representation is made, proof that the defendant breached the agreement is not sufficient by itself.[52] Slight circumstantial evidence of fraud, when considered with the breach of a promise to perform, is enough to find intent not to perform.[53] A defendant's attempt to force a plaintiff to accept a new, lesser agreement is some evidence that the defendant never intended to honor the original agreement.[54] A defendant's denial that he made the promise is also some evidence that the defendant never intended to honor the original promise.[55] And if you find that the defendant shows no pretense of performance, that is also evidence that the defendant never intended to honor the promise.[56]

**"Material Misrepresentation"** is defined as a misrepresentation that is important to the plaintiff in making a decision—that is, if a reasonable person would attach importance to and be induced to act on the information in determining whether to make a transaction.[57]

---

[48]    PJC § 105.3B

[49]    O'Connor's Texas Causes of Action, Ch. 12-A, § 2.3.1, p. 321 (2022 ed.) ("A false statement of fact is an untrue, deceptive, or misleading statement concerning a past or present fact.").

[50]    O'Connor's Texas Causes of Action, Ch. 12-A, § 2.3.3, p. 323 (2022 ed.) (". To prove a false promise of future performance, the plaintiff must establish the defendant made a promise with no intention of performing it.")

[51]    Id.

[52]    Id.

[53]    Id.

[54]    *See Leon's Fine Foods, Inc. v. Merit Inv. Partners, Ltd.*, 2000 Tex. App.  LEXIS 5083 * 9 (Tex. App.—Dallas, July 31, 2000).

[55]    *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) ("Courts have held a party's denial that he ever made a promise is a factor showing no intent to perform when he made the promise.").

[56]    *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) ("No pretense of performance by the defendant has also been held to be a factor showing lack of intent.") (*citing C. T. M. C. Ry. Co. v. Titterington*, 84 Tex. 218, 219 (Tex. 1892).

[57]    O'Connor's Texas Causes of Action, Ch. 12-A, § 2.1.1(4), p. 320 (2022 ed.) ("A false representation is material if it is important to the plaintiff in making a decision—that is, if a reasonable person would attach importance to and be induced to act on the information in determining whether to make a transaction.")

Answer the following question only if you unanimously answered "Yes" to Question 2 concerning whether AROG committed fraud on Abby. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of six or more jurors. Otherwise, you must not answer the following question.

**Punitive Damages**

**Question Number 9:** Do you find by clear and convincing evidence that the harm to Abby resulted from malice attributable to AROG?[58]

**Answer "Yes" or "No":** _____

**"Clear and convincing evidence"** means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.[59]

**"Malice"** means a specific intent by Dr. Jain to cause substantial injury or harm to Abby.[60]

You are further instructed that AROG may be liable for Dr. Jain's malice against Abby if, but only if—

1. Dr. Jain was employed by AROG as a vice principal in a managerial capacity and was acting in the scope of his employment as a vice principal; or

2. AROG or another manager or vice principal of AROG ratified or approved the act.

A person is a **"Vice Principal"** if—

1. that person is a corporate officer; or

2. that person has the authority to employ, direct, and discharge an employee of AROG; or

3. that person is engaged in the performance of nondelegable or absolute duties of AROG.

---

[58]     Under Texas law, AROG may be vicariously liable for exemplary damages upon a finding by clear and convincing evidence that Dr. Jain, as a vice-principal for AROG, "acted with malice or gross negligence." *See* O'Connor's Texas Causes of Action, Ch. 42-B, § 2.2.1(3), p. 1517 (2022 ed.) ("A corporation may be held liable for exemplary damages for a vice-principal's noncriminal act if the vice-president acted with malice or gross negligence. A vice-principal's acts are considered to be the corporation's acts").

[59]     PJC § 115.37B

[60]     PJC § 115.37B

Joint Status Report

**Jury Instruction No. 10**: Under Code § 32.46 of a relevant Texas statute,[61] a person commits the offense of securing the execution of a document by deception if, with intent to defraud or harm any person, he, by deception, causes another to sign or execute any document affecting property or service or the pecuniary interest of any person.[62] Did you find by clear and convincing evidence that Dr. Jain's fraud against Abby constituted a violation of this Code § 32.46?

**Answer "Yes" or "No":** _____

**"Deception"** means:

1. Creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true.

2. Failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true.

3. Promising performance that is likely to affect the judgment of another in the transaction, and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intent to perform or knew the promise would not be performed.

---

[61]     To avoid any potential confusion, this jury instruction avoids making a reference to a criminal statute. There is no need to reference a criminal statute to obtain a finding that Dr. Jain's fraud satisfies the elements of this criminal statute.

[62]     This jury charge is offered to show that any award for exemplary damages should not be capped because Plaintiff can show that Defendant Dr. Jain's fraud in this case constituted a violation of Tex. Pen. Code § 32.46, which nullifies any potential cap on Plaintiff's recovery of exemplary damages. To ensure that Plaintiff procures a jury finding on this particular offense, Plaintiff proffers a jury instruction based on the jury instructions prepared by two former Texas Criminal State Court Judges. *See* Judge Elizabeth Berry and Judge George Gallagher, Texas Criminal Jury Charges (Revision 15) (James Publishing 2014) § 8.1470 (involving Tex. Pen. Code § 32.46(a)(1)). The jury instruction in this section asserts that:

> [a] person commits the offense of securing the execution of a document by deception if, with intent to defraud or harm any person, he, by deception, causes another to sign or execute any document affecting property or service or the pecuniary interest of any person.

The above jury instruction also quotes verbatim three of the relevant definitions for the term "deception."

**Contract Question**

**Jury Question Number 25:** When AROG terminated Abby on February 21, 2017, did AROG terminate Abby for "Cause" in accord with the terms and conditions of the 2015 Employment Agreement?[63]

**Answer "Yes" or "No": _____**

**Termination Without Cause**. A "No" answer means that AROG terminated Abby "**without cause**" under the 2015 Employment Contract, which shall also mean that Abby was terminated without cause as it affects his LTIU units under the 2010 LTIU Plan.

**Termination With Cause**. A "Yes" answer means that AROG terminated Abby "**for Cause**" under the 2015 Employment Contract, which shall also mean that Abby was terminated for Cause as it affects his LTIU units under the 2010 LTIU Plan.

**Contractual Conditions of a for "Cause" Termination**: Under the 2015 Employment Contract, AROG can terminate Abby for Cause based on the following provision:

> **"Termination for Cause**. Employer may terminate this Agreement for Cause immediately upon notice to Employee. Upon termination for Cause, Employer shall pay to Employee all base salary and employment benefits that have fully accrued and vested, but not been paid as of the effective date of such termination. Employee's rights with respect to the Inventive Units, if any, shall be governed by the terms and conditions of the Plan. All other rights and benefits of Employee hereunder shall terminate, except for any right to the continuation of benefits otherwise provided by law.

>> "Cause" means, with respect to any Participant that is a party to a written employment agreement with the Company or any of its Affiliates or Subsidiaries that is then in effect, "Cause" as defined in such employment agreement and, with respect to any other Participant, any one or more of the following acts or omissions by the Participant:

>> (i)    breach of any material term of the Plan or an Award Agreement or any other agreement with the Company, its Affiliates or Subsidiaries;

---

[63]    The Pattern Jury Charges holds that a jury instruction concerning termination for cause should include the text from the contract at issue: "If 'good cause' or a similar term, such as 'just cause' or 'proper cause,' is explicitly defined in the agreement," that provision in the agreement should be used and the PJC instruction on good cause termination "should not be submitted." PJC § 107.2. This is why Plaintiff proffers to include the full text of this provision within the jury instructions.

(ii)     material violation of the Company's policies and procedures, gross negligence or gross misconduct;

(iii)     excessive absenteeism, persistent neglect of duty or failure to perform the duties of Participant's position to the satisfaction of the Company;

(iv)     fraudulent, disloyal or dishonest act committed in connection with Participant's employment, or conviction of or plea of nolo contendere to any criminal conduct against the Company;

(v)     alcohol or substance abuse; or conviction of or plea of nolo contendere to any felony or to any misdemeanor involving fraud, embezzlement, theft, or dishonesty."

## Defendant's Third Contract Claim[64]

*Declaratory Judgment Action re: 2010 LTIU Plan*

There are two outstanding questions concerning the meaning of the 2010 LTIU Plan. It is your duty to interpret the following provisions of the 2010 LTIU Plan to resolve these two disputes: section 5, section 6, section 8, section 9, and section 10. In interpreting these provisions, you must decide their meaning by determining the intent of the parties at the time of making the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.[65]

The following provisions in the 2010 LTIU Plan are at issue:

<u>SECTION 5</u>

**5.    <u>Payment of Units</u>.** Except for payments which may be made in the Administrator's discretion pursuant to Section 6 below, no payments shall accrue or be made in respect of any Units unless and until the Determination Date following the consummation of a Sale of the Company.

**A.    Sale of the ·Company;** Upon the Determination Date following the consummation of a Sale of the Company, each vested Unit shall entitle the holder thereof to receive .0000025% of the Available Funds on the Determination Date, subject to satisfaction of the eligibility conditions set forth in Section 5(B) below. No amounts shall be paid, distributed or accrued with respect to unissued or unvested Units. By way of example:

(i) If all 4,000,000 Units were issued, outstanding and fully vested on the date a Sale of the Company is consummated, and each Participant meets the eligibility requirements set forth in Section 5(B) below, such Units would entitle the holders thereof to receive, in the aggregate, 10% of all Available Funds on the Determination Date.

(ii) If the Company has granted a total of 2,000,000 Units under the Plan (and all of such Units are outstanding and fully vested and each such Participant meets the eligibility requirements set forth in Section 5(B)) and the Company has Available Funds of $1,000,000 on the Determination Date, the Company shall pay to the Participants holding the Units an amount equal to $0.025 per Unit and $50,000 in the aggregate for all Units.

---

[64]    There are three issues raised in AROG's declaratory judgment action concerning Plaintiff's current rights under the 2010 LTIU Plan. While Plaintiff does not contest that his "vested" units would have been "cancelled" if he was terminated for Cause, he disputes AROG's position on the other two interpretations of the 2010 LTIU Plan. Plaintiff intends to argue that these provisions are clearly delineated in the 2010 LTIU Plan and do not support Defendant AROG's interpretation of these provisions. To the extent that this Court reject's Plaintiff's argument and finds that there is a sufficient ambiguity created by the provisions at issue, Plaintiff proffers the jury instructions herein.

[65]    PJC § 101.8

All amounts payable under this Section 5 shall be paid in cash as soon as practicable following the Determination Date, but in no event later than 60 days following the end of the calendar year in which the Determination Date occurs. No payments under the Plan shall accrue interest from the Determination Date to the_ date of actual payment to the Participants. No payments shall be made in respect of any vested Unit that has previously been paid hereunder.

> **B.     Eligibility Requirements,** Notwithstanding anything herein to the contrary, and unless provided otherwise in an Award Agreement, in order for a Participant to be eligible to receive payment in respect of Units granted hereunder, such Participant shall have been continuously employed with the Company or an Affiliate or Subsidiary ( or in the case of non-employee Participants, the services of such Person have been continuously provided to the Company or an Affiliate or Subsidiary) from the Date of Grant through the Determination Date. For purposes of the Plan, employment or provision of services shall be considered as continuing uninterrupted (i) during any bona fide leave of absence approved in writing by the Company (such as those attributable to illness or maternity leave consistent with the Company's policies), (ii) after any termination of employment or provision of services where there is a simultaneous reemployment or reengagement of Participant's services by the Company or any of its Affiliates or Subsidiaries, and (iii) following a Participant's death. Any Participant who is not eligible for payment in respect of a Unit hereunder will forfeit his right to receive payment in respect of such Unit. Nothing in the Plan or in any Award Agreement shall be deemed to give any Participant the right to be retained in employment or other service by the Company or any of its Affiliates or Subsidiaries for any period of time.

## SECTION 6

> **6.     Public Offering.** Immediately following the consummation of a Public Offering, all or any portion of the vested Units held by the Participants may, at the option of the Administrator, be converted into Capital Securities with such conversion ratio as the Administrator shall determine based upon the Fair Market Value of the Company at the time of the Public Offering and subject to any restrictions or requirements as the Administrator may deem necessary or appropriate. If any vested Units held by the Participants are not so converted, the Administrator may elect to cancel all or any portion of such vested Units in connection with a Public Offering upon payment to the Participants of an amount equal to the Fair Market Value of such vested Units assuming a Sale of the Company occurred as of the date of such cancellation.

## SECTION 8

> **8.     Vesting Restrictions.**

> A.     Time Vesting. Unless otherwise provided in an Award Agreement, Units granted under the Plan shall vest as follows:

> On the first anniversary of the Date of Grant                    20%

| On the second anniversary of the Date of Grant | 40% |
| On the third anniversary of the Date of Grant | 60% |
| On the fourth anniversary of the Date of Grant | 80% |
| On the fifth anniversary of the Date of Grant | 100% |

B.      Acceleration of Vesting. Unless otherwise provided in an Award Agreement, (i) all issued Units shall automatically become fully vested immediately prior to the consummation of a Sale of the Company or Public Offering; and (ii) upon the death of a Participant, such Participant's estate shall automatically become fully vested in all Units issued to such Participant.

## SECTION 9

9.      **Cancelation of Unvested Units.** Unless otherwise provided in an Award Agreement, if a Participate experiences a Termination of Service for any reason other than the Participant's death, no Units issued to such Participant may become vested after the date of such Termination of Service and all unvested Units held by such Participant shall automatically be cancelled as of such date.

## SECTION 10

10.     **Cancellation of Vested Units**

A.      **"Death, Disability or Termination without Cause.** If a Participant experiences a Termination of Service for any reason other than termination by the Company for Cause or resignation by such Participant, all vested Units held by such Participant (or his or her estate) shall remain outstanding until the first to occur of: (i) the tenth anniversary of the applicable Date of Grant (or such earlier date as may be provided in the Award Agreement) and (ii) the twentieth anniversary of the Adoption Date (as defined below); provided, that the Company may elect to cancel all or any portion of such vested Units within 18 months after the date of such Termination of Service upon payment to the Participant or his or her estate, as applicable, of an amount equal to the Fair Market Value of such vested Units assuming a Sale of the Company occurred as of the date of such cancellation.

* * *

C.      **Termination for Cause**. If a Participant experiences a Termination of Service due to termination by the Company for Cause, all vested Units held by such Participant shall be automatically cancelled on the date of such Termination of Service without further consideration.

Joint Status Report

## FIRST ISSUE OF INTERPRETATION

**Potential Payout based on an "Assumed" Sale of the Company**.

In the event that Abby was terminated without cause, there is a factual dispute about whether Abby can recover under the 2010 LTIU Plan without an actual Sale of the Company that generates available funds to be paid out.

> **Defendants' Position**. According to Dr. Jain and AROG, they contend that Abby cannot be paid under the terms and conditions of the 2010 LTIU Plan following a termination without cause unless there is an actual Sale of the Company that makes funds available for distribution on the Determination Date. Dr. Jain and AROG rely on Section 5 of the 2010 LTIU Plan to support their position.

> **Plaintiff's Position**. In contrast, Abby contends that there are three potential triggers for a payment on his "vested" units after he is terminated without cause: (1) a Sale of the Company under Section 5; (2) a "Public Offering" under section 6; and (3) a cancellation of Abby's "vested" units within 180 days following his termination without cause. According to Abby, a payout under option 2 (Public Offering) would generate a payout in the form of public shares from the Public Offering or a payment based on an "assumed" Sale of the Company" based on the Fair Market Value of AROG at the time of the IPO. According to Plaintiff, AROG's Fair Market Value could be based on a prior independent valuation of AROG. Likewise, a payout under option 3 (Cancellation of Units after a termination without cause) would generate a payout based on an "assumed" Sale of the Company based on AROG's Fair Market Value.

**Jury Question No. 26.** In the event that Abby was terminated without cause, does the 2010 LTIU Plan permit Abby to receive payment based on an "assumed" Sale of the Company calculated in accord with the provisions of either Section 6 (Public Offering) or Section 10(a) (cancelation after a termination without cause)?

**Answer "Yes" or "No":** _____

**A "Yes" Answer.** An answer of "Yes" means that you accept Abby's interpretation of the 2010 LTIU Plan.

**A "No" Answer.** An answer of "No" means that you accept AROG's interpretation of the 2010 LTIU Plan.

Joint Status Report

## SECOND ISSUE OF INTERPRETATION

**Eligibility Requirement of Continue Employment.**

In the event that Abby was terminated without cause, there is a factual issue about whether Abby must be continuously employed by AROG to receive payment under the 2010 LTIU Plan.

> **Plaintiff's Position**. According to Abby, if he is terminated "Without Cause," his "vested" units shall remain outstanding until the first to occur: (1) the 10th anniversary of the Grant Date; or (2) the 20th anniversary of the Adoption Date. Abby also contends that, while these "vested" units remain outstanding, AROG has the option to cancel the units by paying the Fair Market Value of these vested units. As for Abby's "unvested units" that were granted to him but did not vest, Abby agrees that such unvested units granted to him shall automatically terminate under Section 9 of the 2010 LTIU Plan, even if he is terminated without cause. For Abby, while there is a continued employment requirement for "unvested" units granted under the Plan, there is no continued employment requirement for "vested" units. The vested units are controlled by section 10(a) of the 2010 LTIU Plan.

> **Defendant's Position**. AROG contends that Section 5(b) nullifies the provisions in Section 10(a) because AROG contends that there is a requirement of "continued employment" for "granted" units from the date the units are granted to the "Determination Date" after a Sale of the Company: to wit, AROG cites, "in order for a Participant to be eligible to receive payment in respect of Units granted hereunder, such Participant shall have been continuously employed with the Company...from the Date of Grant through the Determination Date." According to AROG, this provision effactually cancels Abby's LTIUs upon his termination without cause because his failure to remain continuously employed "forfeits" his right to recover under the 2010 LTIU Plan.

> **Plaintiff's Retort**. Abby contends that section 5(b) does not apply to "vested" units; it only applies to "granted units" that have not vested. According to Abby, once a "granted" unit "vests" under Section 8, the provisions associated with such vested units—including Section 6 and Section 10(a)—determine Abby's rights in such vested units.

**Jury Question No. 27:** In the event that Abby was terminated without cause, did his "vested" units awarded under the 2010 LTIU Plan "remain outstanding" pursuant to the terms and conditions of Section 10(a)?

**Answer "Yes" or "No": _____**

> **A "Yes" Answer**. An answer of "Yes" means that you accept Abby's position that his "vested" units awarded under the 2010 LTIU Plan "remained outstanding" under the 2010 LTIU Plan after he was terminated without cause.

Joint Status Report

**A "No" Answer.** An answer of "No" means that you accept AROG's position that Abby's "vested" units awarded under the 2010 LTIU Plan were effectively "forfeited" and "cancelled" by provision 5(b) of the 2010 LTIU Plan.

## <u>EXHIBIT 13</u>

## <u>DEFENDANTS' PROPOSED JURY CHARGE</u>

## <u>PROPOSED JURY CHARGE AND INTERROGATORIES</u>

COMES NOW DEFENDANTS, AROG PHARMACEUTICALS, INC.[66] ("AROG") and

DR. VINAY JAIN ("Dr. Jain")(AROG and Dr. Jain are collectively "Defendants"), hereby

**MEMBERS OF THE JURY:**

It is my duty and responsibility to instruct you on the law you are to apply in this case.[67]

The law contained in these instructions is the only law you may follow. It is your duty to follow

what I instruct you the law is, regardless of any opinion that you might have as to what the law

ought to be.

If I have given you the impression during the trial that I favor either party, you must disregard

that impression. If I have given you the impression during the trial that I have an opinion about the

facts of this case, you must disregard that impression. You are the sole judges of the facts of this case.

Other than my instructions to you on the law, you should disregard anything I may have said or

done during the trial in arriving at your verdict.

---

[66] AROG believes that summary judgment was granted in its favor for fraud by the Court on January 11, 2022. [Dkt. No. 172]. Therefore, AROG does not believe it is a party to this lawsuit. Should the Court find that it did not grant summary judgment in AROG's favor as to the fraud claim, AROG submits this Proposed Jury Charge and Interrogatories.

[67] Fifth Circuit Pattern Jury Instruction, Civil Cases, 3.1 (2020)

Joint Status Report

You should consider all of the instructions about the law as a whole and regard each instruction in light of the others, without isolating a particular statement or paragraph.

The testimony of the witnesses and other exhibits introduced by the parties constitute the evidence. The statements of counsel are not evidence; they are only arguments. It is important for you to distinguish be- tween the arguments of counsel and the evidence on which those arguments rest. What the lawyers say or do is not evidence. You may, however, consider their arguments in light of the evidence that has been admitted and determine whether the evidence admitted in this trial supports the arguments. You must determine the facts from all the testimony that you have heard and the other evidence submitted. You are the judges of the facts, but in finding those facts, you must apply the law as I instruct you

You are required by law to decide the case in a fair, impartial, and unbiased manner, based entirely on the law and on the evidence presented to you in the courtroom. You may not be influenced by passion, prejudice, or sympathy you might have for the plaintiff or either defendant in arriving at your verdict.

Do not let bias, prejudice or sympathy play any part in your deliberations. A corporation and all other persons are equal before the law and must be treated as equals in a court of justice.[68]

**Preponderance of the Evidence**

---

[68] Fifth Circuit Pattern Jury Instruction, Civil Cases, 2.16 (2020).

Plaintiff Abhijit Ramachandran has the burden of proving his case by a preponderance of the evidence.[69] To establish by a preponderance of the evidence means to prove something is more likely so than not so. If you find that Plaintiff Abhijit Ramachandran has failed to prove any element of his claim by a preponderance of the evidence, then he may not recover on that claim.

**Evidence**

The evidence you are to consider consists of the testimony of the witnesses, the documents and other exhibits admitted into evidence, and any fair inferences and reasonable conclusions you can draw from the facts and circumstances that have been proven.[70]

Generally speaking, there are two types of evidence. One is direct evidence, such as testimony of an eyewitness. The other is indirect or circumstantial evidence. Circumstantial evidence is evidence that proves a fact from which you can logically conclude another fact exists. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

**Stipulations**

A "stipulation" is an agreement. When there is no dispute about certain facts, the attorneys may agree or "stipulate" to those facts. You must accept a stipulated fact as evidence and treat that fact as having been proven here in court.[71]

---

[69] Fifth Circuit Pattern Jury Instruction, Civil Cases, 3.2 (2020).

[70] Fifth Circuit Pattern Jury Instruction, Civil Cases, 3.3 (2020).

[71] Fifth Circuit Pattern Jury Instruction, Civil Cases, 2.3 (2020).

Joint Status Report

**Witnesses**

You alone are to determine the questions of credibility or truthfulness of the witnesses.[72] In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case, that he or she may have, and the consistency or inconsistency of his or her testimony considered in the light of the circumstances. Has the witness been contradicted by other credible evidence? Has he or she made statements at other times and places contrary to those made here on the witness stand? You must give the testimony of each witness the credibility that you think it deserves.

Even though a witness may be a party to the action and therefore interested in its outcome, the testimony may be accepted if it is not contradicted by direct evidence or by any inference that may be drawn from the evidence, if you believe the testimony.

You are not to decide this case by counting the number of witnesses who have testified on the opposing sides. Witness testimony is weighed; witnesses are not counted. The test is not the relative number of witnesses, but the relative convincing force of the evidence. The testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses testified to the contrary, if after considering all of the other evidence, you believe that witness.

**Inconsistent Statements**

In determining the weight to give to the testimony of a witness, consider whether there was evidence that at some other time the witness said or did something, or failed to say or do something,

---

[72] Fifth Circuit Pattern Jury Instruction, Civil Cases, 3.4 (2020).

Joint Status Report

that was different from the testimony given at the trial.[73] A simple mistake by a witness does not necessarily mean that the witness did not tell the truth as he or she remembers it. People may forget some things or remember other things inaccurately. If a witness made a misstatement, consider whether that misstatement was an intentional falsehood or simply an innocent mistake. The significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

**Deposition Testimony**

Certain testimony has been presented to you through a deposition.[74] A deposition is the sworn, recorded answers to questions a witness was asked in advance of the trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, that witness's testimony may be presented, under oath, in the form of a deposition. Sometime before this trial, attorneys representing the parties in this case questioned this witness under oath. A court reporter was present and recorded the testimony. The questions and answers have been read [shown] to you. This deposition testimony is entitled to the same consideration and is to be judged by you as to credibility and weighed and otherwise considered by you in the same way as if the witness had been present and had testified from the witness stand in court.

**Limiting Instructions**

---

[73] Fifth Circuit Pattern Jury Instruction, Civil Cases, 2.11 (2020).

[74] Fifth Circuit Pattern Jury Instruction, Civil Cases, 2.13 (2020).

Joint Status Report

When testimony or an exhibit is admitted for a limited purpose, you may consider that testimony or exhibit only for the specific limited purpose for which it was admitted.[75] No Inference from Filing Suit The fact that a person brought a lawsuit and is in court seeking damages creates no inference that the person is entitled to a judgment. Anyone may make a claim and file a lawsuit. The act of making a claim in a lawsuit, by itself, does not in any way tend to establish that claim and is not evidence.[76]

**Deliberations**

It is now your duty to deliberate and to consult with one another in an effort to reach a verdict. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors.[77] During your deliberations, do not hesitate to reexamine your own opinions and change your mind if you are convinced that you were wrong. But do not give up on your honest beliefs because the other jurors think differently, or just to finish the case. Remember at all times, you are the judges of the facts. You have been allowed to take notes during this trial. Any notes that you took during this trial are only aids to memory. If your memory differs from your notes, you should rely on your memory and not on the notes. The notes are not evidence. If you did not take notes, rely on your independent recollection of the evidence and do not be unduly influenced by the notes of other jurors. Notes are not entitled to greater weight than the recollection or impression of each juror about the testimony.

---

[75] Fifth Circuit Pattern Jury Instruction, Civil Cases, 2.6 (2020).

[76] Fifth Circuit Pattern Jury Instruction, Civil Cases, 3.6 (2020).

[77] Fifth Circuit Pattern Jury Instruction, Civil Cases, 3.7 (2020).

Joint Status Report

When you go into the jury room to deliberate, you may take with you a copy of this charge, the exhibits that I have admitted into evidence, and your notes. You must select a jury foreperson to guide you in your deliberations and to speak for you here in the courtroom.

Your verdict must be unanimous. After you have reached a unanimous verdict, your jury foreperson must fill out the answers to the written questions on the verdict form and sign and date it. After you have concluded your service and I have discharged the jury, you are not required to talk with anyone about the case.

If you need to communicate with me during your deliberations, the jury foreperson should write the inquiry and give it to the court security officer. After consulting with the attorneys, I will respond either in writing or by meeting with you in the courtroom. Keep in mind, however, that you must never disclose to anyone, not even to me, your numerical division on any question on the verdict form.

You may now proceed to the jury room to begin your deliberations.

## <u>JURY INSTRUCTIONS</u>

Plaintiff Abhijit Ramachandran ("Plaintiff Ramachandran") claims that AROG and Dr. Jain committed fraud when they told him he could garner a piece of the upside of AROG when he was awarded Long Term Incentive Units ("LTIUs") pursuant to the AROG 2010 Long Term Incentive Plan (the "Plan").

Plaintiff Ramachandran signed four separate agreements where he received LTIUs subject to the Plan:  (1) January 28, 2011; (2) September 16, 2011; (3) July 30, 2012; and (4) July 30, 2014.  Despite clear contractual terms that Plaintiff Ramachandran accepted before issuance of the

Joint Status Report

LTIUs, Plaintiff Ramachandran now claims that Dr. Jain committed fraud in 2012 when he (1) told Plaintiff Ramachandran that the LTIUs could provide a piece of the financial upside of AROG, (2) told Plaintiff Ramachandran about the Plan, and (3) used examples of difference scenarios on the potential value of each LTIU.

Defendants deny Plaintiff Ramachandran's claim. Defendants contend that Plaintiff Ramachandran was terminated for cause for dereliction of his job duties with AROG. Defendants also contend that the Plaintiff Ramachandran asserts this spurious claim of fraud in 2012 despite signing two Long Term Incentive Plan Award Agreements in 2011 where he twice acknowledged that he had "received a copy of the Plan, [the] opportunity to review the Plan and agree[d] to be bound by all of its terms and provisions." Plaintiff Ramachandran's wish list from June 22, 2012 – approximately one month before the July 30, 2012 grant – also envisioned an immediate grant of a substantial number of LTIUs *and* the opportunity to earn more LTIUs over time linked to successful performance of his duties. Moreover, the supposed fraud in 2012 did not deter Plaintiff Ramachandran from bargaining for an additional large grant of LTIUs in his 2014 Employment Agreement, despite the passing of two years to cure, address, or event attempt to investigate the alleged previous fraud. Rather than committing fraud, Dr. Jain fulfilled and exceeded Plaintiff Ramachandran's desire for additional LTIUs in 2012 and again in 2014 when he bargained for, and received, his final tranche of LTIUs.

In addition, any allegedly fraudulent statements made by Dr. Jain concerning AROG's projected current and future potential value would have been weighed by Plaintiff Ramachandran against his actual knowledge of the valuation of AROG. In 2012, AROG engaged Joachim Gruel, Ph.D., MBA, a biotech valuation expert who founded Bioscience Valuation BSV

Joint Status Report

GmbH ("Bioscience") to provide a net present value, or NPV, of AROG.  Due to Plaintiff Ramachandran's diligent work with Bioscience, this exercise was completed in February 17, 2012, approximately five months before the Effective Date of Plaintiff Ramachandran's 2012 Employment Agreement.  Indeed, not only did Plaintiff Ramachandran have a copy of the completed valuation when negotiating his 2012 Employment Agreement, he coordinated the project for AROG and was the primary point of contact for all necessary information to complete the valuation exercise.  Therefore, Plaintiff Ramachandran was aware that AROG had a projected net present value of $41 million for crenolanib's development in glioma, $24 million for crenolanib's development in AML, and $16 million for crenolanib's development in glioma which, together with assumptions regarding the valuation for non-major markets, made AROG worth approximately $100 million when he bargained for his 2012 Employment Agreement and LTIUs.  He was also aware that the experts at BSV forecasted (i) a 30% chance that AROG drug candidate, crenolanib, would fail in its leading indication, Acute Myeloid Leukemia, before it entered human clinical trials (i.e., no patients had been treated) and (ii) another 50% - 65% chance that crenolanib would fail early clinical studies in AML and other types of cancer).  Moreover, the Bioscience's valuation details that securing outside funding to develop crenolanib is not guaranteed, regardless of stage of development, and *does not* state that a Sale of the Company or even an initial public offering (whereby the administrator would have the option to convert LTIUs into capital securities) be ensured or even more probable if crenolanib were to reach Phase 3 clinical studies.

Furthermore, Plaintiff Ramachandran has admitted that the allegedly fraudulent statements made by Dr. Jain were consistent with the written language of the Plan itself, and Plaintiff

Ramachandran has also admitted that he did not think there was anything false about Dr. Jain's statements.

Despite his consistent above-market compensation, first-hand knowledge of the independent valuation and risks of AROG and crenolanib in 2012, bargaining for a large amount of additional LTIUs two years later after the purported fraud occurred, and these damaging and potentially dispositive admissions by Ramachandran, he nonetheless maintains this fraud claim[3] against Defendants and seek to have an award of millions dollars, even though a triggering event for such payout has not occurred and he fails to meet the eligibility requirements even if such an event were to occur.

More specifically, to prove fraud in the inducement, Plaintiff Ramachandran must prove:

(1) a material misrepresentation,

(2) made with knowledge of its falsity or asserted without knowledge of its truth,

(3) made with the intention that it should be acted on by the other party,

(4) which the other party relied on and

(5) which caused injury."[78]

"Because fraudulent inducement arises only in the context of a contract, the existence of a contract is an essential part of its proof."[79]

The burden is on the plaintiff to plead and prove all elements of his fraud claim.[80]  Where, as here, the alleged fraud is based upon a promise to perform in the future, in addition to the above

---

[78] *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 557 (Tex. 2019) citing *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018).

[79] *Mercedes-Benz USA, LLC*, 583 S.W.3d at 557.

[80] *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 571 (Tex. App.–Dallas 1989, no writ) citing *Citizens Standard Life Ins. Co. v. Gilley*, 521 S.W.2d 354, 356 (Tex.Civ.App.–Dallas 1975, no writ)

Joint Status Report

five elements, it is necessary to also prove facts of a sixth element:  that the promise was made with a then present intent not to perform.[81]  Mere breach of an agreement is not enough in itself to establish that the speaker made the promise with no intention of fulfilling it.[82]  Moreover, fraud will never be presumed.[83]

The first element Plaintiff Ramachandran must establish is that Defendants made a misrepresentation that was material.[84]  To recover on a claim of fraud, a plaintiff must prove that a representation was false when made.[85]  A false representation is material if it is important to the plaintiff in making a decision—that is, if a reasonable person would attach importance to and be induced to act on the information in determine whether to make a transaction.[86]

---

[81] *Gillum*, 778 S.W.2d at 571 citing *New Process Steel Corp., Inc. v. Steel Corp. of Texas, Inc.*, 703 S.W.2d 209, 214 (Tex App.–Houston [1st Dist.] 1985, writ ref'd n.r.e.).

[82] *Gillum*, 778 S.W.2d at 571 citing *New Process Steel*, 703 S.W.2d at 214; *see William B. Roberts, Inc. v. McDrilling Co., Inc.*, 579 S.W.2d 335, 339–40 (Tex.Civ.App.–Corpus Christi 1979, no writ)

[83] *Gillum*, 778 S.W.2d at 571 citing *Garcia v. Rutledge*, 649 S.W.2d 307, 312 (Tex.App.–Amarillo 1982, no writ); *William B. Roberts, Inc.*, 579 S.W.2d at 339.

[84] *Barrow-Shaver Res. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496 (Tex.2019); *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex.2011); *Grohman v. Kahlig*, 318 S.W.3d 882, 888 (Tex.2010).

[85] *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 359 (5th Cir. 1996).

[86] *Barrow-Shaver Res.*, 590 S.W.3d at 496; *Italian Cowboy Partners v. Prudential Ins.*, 341 S.W.3d 323, 337 (Tex.2011); *Chicago Auto Parts & Serv. v. Crockett*, 512 S.W.3d 560, 576 (Tex.App.–El Paso 2017, pet. denied); *see e.g., Lundy v. Masson*, 260 S.W.3d 482, 493 (Tex.App.–Houston [14th Dist.] 2008, pet. denied) (defendant's statement that plaintiff's business could use patented medical device was material misrepresentation); *Taylor Elec. Servs. v. Armstrong Elec. Sup.*, 167 S.W.3d 522, 527-28 (Tex.App-Fort Worth 2005, no pet.) (defendant's promise to meet delivery dates was a material misrepresentation).

A misrepresentation can be material even if it is not the plaintiff's only inducement for making a transaction, as long as the plaintiff relied on the misrepresentation.[87]   But a misrepresentation cannot be material if it is too vague or imprecise.[88]

### An Expression of Opinion is Not a False Representation.

Generally, an expression of pure opinion is not considered a false representation.[89]  To be a misrepresentation, a statement must concern fact as opposed to mere opinion, judgment, probability or expectation.[90]

Opinions and beliefs reside in an inner sphere of human personality and subjectivity that lies beyond the reach of the law and is not subject to its sanctions.[91]   Actions for fraud or

---

[87] *Barrow-Shaver Res.*, 590 S.W.3d at 496; *Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 727 (Tex.App.–Waco 1998, pet. denied); *Marburger v. Seminole Pipeline Co.*, 957 S.W.2d 82, 86 n.4 (Tex.App.–Houston[14th Dist.] 1997, pet. denied), *disapproved on other grounds, Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172 (Tex.2004).

[88] *Samson Lone Star Ltd. P'ship v. Hooks*, 497 S.W.3d 1, 14 (Tex. App.–Houston [1st 430, 443 (Tex.App.–San Antonio 2008), rev'd on other grounds, 342 S.W.3d 59 (Tex.2011); *O'Brien* Dist.] 2016, pet. denied) (map that showed well at plus/minus 1,400 feet from boundary of lease and statement that well was 1,500 feet from boundary were not too imprecise to be material misrepresentations); *In re Media Arts Grp. Inc.*, 116 S.W.3d 900, 910 (Tex.App.–Houston [14th Dist.] 2003, no pet.) (employee's statement "don't worry about it" was too vague to be material misrepresentation that arbitration agreement would not be enforced).   A "[v]ague representations cannot constitute a material representation actionable under our laws." *Cadle Co. v. Davis*, No. 04-09-00763-CV, 2010 WL 5545389, at *8 (Tex.App.–San Antonio Dec. 29, 2010, pet. denied) (mem.op.) (citing *In re Media Arts Grp., Inc.*, 116 S.W.3d at 910); *Bank One, Tex., N.A. v. Little*, 978 S.W.2d 272, 280 (Tex.App.–Fort Worth 1998, pet. denied) (imprecise or vague representation constitutes mere opinion and is not actionable misrepresentation under DTPA); *Hedley Feedlot, Inc. v. Weatherly Trust*, 855 S.W.2d 826, 839 (Tex.App.–Amarillo 1993, writ denied) (imprecise statement not actionable misrepresentation under DTPA)).

[89] *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337-38 (Tex. 2011); *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995); *BP Am. Prod. v. Marshall*, 288 S.W.3d 430, 443 (Tex.App.–San Antonio 2008), rev'd on other grounds, 342 S.W.3d 59 (Tex.2011); *O'Brien v. Daboval*, 388 S.W.3d 826, 840 (Tex.App.–Houston [1st Dist.] 2012, no pet.); *Sheehan v. Adams*, 320 S.W.3d 890, 899-900 (Tex.App.–Dallas 2012, no pet.).  To be a misrepresentation, a statement must concern fact as opposed to mere opinion, judgment, probability or expectation. *Jeffcoat v. Phillips*, 534 S.W.2d 168, 171 (Tex.App.–Houston [14th Dist.] 1976, writ ref'd n.r.e).

[90] *Jeffcoat v. Phillips*, 534 S.W.2d 168, 171 (Tex.App.–Houston [14th Dist.] 1976, writ ref'd n.r.e).

[91] *Presidio Enterprises, Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986).

misrepresentation must be based on objective statements of fact, not expressions of personal opinion.[92]  The law wisely declines to tread in the latter area because, in some deep sense, "everyone is entitled to his own opinion."[93]

"Whether a statement is an actionable statement of 'fact' or merely an innocuous statement of 'opinion' often depends on the circumstances in which a statement is made."[94]  Relevant circumstances include "the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future." *Id.*

An actionable representation is one concerning a material fact; a pure expression of opinion will not support an action for fraud.[95]  In particular, an expression of opinion about monetary value is not a representation of fact which gives rise to an action for fraud. [96]

The courts have weighed in on whether the statements are false or are mere puffery or opinion.  Examples of representations that can amount to mere puffery or opinion include claims that an investment is "low risk" and will "produce large revenues for a long time," that a settlement is "top dollar," and that a property is "superb," "super fine," and "one of the finest little properties in the City of Austin

---

[92] *Id.*

[93] *Id.*

[94] *Id. citing Transport Ins.,* 898 S.W.2d at 276.

[95] *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983).

[96] *See McCollum v. P/S Invs., Ltd.,* 764 S.W.2d 252, 254 (Tex.App.–Dallas 1988, writ denied); *Cravens v. Skinner,* 626 S.W.2d 173, 177 (Tex.App.–Fort Worth 1981, no writ); *Morris v. Leonard,* 441 S.W.2d 877, 881 (Tex.App.–Fort Worth 1969, writ ref'd n.r.e.), *cert. denied,* 402 U.S. 974, 91 S.Ct. 1667, 29 L.Ed.2d 139 (1971).

Joint Status Report

1. <u>A Prediction About the Future is an Expression of Opinion is Not a False Representation.</u>

A prediction about the future is an expression of opinion and not actionable.[97] "Pure expressions of opinion are not representations of material fact, and thus cannot provide a basis for a fraud claim."[98]  Because "[a] prediction, or statement about the future, is essentially an expression of opinion," future predictions are generally not actionable.[99]

   1. *Plaintiff Ramachandran Must Prove that the Defendants Made the Statement with Knowledge of its Falsity or was Made Without Knowledge of Its Truth.*

Plaintiff Ramachandran must prove that the Defendants made the fraudulent statement with knowledge of its falsity or asserted without knowledge of its truth.[100]  This element requires scienter.[101]

A defendant makes a misrepresentation "knowingly" when the defendant is aware of its falsity or understands it is false.[102]

---

[97] *Hoffman v. L & M Arts*, 838 F.3d 568, 579 (5th Cir. 2016).

[98] *Italian Cowboy*, 341 S.W.3d at 337–38.

[99] *Presidio Enters.*, 784 F.2d at 679-680.

[100] *Mercedes-Benz,* 583 S.W.3d at 557 citing *Anderson v. Durant,* 550 S.W.3d 605, 614 (Tex.2018).

[101] *Rhine v. Priority One Ins. Co.*, 411 S.W.3d 651, 659 (Tex. App. 2013).

[102] *JJJ Walker, LLC v. Yollick,* 447 S.W.3d 453, 461-62 (Tex.App-Houston [14th Dist.] 2014, pet. denied) (defendant made misrepresentation knowingly because he witnesses board's approval of plan to violate agreement); *see also Landers v. Aurora Loan Services, LLC,* 434 S.W.3d 291, 296 (Tex. App.–Texarkana 2014, no pet.) (one agent's knowledge of falsity cannot be imputed to other agent who makes representation but has no knowledge of falsity).

Joint Status Report

"Under the 'reckless' standard, the speaker must have known he did not have sufficient information or basis to make the statement, but made it anyway as a positive assertion and with the intent it be relied upon."[103]   In other words, a representation is made recklessly when the defendant knows it does not have sufficient information or basis to support the representation or when the defendant realizes it does not know whether the representation is true.[104]   A representation is not made recklessly solely because the representation is later found to be wrong.[105]

Plaintiff Ramachandran's allegations concern future performance.  Plaintiff Ramachandran has not and cannot produce any evidence that at the time that Dr. Jain made the alleged representations in question, such representations were either known to be false when made or were asserted without knowledge of their truth.  For this reason, Plaintiff Ramachandran's fraud claim should fail.

> 2. *Plaintiff Ramachandran Must Show Actual and Justifiable Reliance on the Statement.*

>> 1. It is Not Actual and Justifiable Reliance for Plaintiff Ramachandran to Rely on Oral Misrepresentations Regarding a Contract's Unambiguous Terms.

---

[103] *Forgetaboutit, Inc. v. Warner,* No. 09-04-503 CV, 2005 WL 3219578, at *2 (Tex. App. Dec. 1, 2005) (citing *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 527 (Tex.1998)); *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992); *Trenholm,* 646 S.W.2d at 933; *Custom Leasing, Inc. v. Texas Bank & Trust Co.,*  516 S.W.2d 927, 933 (Tex.1974).

[104] *Johnson & Higgins,* 962 S.W.2d at 527; *Trenholm,* 646 S.W.2d at 933; *see, e.g, Stone v. Lawyers Title Ins.,*  554 S.W.2d 183, 188 (Tex.1977) (title company was reckless in disregarding title opinion and relying on owner's statement regarding easement).

[105] *Landers,*  434 S.W.3d at 297.

Joint Status Report

To prevail on a fraud claim, a "plaintiff [must] show actual and justifiable reliance."[106]  A person is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.[107] A party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms.[108]  This is particularly true when the party had a reasonable opportunity to review the written agreement but failed to exercise ordinary care to do so.[109]

Instead of excusing a party's failure to read a contract when the party has an opportunity to do so, the law presumes that the party knows and accepts the contract terms.[110]

Similarly, whether reliance is justifiable, the court "must inquire whether, 'given a fraud plaintiffs individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's

---

[106] *Mercedes-Benz USA*, 583 S.W.3d at 558 citing *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). "[A] party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424 (Tex. 2015).

[107] *Westergren*, 453 S.W.3d at 424–25 citing RESTATEMENT (SECOND) OF TORTS § 541 (1977).

[108] *Westergren*, 453 S.W.3d at 424–25; *see, e.g.*, *Thigpen v. Locke,* 363 S.W.2d 247, 251 (Tex.1962) ("In an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests.... [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party.") (citation omitted).

[109] *Westergren*, 453 S.W.3d at 425 citing *Tex. & Pac. Ry. Co. v. Poe,* 131 Tex. 337, 115 S.W.2d 591, 592 (1938) (holding that evidence was legally insufficient to support a finding of fraud where party who relied on oral statement that release was a receipt had an opportunity to read the document which plainly identified itself as a release); *see also Thigpen,* 363 S.W.2d at 251.

[110] *Westergren*, 453 S.W.3d at 425 citing *See, e.g., Poe,* 115 S.W.2d at 592; *Indem. Ins. Co. of N. Am. v. W.L. Macatee & Sons,* 101 S.W.2d 553, 556 (1937); *cf. In re Lyon Fin. Servs., Inc.,* 257 S.W.3d 228, 232 (Tex. 2008); *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 133–34 (Tex. 2004); *Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505 (Tex.1993).

Joint Status Report

part.'[111]  A plaintiff may not justifiably rely on a representation if there are 'red flags' indicating such reliance is unwarranted.[112]

A "failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party."[113]  Accordingly, a plaintiff may not "blindly rely on a representation by a defendant" when the plaintiff's knowledge, experience, and background alert it to investigate the defendant's representations before acting in reliance on those representations.[114]

**Damages**

If you found that Defendants committed fraud, then you must determine whether the violation has caused Plaintiff Ramachandran damages and, if so, you must determine the amount of those damages.[115] You should not conclude from the fact that I am instructing you on damages that I have any opinion as to whether Plaintiff Ramachandran has proved his claims against AROG or Dr. Jain.

Plaintiff Ramachandran must prove his damages by a preponderance of the evidence. Your award must be based on evidence and not on speculation or guesswork. On the other hand, Plaintiff Ramachandran need not prove the amount of her losses with mathematical precision, but only with as much definitiveness and accuracy as the circumstances permit. You should consider the following elements of actual damages, and no others: out-of-pocket damages or benefit-of-the-bargain damages.

---

[111] *O'Brien*, 388 S.W.3d at 842–43.

[112] *Mercedes-Benz*, 583 S.W.3d at 558 citing *JPMorgan Chase Bank, N.A., v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 655 (Tex.2018).

[113] *Thigpen*, 363 S.W.2d at 251 (citation omitted).

[114] *See Orca Assets*, 546 S.W.3d at 654;  *Barrow-Shaver*, 590 S.W.3d at 497.

[115] Fifth Circuit Pattern Jury Instruction, Civil Cases, 11.14 (2020) was used as a template for this instruction.

Out-of-pocket damages are the difference between the value of what the defrauded party parted with and the damage actually received.[116]  Benefit-of the bargain damages are the difference between the value represented and the value received.[117]  Out-of-pocket damages are measured at the time of the sale or transaction.[118]

There is no exact standard for determining actual damages. You are to determine an amount that will fairly compensate Plaintiff Ramachandran for the harm he has sustained.

In limited circumstances, Plaintiff Ramachandran can recover exemplary damages.[119]  A favorable finding of fraudulent misrepresentation and actual damages does not automatically entitle Plaintiff Ramachandran to exemplary damages for the same conduct.  Proving fraud for exemplary damages requires proof by clear and convincing evidence, while proving fraud for actual damages requires proof only by preponderance of the evidence.

It is now your duty to deliberate and to consult with one another in an effort to reach a verdict. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors.[120] During your deliberations, do not hesitate to reexamine your

---

[116] *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018); *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007); *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009).

[117] *Kinsel v. Lindsey*, 526 S.W.3d 411, 421 (Tex. 2017).

[118] *Kinsel v. Lindsey*, 526 S.W.3d 411, 421 (Tex. 2017).

[119] TEX.CIV.PRAC.& REM. CODE §41.003a(a)(1); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006).

[120] Fifth Circuit Pattern Jury Instruction, Civil Cases, 3.7 (2020).

Joint Status Report

own opinions and change your mind if you are convinced that you were wrong. But do not give up on your honest beliefs because the other jurors think differently, or just to finish the case.

Remember at all times, you are the judges of the facts. You have been allowed to take notes during this trial. Any notes that you took during this trial are only aids to memory. If your memory differs from your notes, you should rely on your memory and not on the notes. The notes are not evidence. If you did not take notes, rely on your independent recollection of the evidence and do not be unduly influenced by the notes of other jurors. Notes are not entitled to greater weight than the recollection or impression of each juror about the testimony.

When you go into the jury room to deliberate, you may take with you a copy of this charge, the exhibits that I have admitted into evidence, and your notes. You must select a jury foreperson to guide you in your deliberations and to speak for you here in the courtroom.

Your verdict must be unanimous. After you have reached a unanimous verdict, your jury foreperson must fill out the answers to the written questions on the verdict form and sign and date it. After you have concluded your service and I have discharged the jury, you are not required to talk with anyone about the case.

If you need to communicate with me during your deliberations, the jury foreperson should write the inquiry and give it to the court security officer. After consulting with the attorneys, I will respond either in writing or by meeting with you in the courtroom. Keep in mind, however, that you must never disclose to anyone, not even to me, your numerical division on any question on the verdict form.

You may now proceed to the jury room to begin your deliberations.

Joint Status Report

### A. Proposed jury interrogatories

#### 1. Claims against AROG

**Question No. 1**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made a material misrepresentation in 2011 when it stated that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 1, then answer Question No. 2

**Question No. 2**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made a false misrepresentation in 2011 when it stated that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 2, then answer Question No. 3

**Question No. 3:**

Was the statement made by AROG in 2011 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of pure opinion?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 3, you do not need to answer any other questions.

**Question No. 4:**

Was the statement made by AROG in 2011 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of probability or expectation?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 4, you do not need to answer any other questions.

**Question No. 5:**

Was the statement made by AROG in 2011 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of a prediction about the future?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 5, you do not need to answer any other questions.

**Question No. 6:**

Was the statement made by AROG in 2011 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan contradicted by the terms of the 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

Joint Status Report

If you answered "Yes" to Question No. 6, you do not need to answer any other questions.

**Question No. 7:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made the statement in 2011 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG knew it was false?

Answer "Yes" or "No." ————

If you answered "Yes" to Question No. 7, then answer Question No. 8

**Question No.8:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made the statement in 2011 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG made such statement without knowledge of its truth?

Answer "Yes" or "No." ————

If you answered "Yes" to Question No. 8, then answer Question No. 9

**Question No. 9:**

Joint Status Report

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made the statement in 2011 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG made such statement with the intention that Plaintiff Abhijit Ramachandran made with the intention that it should be acted on by Plaintiff Abhijit Ramachandran?

Answer "Yes" or "No." ⸺⸺⸺


If you answered "Yes" to Question No. 9, then answer Question No. 10

**Question No. 10:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that he justifiably relied on the 2011 statement to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ⸺⸺⸺


If you answered "Yes" to Question No. 10, then answer Question No. 11

**Question No. 11:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that he suffered damages from the 2011 statement to Plaintiff Abhijit Ramachandran that he would garner a piece

Joint Status Report

of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 11, then answer Question No. 12

**Question No. 12:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made a material misrepresentation in 2012 when it stated that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 12, then answer Question No. 13

**Question No. 13:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made a false misrepresentation in 2012 when it stated that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 13, then answer Question No. 14

Joint Status Report

**Question No. 14:**

Was the statement made by AROG in 2012 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of pure opinion?

Answer "Yes" or "No." ————

If you answered "Yes" to Question No. 14, you do not need to answer any other questions.

**Question No. 15:**

Was the statement made by AROG in 2012 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of probability or expectation?

Answer "Yes" or "No." ————

If you answered "Yes" to Question No. 16, you do not need to answer any other questions.

**Question No. 16:**

Was the statement made by AROG in 2012 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of a prediction about the future?

Answer "Yes" or "No." ————

If you answered "Yes" to Question No. 16, you do not need to answer any other questions.

**Question No. 17:**

Joint Status Report

Was the statement made by AROG in 2012 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan contradicted by the terms of the 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ⸻

If you answered "Yes" to Question No. 17, you do not need to answer any other questions.

**Question No. 18:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made the statement in 2012 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG knew it was false?

Answer "Yes" or "No." ⸻

If you answered "Yes" to Question No. 18, then answer Question No. 19

**Question No. 19:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made the statement in 2012 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG made such statement without knowledge of its truth?

Answer "Yes" or "No." ⸻

Joint Status Report

If you answered "Yes" to Question No. 19, then answer Question No. 20

**Question No. 20:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made the statement in 2012 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG made such statement with the intention that Plaintiff Abhijit Ramachandran made with the intention that it should be acted on by Plaintiff Abhijit Ramachandran?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 20, then answer Question No. 21

**Question No. 21:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that he justifiably relied on the 2012 statement to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 21, then answer Question No. 22

**Question No. 23:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that he suffered damages from the 2012 statement to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 23, then answer Question No. 24

**Question No. 25:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made a material misrepresentation in 2014 when it stated that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 25, then answer Question No. 26

**Question No. 26:**

Joint Status Report

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made a false misrepresentation in 2014 when it stated that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 26, then answer Question No. 27

**Question No. 27:**

Was the statement made by AROG in 2014 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of pure opinion?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 27, you do not need to answer any other questions.

**Question No. 28:**

Was the statement made by AROG in 2014 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of probability or expectation?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 28, you do not need to answer any other questions.  .

**Question No. 29:**

Joint Status Report

Was the statement made by AROG in 2014 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of a prediction about the future?

Answer "Yes" or "No." ————

If you answered "Yes" to Question No. 29, you do not need to answer any other questions.

**Question No. 30:**

Was the statement made by AROG in 2014 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan contradicted by the terms of the 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ————

If you answered "Yes" to Question No. 30, you do not need to answer any other questions.

**Question No. 31:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made the statement in 2014 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG knew it was false?

Answer "Yes" or "No." ————

If you answered "Yes" to Question No. 31, then answer Question No. 32

Joint Status Report

**Question No. 32:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made the statement in 2014 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG made such statement without knowledge of its truth?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 32, then answer Question No. 33

**Question No. 33:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that AROG made the statement in 2014 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG made such statement with the intention that Plaintiff Abhijit Ramachandran made with the intention that it should be acted on by Plaintiff Abhijit Ramachandran?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 33, then answer Question No. 34

**Question No. 34:**

Joint Status Report

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that he justifiably relied on the 2014 statement to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ⸺

If you answered "Yes" to Question No. 34, then answer Question No. 35

**Question No. 35:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that he suffered damages from the 2014 statement to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ⸺

If you answered "Yes" to Question No. 35, then answer Question No. 36

**Question 36**

If you answered "Yes" to Questions 1-2, 7-13,18-26, and 31-36, what sum of money, if paid now in cash, would compensate Plaintiff Abhijit Ramachandran for the damages you have found Defendant AROG caused Plaintiff Abhijit Ramachandran?

Joint Status Report

Answer in dollars and cents for the following and none other:

    a.   Out-of-Pocket damages?

    b.   Benefit-of-the bargain damages?

    **2.   Claims against Dr. Jain**

**<u>Question No. 1</u>**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made a material misrepresentation in 2011 when it stated that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ————

If you answered "Yes" to Question No. 1, then answer Question No. 2

**<u>Question No. 2</u>**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made a false misrepresentation in 2011 when it stated that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ————

If you answered "Yes" to Question No. 2, then answer Question No. 3

**<u>Question No. 3:</u>**

Joint Status Report

Was the statement made by Dr. Jain in 2011 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of pure opinion?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 3, , you do not need to answer any other questions.

**Question No. 4:**

Was the statement made by Dr. Jain in 2011 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of probability or expectation?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 4, you do not need to answer any other questions.

**Question No. 5:**

Was the statement made by Dr. Jain in 2011 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of a prediction about the future?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 5, you do not need to answer any other questions.

**Question No. 6:**

Joint Status Report

Was the statement made by Dr. Jain in 2011 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan contradicted by the terms of the 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 6, you do not need to answer any other questions.


**Question No. 7:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made the statement in 2011 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG knew it was false?

Answer "Yes" or "No." ———


If you answered "Yes" to Question No. 7, then answer Question No. 8

**Question No.8:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made the statement in 2011 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG made such statement without knowledge of its truth?

Joint Status Report

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 8, then answer Question No. 9

**Question No. 9:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made the statement in 2011 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG made such statement with the intention that Plaintiff Abhijit Ramachandran made with the intention that it should be acted on by Plaintiff Abhijit Ramachandran?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 9, then answer Question No. 10

**Question No. 10:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that he justifiably relied on the 2011 statement to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

Joint Status Report

If you answered "Yes" to Question No. 10, then answer Question No. 11

**<u>Question No. 11:</u>**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that he suffered damages from the 2011 statement to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 11, then answer Question No. 12

**<u>Question No. 12:</u>**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made a material misrepresentation in 2012 when it stated that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 12, then answer Question No. 13

**<u>Question No. 13:</u>**

Joint Status Report

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made a false misrepresentation in 2012 when it stated that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." –––––––

If you answered "Yes" to Question No. 13, then answer Question No. 14

**Question No. 14:**

Was the statement made by Dr. Jain in 2012 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of pure opinion?

Answer "Yes" or "No." –––––––

If you answered "Yes" to Question No. 14 , you do not need to answer any other questions.

**Question No. 15:**

Was the statement made by Dr. Jain in 2012 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of probability or expectation?

Answer "Yes" or "No." –––––––

If you answered "Yes" to Question No. 16, you do not need to answer any other questions.

**Question No. 16:**

Joint Status Report

Was the statement made by Dr. Jain AROG in 2012 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of a prediction about the future?

Answer "Yes" or "No." —————

If you answered "Yes" to Question No. 16, you do not need to answer any other questions.

## Question No. 17:

Was the statement made by Dr. Jain in 2012 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan contradicted by the terms of the 2010 Long Term Incentive Plan?

Answer "Yes" or "No." —————

If you answered "Yes" to Question No. 17, you do not need to answer any other questions.

## Question No. 18:

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made the statement in 2012 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG knew it was false?

Answer "Yes" or "No." —————

If you answered "Yes" to Question No. 18, then answer Question No. 19

Joint Status Report

**Question No. 19:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made the statement in 2012 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG made such statement without knowledge of its truth?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 19, then answer Question No. 20

**Question No. 20:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made the statement in 2012 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG made such statement with the intention that Plaintiff Abhijit Ramachandran made with the intention that it should be acted on by Plaintiff Abhijit Ramachandran?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 20, then answer Question No. 21

**Question No. 21:**

Joint Status Report

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that he justifiably relied on the 2012 statement to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 21, then answer Question No. 22

**Question No. 23:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that he suffered damages from the 2012 statement to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 23, then answer Question No. 24

**Question No. 25:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made a material misrepresentation in 2014 when it stated that Plaintiff Abhijit Ramachandran garner a

piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ⸺⸺⸺

If you answered "Yes" to Question No. 25, then answer Question No. 26

**Question No. 26:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made a false misrepresentation in 2014 when it stated that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ⸺⸺⸺

If you answered "Yes" to Question No. 26, then answer Question No. 27

**Question No. 27:**

Was the statement made by Dr. Jain in 2014 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of pure opinion?

Answer "Yes" or "No." ⸺⸺⸺

If you answered "Yes" to Question No. 27, you do not need to answer any other questions.

**Question No. 28:**

Was the statement made by Dr. Jain in 2014 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of probability or expectation?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 28, you do not need to answer any other questions.

## Question No. 29:

Was the statement made by Dr. Jain in 2014 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan an expression of a prediction about the future?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 29, you do not need to answer any other questions.

## Question No. 30:

Was the statement made by Dr. Jain in 2014 that Plaintiff Abhijit Ramachandran garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan contradicted by the terms of the 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 30, you do not need to answer any other questions

## Question No. 31:

Joint Status Report

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made the statement in 2014 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG knew it was false?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 31, then answer Question No. 32

**Question No. 32:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made the statement in 2014 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG made such statement without knowledge of its truth?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 32, then answer Question No. 33

**Question No. 33:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that Dr. Jain made the statement in 2014 to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan that AROG made such statement with the intention that Plaintiff Abhijit

Ramachandran made with the intention that it should be acted on by Plaintiff Abhijit Ramachandran?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 33, then answer Question No. 34

**Question No. 34:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that he justifiably relied on the 2014 statement to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

If you answered "Yes" to Question No. 34, then answer Question No. 35

**Question No. 35:**

Has Plaintiff Abhijit Ramachandran proved by a preponderance of the evidence that he suffered damages from the 2014 statement to Plaintiff Abhijit Ramachandran that he would garner a piece of the upside of AROG when he was awarded Long Term Incentive Units pursuant to the AROG 2010 Long Term Incentive Plan?

Answer "Yes" or "No." ———

Joint Status Report

If you answered "Yes" to Question No. 35, then answer Question No. 36

**Question 36**

If you answered "Yes" to Questions 1-2, 7-13,18-26, and 31-36, what sum of money, if paid now in cash, would compensate Plaintiff Abhijit Ramachandran for the damages you have found Defendant AROG caused Plaintiff Abhijit Ramachandran?

Answer in dollars and cents for the following and none other:

      c.   Out-of-Pocket damages?

      d.   Benefit-of-the bargain damages?

Joint Status Report

EXHIBIT 14

DEFENDANTS' OBJECTIONS TO PLAINTIFF'S PROPOSED JURY INSTRUCTIONS

# PART ONE: GENERAL INSTRUCTIONS
## THE FIFTH CIRCUIT'S PATTERN JURY INSTRUCTIONS (CIVIL CASES)

**Stipulated Testimony**

A "stipulation" is something that the attorneys agree is accurate. When there is no dispute about certain testimony, the attorneys may agree or "stipulate" to that testimony.

Stipulated testimony must be considered in the same way as if that testimony had been received here in court.

**Stipulations of Fact**

A "stipulation" is an agreement. When there is no dispute about certain facts, the attorneys may agree or "stipulate" to those facts. You must accept a stipulated fact as evidence and treat that fact as having been proven here in court.

**Judicial Notice**

You must accept as proved facts of which the court takes judicial notice. The court has taken judicial notice that: [insert matters].

**Discontinuance as to Some Parties**

Certain parties are no longer involved in this trial. As jurors, it is your duty to consider the issues among the remaining parties.

**Limiting Instruction**

When testimony or an exhibit is admitted for a limited purpose, you may consider that testimony or exhibit only for the specific limited purpose for which it was admitted.

**Charts and Summaries**

Certain charts and summaries have been shown to you solely to help explain or summarize the facts disclosed by the books, records, and other documents that are in evidence. These charts and summaries are not evidence or proof of any facts. You should determine the facts from the evidence.

**Demonstrative Evidence**

Exhibit [specify] is an illustration. It is a party's [description/picture/model] used to describe something involved in this trial. If your recollection of the evidence differs from the exhibit, rely on your recollection.

Joint Status Report

**Similar Acts**

Evidence that an act was done at one time or on one occasion is not any evidence or proof whatsoever that the act was done in this case.

Then how may you consider evidence of similar acts?

You may consider evidence of similar acts for the limited purpose of showing Dr. Jain's motive, opportunity, intent, knowledge, plan, or absence of mistake or accident, which is at issue in this case.

Such evidence may not be considered for any other purpose whatsoever. You may not use the evidence to consider or reflect Dr. Jain's character.

**Deposition Testimony**

Certain testimony has been presented to you through a deposition. A deposition is the sworn, recorded answers to questions a witness was asked in advance of the trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, that witness's testimony may be presented, under oath, in the form of a deposition. Some time before this trial, attorneys representing the parties in this case questioned this witness under oath. A court reporter was present and recorded the testimony. The questions and answers have been read or shown to you via video. This deposition testimony is entitled to the same consideration and weighed and otherwise considered by you in the same way as if the witness had been present and had testified from the witness stand in court.

**Burden of Proof: Preponderance of The Evidence**

Unless otherwise told that a different standard of proof applies, Plaintiff Abhijit Ramachandran has the burden of proving his case by a preponderance of the evidence. To establish by a preponderance of the evidence means to prove something is more likely so than not so. If you find that Plaintiff Ramachandran has failed to prove any element of his claim by a preponderance of the evidence, then he may not recover on that claim.

**Evidence**

The evidence you are to consider consists of the testimony of the witnesses, the documents and other exhibits admitted into evidence, and any fair inferences and reasonable conclusions you can draw from the facts and circumstances that have been proven.

Generally speaking, there are two types of evidence. One is direct evidence, such as testimony of an eyewitness. The other is indirect or circumstantial evidence. Circumstantial evidence is evidence that proves a fact from which you can logically conclude an- other fact exists. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.1

Joint Status Report

**Witnesses**

You alone are to determine the questions of credibility or truthfulness of the witnesses. In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case, that he or she may have, and the consistency or inconsistency of his or her testimony considered in the light of the circumstances. Has the witness been contradicted by other credible evidence? Has he or she made statements at other times and places contrary to those made here on the witness stand? You must give the testimony of each witness the credibility that you think it deserves.

Even though a witness may be a party to the action and therefore interested in its outcome, the testimony may be accepted if it is not contradicted by direct evidence or by any inference that may be drawn from the evidence, if you believe the testimony.

You are not to decide this case by counting the number of witnesses who have testified on the opposing sides. Witness testimony is weighed; witnesses are not counted. The test is not the relative number of wit- nesses, but the relative convincing force of the evidence. The testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses testified to the contrary, if after considering all of the other evidence, you believe that witness.

**Expert Witnesses**

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely on it.

## PART II: PLAINTIFF'S FRAUDULENT INDUCEMENT CLAIM

**Jury Question Number 1**: Did Dr. Jain commit fraud against Abby?[121]

Answer "Yes" or "No": _____

Defendants object to the proposed Jury Question Number 1 because it fails to state with specificity the act(s) of fraud complained of. This lack of notice is prejudicial to Defendants and is confusing to the jury.

"**Fraud**" occurs when—

      1.      A party makes a material misrepresentation, and

      2.      The misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and

      3.      The misrepresentation is made with the intention that it should be acted on by the other party, and

      4.      The other party justifiably relies on the misrepresentation and thereby suffers injury.[122]

"**Misrepresentation**" means—

A false statement of fact,[123] **or**

A promise of future performance made with an intent, at the time the promise was made, not to perform as promised.[124]

        **False Statement of Fact**. A false statement of fact is an untrue, deceptive, or misleading statement concerning a past or present fact.[125]

        **False Promise of Future Performance**. To prove a false promise of future performance, the plaintiff must establish the defendant made a promise with no intention of performing it.[126] The plaintiff must show that the defendant had no intention of performing when the defendant made the promise.[127] Although intent

---

[121]    Texas Patter Jury Charges—Business, Consumer, Insurance & Employment (2020) ("**PJC**") § 105.1 ("PJC 105.1 is a broad-form question designed to be accompanied by one or more appropriate instructions")

[122]    PJC § 105.2.

[123]    PJC § 105.3A

[124]    PJC § 105.3B

[125]    O'Connor's Texas Causes of Action, Ch. 12-A, § 2.3.1, p. 321 (2022 ed.) ("A false statement of fact is an untrue, deceptive, or misleading statement concerning a past or present fact.").

[126]    O'Connor's Texas Causes of Action, Ch. 12-A, § 2.3.3, p. 323 (2022 ed.) (". To prove a false promise of future performance, the plaintiff must establish the defendant made a promise with no intention of performing it.")

[127]    Id.

may be inferred from the acts of the party after the representation is made, proof that the defendant breached the agreement is not sufficient by itself.[128] Slight circumstantial evidence of fraud, when considered with the breach of a promise to perform, is enough to find intent not to perform.[129] A defendant's attempt to force a plaintiff to accept a new, lesser agreement is some evidence that the defendant never intended to honor the original agreement.[130] A defendant's denial that he made the promise is also some evidence that the defendant never intended to honor the original promise.[131] And if you find that the defendant shows no pretense of performance, that is also evidence that the defendant never intended to honor the promise.[132]

**"Material Misrepresentation"** is defined as a misrepresentation that is important to the plaintiff in making a decision—that is, if a reasonable person would attach importance to and be induced to act on the information in determining whether to make a transaction.[133]

**Personal Liability**. An officer of a company may be individually liable for his own act of fraud performed for his company.[134]

---

[128]   Id.

[129]   Id.

[130]   *See Leon's Fine Foods, Inc. v. Merit Inv. Partners, Ltd.,* 2000 Tex. App.  LEXIS 5083 * 9 (Tex. App.—Dallas, July 31, 2000).

[131]   *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex. 1986) ("Courts have held a party's denial that he ever made a promise is a factor showing no intent to perform when he made the promise.").

[132]   *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex. 1986) ("No pretense of performance by the defendant has also been held to be a factor showing lack of intent."); (*citing C. T. M. C. Ry. Co. v. Titterington,* 84 Tex. 218, 219 (Tex. 1892).

[133]   O'Connor's Texas Causes of Action, Ch. 12-A, § 2.1.1(4), p. 320 (2022 ed.) ("A false representation is material if it is important to the plaintiff in making a decision—that is, if a reasonable person would attach importance to and be induced to act on the information in determining whether to make a transaction.").

[134]   O'Connor's Texas Causes of Action, Ch. 12-A, § 2.1.1(4), p. 320 (2022 ed.) ("An agent may be individually liable for its own act of fraud performed for its principal.").

Joint Status Report

If you answered "Yes" to Question 1, then answer the following question. Otherwise, do not answer this question.

**Jury Question Number 2:** Did AROG commit fraud against the plaintiff?

**Answer "Yes" or "No":** _____

<span style="color:red">Defendants object to the proposed Jury Question Number 1 because it fails to state with specificity the act(s) of fraud complained of. This lack of notice is prejudicial to Defendants and is confusing to the jury.</span>

**Vicarious Liability**. AROG is liable for the fraudulent conduct of Dr. Jain so long as: (1) Dr. Jain acted with actual **or** apparent authority **or** if AROG ratified the conduct of Dr. Jain; and (2) Dr. Jain was acting within the scope of his authority when he committed fraud.[135]

**Actual Authority.** Authority for Dr. Jain to act for AROG must arise from Dr. Jain's agreement that he has the authority to act on behalf and for the benefit of AROG. If AROG so authorizes Dr. Jain to perform an act, Dr. Jain is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized.[136]

**Apparent Authority**. Apparent authority exists if AROG (1) knowingly permits Dr. Jain to hold himself out as having authority or, (2) through lack of ordinary care, bestows on Dr. Jain such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exits.[137]

---

[135]    PJC § 101.4 ("A party's conduct includes the conduct of another who acts with the party's authority or apparent authority"); *see also* O'Connor's Texas Causes of Action, Ch. 12-A, § 2.1.1(1), p. 320 (2022 ed.) ("A principal may be vicariously liable for the fraudulent conduct of its agent if the agent acted with actual or apparent authority or if the principal ratified the conduct.").

[136]    In its section on Principal-Agent Liability, O'Connor's notes that PJC § 101.4 is appropriate to define actual and apparent authority, even though this instruction in § 101.4 notes that vicarious liability may require more to establish vicarious liability for a tort like fraud. Here, the addition of acting within the scope of authority is the additional instruction required to establish vicarious liability for fraud. Moreover, Plaintiff's proposed jury instruction is taken from the Pattern Jury Instructions with the only change being the insertion of the parties to make it more accessible for the jury to follow. PJC § 101.4 ("Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a Party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized.)

[137]    Similar to the previous instruction, Plaintiff's proposed jury instruction is taken from the Pattern Jury Instructions with the only change being the insertion of the parties to make it more accessible for the jury to follow. PJC § 101.4 ("Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person

**Scope of Authority**. Dr. Jain must have been acting within the scope of his authority when he committed the fraudulent conduct. Dr. Jain's authority is generally limited to certain acts that are incident to the management of AROG.[138]

_____

to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exits.")

[138]     O'Connor's Texas Causes of Action, Ch. 38-A, § 2.2.2 ("The agent must have been acting within the scope of its authority. An agent's authority is generally limited to certain acts that are incident to the management of the particular business with which it is entrusted.")

Joint Status Report

**Jury Question Number 3:** Did Dr. Jain fail to act in good faith in regard to Abby's units awarded under the 2010 LTIU Plan?[139]

**Answer "Yes" or "No":** _____

Defendants object to Plaintiff's proposed Jury Question Number 3 because it is irrelevant to Plaintiff's remaining fraud claim. This Court has ruled that Plaintiff's claims related to the 2010 LTIU Plan were not ripe, and the Court lacks subject matter jurisdiction to adjudicate them.

Document 153 filed 12/15/20 Page ID 3372

Under the 2010 LTIU Plan, the plan's administrator was obligated to act in good faith when administering the plan for the benefit of the plan's participants like Abby. Because Dr. Jain was the administrator under the 2010 LTIU Plan, he was obligated to act in good faith when administering this plan for the benefit of Abby.

> **Good Faith means—**
>
> a state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing **or** (4) absence of intent to defraud or to seek unconscionable advantage. Good faith requires conduct that is honest in fact and is free of both improper motive and willful ignorance of the facts at hand.[140] A party who hokes up a phony defense to the performance of his

---

[139]    PJC 103.3 (noting that, in the event of a contractual obligation to act in good faith, the "basic question in PJC 101.2 should be used...").

[140]    The Texas Pattern Jury Charges and the Fifth Circuit Jury Charges do not include a definition of "good faith." Consequently, this jury instruction relies on the common law definition of good faith, as defined by the Texas Supreme Court. *Janvey v. GMAG, LLC*, 592 S.W.3d 125, 129 (Tex. 2019) (defining "good faith" for a statute that does not contain a definition by determining the word's "plain or common meaning."). In doing this, the Texas Supreme Court defined good faith as follows:

> [Good faith is] defined as '[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing ..., or (4) absence of intent to defraud or to seek unconscionable advantage.' We have explained that good faith 'requires conduct that is honest in fact and is free of both improper motive and willful ignorance of the facts at hand.' And we have recognized "reasonableness" as a component of good faith. *Wichita County v. Hart*, 917 S.W.2d 779, 786 (Tex. 1996) (combining "honesty in fact" with "reasonableness" to define what constitutes good faith under the Whistleblower Act).

*Janvey v. GMAG, LLC*, 592 S.W.3d 125, 129 (Tex. 2019) (citing, inter alia, Black's Law Dictionary (11th Ed. 2019).

Joint Status Report

contractual duties and then when that defense fails tries another defense for size is not acting in good faith.[141]

---

[141]     *Market Street Assoc. Ltd. Partnership v. Frey,* 941 F.2d 588, 595 (7th Cir. 1991) ("A party who hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries an another defense for size can properly be said to be acting in bad faith.") (*citing Harbor Ins. Co. v. Continental Bank Corp.,* 922 F.2d 357, 363 (7th Cir. 1990) and *Larson v. Johnson,* 1 Ill.App.2d 36, 46, 116 N.E.2d 187, 191-92 (1953)).

**Jury Question Number 4:** Did Dr. Jain cancel or forgo AROG's plans to make a "Public Offering" to avoid triggering Abby's rights under Section 6 of the 2010 LTIU Plan?

**Answer "Yes" or "No":** _____

Defendants object to proposed Jury Question Number 4 because it does not define Public Offering but merely states the procedure should a Public Offering occur. Public Offering is defined in the 2010 LTIU Plan as, "the underwritten public offering of Capital Securities of the Company.

Defendants further object because Dr. Jain had the absolute right to direct AROG's decision regarding any contemplated Public Offering in his sole discretion. This proposed Jury Question is irrelevant and would be confusing to the jury.

Under the 2010 LTIU Plan, there were two primary events that would trigger a payout to Abby: (1) a Sale of the Company under Section 5 and (2) a public offering under section 6. Section 6 of the 2010 LTIU Plan reads as follows:

> **"Public Offering.** Immediately following the consummation of a Public Offering, all or any portion of the vested Units held by the Participants may, at the option of the Administrator, be converted into Capital Securities with such conversion ratio as the Administrator shall determine based upon the Fair Market Value of the Company at the time of the Public Offering and subject to any restrictions or requirements as the Administrator may deem necessary or appropriate. If any vested Units held by the Participants are not so converted, the Administrator may elect to cancel all or any portion of such vested Units in connection with a Public Offering upon payment to the Participants of an amount equal to the Fair Market Value of such vested Units assuming a Sale of the Company occurred as of the date of such cancellation."[142]

**Initial Public Offering** means a "company's first public sale of stock; the first offering of an issuer's equity securities to the public through a registration statement"[143] An initial public offering (IPO) is the event that makes a corporation's transition from private to public ownership.

**S-1 Statement** means the SEC form that a company usually must file before listing and trading its securities on a national exchange. This form is used primarily by first-time issuers of securities. This form is the basic, full-length registration statement that requires a great deal of information about the issuer and the securities being sold.[144]

**S-1 Required Disclosures re Pending Litigation.** An S-1 form requires a party to disclose, among other things, any pending litigation against the company.

---

[142]     2010 LTIU Plan, § 6.

[143]     Black's Law Dictionary, p. 1254 (Garner, 10th Ed.)

[144]     Black's Law Dictionary, p. 1535 (Garner, 10th Ed.)

Joint Status Report

**Jury Question Number 5:** Did AROG fail to comply with the 2010 LTIU Plan when it adopted the 2014 LTIU Plan without Abby's consent?

**Answer "Yes" or "No":** _____

Defendants object to proposed Jury Question Number 5 because it is irrelevant to Plaintiff's only remaining fraud claim. It is undisputed that Abby's LTIUs were issued pursuant to the 2010 LTIU Plan. Abby was never a Participant in the 2014 LTIU Plan.

**Prior Written Consent of Abby.** The 2010 LTIU Plan holds that, "No amendment, supplement, modification or waiver of the Plan will be effective without the prior written consent of [Dr. Jain] and [Abby] if such amendment, supplement, modification or waiver would **materially <u>and</u> adversely** modify in **any respect** the rights of [Abby] under the Plan."[145]

**Material** means of such a nature that knowledge of the item would affect a person's decision making; significant; essential.[146]

**Adverse action** means a decision or event that unfavorably affects a person, entity, or association.[147]

---

[145]     2010 LTIU Plan, § 12.

[146]     Black's Law Dictionary, p. 1254 (Garner, 10th Ed.)

[147]     Black's Law Dictionary, p. 1254 (Garner, 10th Ed.)

Joint Status Report

If you answered "Yes" to Question 1 about whether Dr. Jain committed fraud on the Plaintiff, then answer the following question. Otherwise, do not answer the following question.

**Direct Damages**

**Question Number 6:** What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the plaintiff for his damages, if any, that resulted from Dr. Jain's fraud?

> **Direct Damages.** Direct damages are the damages that are the necessary and usual result of the wrongful act. This case presents a fraud claim based on an inducement of a binding contract. Consequently, there are two types of direct damages that are available for this type of fraud claim: (1) out-of-pocket damages; and (2) benefit-of-the-bargain damages. This case is limited to Benefit-of-the-Bargain Damages.[148]

> **Benefit-Of-The-Bargain Damages** is measured by the difference between the value as represented and the valued received, allowing the injured party to recover money or benefits that would have been made had the bargain been performed as promised.[149]

**Answer Separately**. In answering any questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.[150]

**Benefit of the Bargain Damages** sustained by Plaintiff in the past

---

[148]    *Zorrilla v. Aypco Construction II, LLC,* 469 S.W.3d 143, 153 (Tex. 2015) ("Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the bargain measure. The former derives from a restitutionary theory while the latter derives from an expectancy theory."); *see also Anderson v. Durant,* 550 S.W.3d 605, 614 (Tex. 2018) ("Two types of direct damages are available for common-law fraud: out-of-pocket damages...and benefit-of-the-bargain damages..."); *see generally* PJC § 115.19 Comment ("In fraud cases, direct damages are sometimes referred to as general damages—that is, damages that are the necessary and usual result of the wrongful act.").

[149]    *Zorrilla v. Aypco Construction II, LLC,* 469 S.W.3d 143, 153 (Tex. 2015) ("Benefit-of-the-bargain damages are measured by the difference between the value as represented and the value received, allowing the injured party to recover profits that would have been made had the bargain been performed as promised.") This jury instruction quotes a definition for "benefit-of-the-bargain" from the Texas Supreme Court virtually word for word with one modification. While the Texas Supreme Court references the right to recover "profits" that would have been realized if the agreement had been performed as promised, this jury instruction inserts the word "money or benefits" in place of "profits" because it is more applicable to the facts of this case. If Dr. Jain had honored his promises, Abby would have received either money or a benefit in the form of public shares in AROG.

[150]    PJC 115.19

Joint Status Report

Answer: _____

If you answered "Yes" to Question 1, then answer the following question. Otherwise, do not answer the following question.

**Mental Anguish Damages**

**Question Number 7:** What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the plaintiff for his compensatory damages for mental and emotional distress, if any, that were proximately caused by such fraud?

> **"Proximate Cause"** means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the at or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.[151]

> **Mental Anguish Damages.** To recover compensatory damages for mental and emotional distress, the plaintiff must prove that he has suffered a specific discernable injury with credible evidence. Hurt feelings, anger, and frustration are part of life and are not the types of harm that could support a mental-anguish award. Evidence of mental anguish need not be corroborated by doctors, psychologists, or other witnesses, but the plaintiff must support his claims with competent evidence of the nature, extent, and duration of the harm. Damages for mental or emotional distress must be based on the evidence at trial. They may not be based on speculation or sympathy.[152]

**Answer Separately**. In answering any of the questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

**Mental Anguish sustained by plaintiff in the past**

Answer: _____

---

[151]    PJC §§ 100.13

[152]    Pattern Jury Instructions (Civil Cases), § 10.13, p. 127 (2020). "Mental anguish damages are recoverable for torts that involve intentional or malicious conduct." O'Connor's Texas Causes of Action, Ch. 41-B § 3.1.2(2)(a) p. 1447 (2022 ed.) (*citing City of Tyler v. Likes*, 962 S.W.2d 489, 495 (Tex. 1997) and *SCI Tex. Funeral Servs. V. Nelson*, 540 S.W.3d 539, 544 (Tex. 2018)). "To prove mental anguish damages when there is no physical injury, the plaintiff must (1) offer direct evidence of the nature, duration, and severity of the mental anguish and show how it disrupted the plaintiff's daily routine, or (2) offer other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." O'Connor's Texas Causes of Action, Ch. 41-B § 3.3.1(2), p. 1450 (2022 ed.).

Joint Status Report

Answer the following question only if you unanimously answered "Yes" to Question 1. Otherwise, do not answer the following question. To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of six or more jurors. Otherwise, you must not answer the following question.

**Punitive Damages**

**Question Number 8:** Do you find by clear and convincing evidence that the harm to Abby resulted from malice, or any fraud found by you in Question No. 1?[153]

**Answer "Yes" or "No":** _____

**"Clear and convincing evidence"** means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.[154]

**"Malice"** means a specific intent by Dr. Jain to cause substantial injury or harm to Abby.[155]

**"Fraud"** occurs when—

    1.    A party makes a material misrepresentation, and
    2.    The misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and
    3.    The misrepresentation is made with the intention that it should be acted on by the other party, and
    4.    The other party justifiably relies on the misrepresentation and thereby suffers injury.[156]

**"Misrepresentation"** means—

    A false statement of fact,[157] **or**

---

[153]    Under Texas law, Dr. Jain may be liable for exemplary damages upon a finding by clear and convincing evidence that Dr. Jain's "aggravated conduct amounted to one of the following: (1) gross negligence; (2) malice, or (3) fraud. See O'Connor's Texas Causes of Action, Ch. 12-A, § 2.3.1, p. 321 (2022 ed.) (collecting cases and authority outlining tenets of Exemplary Damages Under the Damages Act) (*citing* Tex. Civ. Prac. & Rem. Code § 41.003(a)); *see also* PJC § 115.37B Comment ("If fraud is an underlying theory of liability as well as a predicate for recovery of exemplary damages, the question may be modified as follows: 'Do you find by clear and convincing evidence that the harm to [plaintiff] resulted from [malice, gross negligence, or] any fraud found by you in Question ___?'")

[154]    **PJC § 115.37B**

[155]    **PJC § 115.37B**

[156]    PJC § 105.2.

[157]    PJC § 105.3A

Joint Status Report

A promise of future performance made with an intent, at the time the promise was made, not to perform as promised.[158]

> **False Statement of Fact**. A false statement of fact is an untrue, deceptive, or misleading statement concerning a past or present fact.[159]
>
> **False Promise of Future Performance**. To prove a false promise of future performance, the plaintiff must establish the defendant made a promise with no intention of performing it.[160] The plaintiff must show that the defendant had no intention of performing when the defendant made the promise.[161] Although intent may be inferred from the acts of the party after the representation is made, proof that the defendant breached the agreement is not sufficient by itself.[162] Slight circumstantial evidence of fraud, when considered with the breach of a promise to perform, is enough to find intent not to perform.[163] A defendant's attempt to force a plaintiff to accept a new, lesser agreement is some evidence that the defendant never intended to honor the original agreement.[164] A defendant's denial that he made the promise is also some evidence that the defendant never intended to honor the original promise.[165] And if you find that the defendant shows no pretense of performance, that is also evidence that the defendant never intended to honor the promise.[166]

---

[158]    PJC § 105.3B

[159]    O'Connor's Texas Causes of Action, Ch. 12-A, § 2.3.1, p. 321 (2022 ed.) ("A false statement of fact is an untrue, deceptive, or misleading statement concerning a past or present fact.").

[160]    O'Connor's Texas Causes of Action, Ch. 12-A, § 2.3.3, p. 323 (2022 ed.) (". To prove a false promise of future performance, the plaintiff must establish the defendant made a promise with no intention of performing it.")

[161]    Id.

[162]    Id.

[163]    Id.

[164]    *See Leon's Fine Foods, Inc. v. Merit Inv. Partners, Ltd.*, 2000 Tex. App.  LEXIS 5083 * 9 (Tex. App.—Dallas, July 31, 2000).

[165]    *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) ("Courts have held a party's denial that he ever made a promise is a factor showing no intent to perform when he made the promise.").

[166]    *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) ("No pretense of performance by the defendant has also been held to be a factor showing lack of intent.") (*citing C. T. M. C. Ry. Co. v. Titterington*, 84 Tex. 218, 219 (Tex. 1892).

Joint Status Report

**"Material Misrepresentation"** is defined as a misrepresentation that is important to the plaintiff in making a decision—that is, if a reasonable person would attach importance to and be induced to act on the information in determining whether to make a transaction. [167]

---

[167]     O'Connor's Texas Causes of Action, Ch. 12-A, § 2.1.1(4), p. 320 (2022 ed.) ("A false representation is material if it is important to the plaintiff in making a decision—that is, if a reasonable person would attach importance to and be induced to act on the information in determining whether to make a transaction.")

Joint Status Report

Answer the following question only if you unanimously answered "Yes" to Question 2 concerning whether AROG committed fraud on Abby. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of six or more jurors. Otherwise, you must not answer the following question.

**Punitive Damages**

**Question Number 9:** Do you find by clear and convincing evidence that the harm to Abby resulted from malice attributable to AROG?[168]

**Answer "Yes" or "No":** _____

**"Clear and convincing evidence"** means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.[169]

**"Malice"** means a specific intent by Dr. Jain to cause substantial injury or harm to Abby.[170]

You are further instructed that AROG may be liable for Dr. Jain's malice against Abby if, but only if—

1. Dr. Jain was employed by AROG as a vice principal in a managerial capacity and was acting in the scope of his employment as a vice principal; or
2. AROG or another manager or vice principal of AROG ratified or approved the act.

A person is a **"Vice Principal"** if—

1. that person is a corporate officer; or
2. that person has the authority to employ, direct, and discharge an employee of AROG; or
3. that person is engaged in the performance of nondelegable or absolute duties of AROG.

---

[168]    Under Texas law, AROG may be vicariously liable for exemplary damages upon a finding by clear and convincing evidence that Dr. Jain, as a vice-principal for AROG, "acted with malice or gross negligence." *See* O'Connor's Texas Causes of Action, Ch. 42-B, § 2.2.1(3), p. 1517 (2022 ed.) ("A corporation may be held liable for exemplary damages for a vice-principal's noncriminal act if the vice-president acted with malice or gross negligence. A vice-principal's acts are considered to be the corporation's acts").

[169]    PJC § 115.37B

[170]    PJC § 115.37B

**Jury Instruction No. 10**: Under Code § 32.46 of a relevant Texas statute,[171] a person commits the offense of securing the execution of a document by deception if, with intent to defraud or harm person, he, by deception, causes another to sign or execute any document affecting property or service or the pecuniary interest of any person.[172] Did you find by clear and convincing evidence that Dr. Jain's fraud against Abby constituted a violation of this Code § 32.46?

**Answer "Yes" or "No": _____**

**<span style="color:red">Defendant, Jain, objects to proposed Jury Instruction No. 10 because the jury instruction fails to state that this question should be answered only if the jury unanimously answered "yes" to Jury Question Number 1.</span>**

"**Deception**" means:

1. Creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true.
2. Failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true.
3. Promising performance that is likely to affect the judgment of another in the transaction, and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intent to perform or knew the promise would not be performed.

---

[171]    To avoid any potential confusion, this jury instruction avoids making a reference to a criminal statute. There is no need to reference a criminal statute to obtain a finding that Dr. Jain's fraud satisfies the elements of this criminal statute.

[172]    This jury charge is offered to show that any award for exemplary damages should not be capped because Plaintiff can show that Defendant Dr. Jain's fraud in this case constituted a violation of Tex. Pen. Code § 32.46, which nullifies any potential cap on Plaintiff's recovery of exemplary damages. To ensure that Plaintiff procures a jury finding on this particular offense, Plaintiff proffers a jury instruction based on the jury instructions prepared by two former Texas Criminal State Court Judges. *See* Judge Elizabeth Berry and Judge George Gallagher, Texas Criminal Jury Charges (Revision 15) (James Publishing 2014) § 8.1470 (involving Tex. Pen. Code § 32.46(a)(1)). The jury instruction in this section asserts that:

> [a] person commits the offense of securing the execution of a document by deception if, with intent to defraud or harm any person, he, by deception, causes another to sign or execute any document affecting property or service or the pecuniary interest of any person.

The above jury instruction also quotes verbatim three of the relevant definitions for the term "deception."

Joint Status Report

## PART III: DEFENDANT AROG'S CONTRACT CLAIMS

### Defendant's First Contract Claim
*Breach Of The 2010 Agreement*

**Jury Instruction No. 20.** Did Abby and AROG agree under the terms and conditions of the 2010 IP Agreement that Abby would not sue AROG to interpret his rights under this agreement?[173]

**Answer "Yes" or "No:** _____

Defendants object to proposed Jury Instruction Number 20 because it is irrelevant to Plaintiff's sole remaining fraud claim. Plaintiff's breach of contract claims were dismissed by Memorandum Opinion and Order entered on December 15, 2020 Doc 153 Page ID 3371, 3372

---

[173]     PJC § 101.1. Plaintiff intends to argue that there is agreement provision not to sue AROG under the terms and conditions of the 2010 Confidentiality and IP Agreement. If, however, this Court determines that there is a fact question about whether sue a provision exits, this jury instruction is appropriate under the PJC because it applies to "a dispute about the existence of an agreement **or its terms**." Id (emphasis added). While this issue may be decided by the Court as a matter of law before the instructions, this jury instruction is proposed in the event that there is a fact issue about whether there was an agreement provision not to sue.

Joint Status Report

**Jury Instruction No. 21**. Did Abby fail to comply with the 2010 Confidentiality and IP Agreement when he filed a declaratory judgment action to be declared one of the "joint inventors" and "joint owners" of the Crenolanib Patents?

Answer "Yes" or "No": _____

Defendants object to proposed Jury Instruction No. 21 because it is irrelevant to Plaintiff's sole remaining fraud claim. This Court has ruled, "Here, however, Ramachandran only disputes the legal validity or enforceability of an assignment agreement that undisputedly all his intellectual property interests to AROG. This falls squarely in the ambit of the rule detailed in *Larson*, and Ramachandran consequently lacts Article III standing to challenge inventorship under section 256 until he first obtains receission of the 2010 Assignment. Accordingly, the Court GRANTS the motion to dismiss count 4." Document 153 filed 12/15/20 Page ID 3375

**Material Breach**. A failure to comply with the 2010 Confidentiality and IP Agreement must be material. The circumstances to consider in determining whether a failure to comply is material include:

1. the extent to which the injured party will be deprived of the benefit which he reasonably expected;
2. the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
3. the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
4. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances;
5. the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

**Actions Rendering a Patent Unenforceable**. Under federal law, if an inventor deliberately conceals another inventor's involvement in the conception of an invention and engages in a pattern of intentional conduct designed to deceive the patent attorney and the patent office as to who the true inventors were, that patent may be deemed unenforceable because an inventor was intentionally concealed from the patent office.[174] In this case, if you find that Dr. Jain intentionally and deliberately concealed the identify and the work performed by Dr. Shah and/or Abby on the concepts incorporated into the Crenolanib Patents, you can conclude that the Crenolanib Patents are unenforceable because Dr. Jain intentionally concealed a known inventor from the patent office. You may consider this finding to conclude that Abby's alleged breach of the 2010 Confidentiality and IP Agreement was not a material breach of the agreement because it the benefits associated with

---

[174]     [cite law]; *see also Frank's Casing Crew & Rental Tools, Inc. v. PMR Technologies, Ltd.*, 292 F.3d 1363, 1376-77 (Fed. Cir. 2002) (holding that patent was unenforceable because the listed inventors had "deliberately concealed [another inventor's] involvement in the conception of the invention and engaged in a pattern of intentional conduct designed to deceive the attorneys and patent office as to who the true inventors were.").

Joint Status Report

the Crenolanib Patents were significantly diminished by Dr. Jain's representations to the patent office.

**Jury Question Number 23:** Did AROG intentionally waive compliance with the 2010 Confidentiality and IP Agreement when it notified Abby multiple times at the time of his termination and afterwards that he was obligated to comply with the "Confidentiality and Intellectual Property provisions" in the **2015 Employment Contract** with no reference to the **2010 Confidentiality and IP Agreement**?

Defendants object to Plaintiff's proposed Jury Question Number 23 because it is irrelevant to Plaintiff's remaining fraud claim. Defendants further object because the Jury Question improperly comments on the evidence and will confuse the jury.

Answer "Yes" or "No": _____

**Waiver.** Failure of Abby to comply with the 2010 Confidentiality and IP Agreement is excused if compliance is intentionally waived by AROG. A waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.[175] In determining this issue of waiver, AROG's intent is the primary factor to consider, focusing on AROG's words, acts, or conduct related to the 2010 Confidentiality and IP Agreement.[176] Prolonged silence or inaction in asserting a known right is conduct that may amount to a waiver.

---

[175]       O'Connor's Texas Causes of Action, Ch. 5-B, § 5.1.20, p. 115-116 (2022 ed.) ("A waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.").

[176]       O'Connor's Texas Causes of Action, Ch. 5-B, § 5.1.20, p. 115-116 (2022 ed.) ("The plaintiff's intent is the primary factor in determining waiver, and in the absence of a clear intent expressed in words, acts, or conduct, waiver will be implied only to prevent fraud or inequitable consequences.").

Joint Status Report

**Jury Instruction No. 22.** Did Abby act in "bad faith" when he filed his declaratory judgment action claim in this Lawsuit to seek a declaration that he was a joint inventor and joint owner of the Crenolanib Patents?[177]

Answer "Yes" or "No": _____

<span style="color:red">Defendants object to proposed Jury Instruction No. 22 because it is irrelevant to Plaintiff's sole remaining fraud claim. This Court has ruled, "Here, however, Ramachandran only disputes the legal validity or enforceability of an assignment agreement that undisputedly all his intellectual property interests to AROG. This falls squarely in the ambit of the rule detailed in *Larson*, and Ramachandran consequently lacks Article III standing to challenge inventorship under section 256 until he first obtains rescission of the 2010 Assignment. Accordingly, the Court GRANTS the motion to dismiss count 4." Document 153 filed 12/15/20 Page ID 3375</span>

**Bad Faith**. The term "bad faith" is determined based on a two-part test about whether a lawsuit is objectively baseless and subjectively designed to directly interfere with a competitor's interests. Under the first part of the test, you have to determine whether the lawsuit was objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit was not filed in bad faith. A party cannot be acting in bad faith if it has probable cause to institute a lawsuit.

For this first part of the test, if you determine that the lawsuit was **not** objectively baseless, you must answer "No" to support a finding that Abby did not file the lawsuit in bad faith. Otherwise, you must continue with the second part of the test to determine bad faith.

Under the second part of the test, if you determine that the lawsuit was objectively baseless, you must determine whether this baseless lawsuit conceals an attempt by Abby to interfere directly with

---

[177]     To support Plaintiff's affirmative defense concerning qualified immunity to file a lawsuit, Plaintiff contends that he has a first amendment right to file a declaratory judgment action to determine whether he had rights under federal law as an inventor of the Crenolanib Patents. This first amendment protection associated with filing lawsuits is generally referred to as the "Noeer-Pennington Doctrine," and it extends to lawsuits filed to determine a party rights under federal patent laws. *See, e.g., Order Applies to Cisco Systems, Inc. v. Innovatio IP Ventures, LLC,* 921 F. Supp. 2d 903, 911 (N.D. Ill. 2013) ("Noerr–Pennington has been extended beyond the antitrust laws, where it originated, and is today understood as an application of the first amendment's speech and petitioning clauses.") (collecting cases); *see also Video Intern. Prod. v. Warner-Amex Cable Com,* 858 F.2d 1075, 1084 (5th Cir. 1988) ("Although the Noerr-Pennington doctrine initially arose in the antitrust field, other circuits have expanded it to protect first amendment petitioning of the government from claims brought under federal and state laws"). Under this doctrine, unless the lawsuit is filed in bad faith–and thus considered a "sham" petition, the party filing the lawsuit to enforce his rights under federal patent laws will be immune from liability arising from any ostensible damages caused by the lawsuit itself. Therefore, unless Defendant AROG can show that Abby filed this lawsuit in bad faith, he cannot be held liable for any damages associated with his petition to this Court. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 60-61 (1993)

Joint Status Report

the business relationships of a competitor, through the use of the litigation process as an anticompetitive weapon. To satisfy this test, AROG must show that Abby knew that he was filing this lawsuit to directly interfere with AROG's business relationships.[178]

---

[178]    *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60-61 (1993) ("First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process — as opposed to the outcome of that process — as an anticompetitive weapon...") (cleaned up).

Joint Status Report

**Defendant's Second Contract Claim**
*Breach of 2015 Employment Contract*

**Jury Question 24:** Did Abby fail to comply with the 2015 Employment Contract by failing to perform his duties as AROG's Director of Clinical Operations and by failing to devote substantially all of his business time, skill and attention to the performance of his duties as AROG's Director of Clinical Operations.

Answer "Yes" or "No": _____

**2015 Employment Contract Provision**. The Plaintiff's time commitment obligations under the 2015 Employment Contract were contained in the following provisions:

> **Time Devoted to Employment**. Employee shall, at all times, faithfully and diligently, and to the best of his ability, experience and talents, perform the duties set forth herein or to which Employee may, in the future, be assigned, acting solely in the best interests of Employer and subject to the lawful direction and control of Employer's Chief Executive Officer. Employee shall keep Employer's Chief Executive Officer promptly and fully informed (in writing if so requested) of his conduct of the affairs of Employer, shall reasonably seek the advice and counsel of Employer's Chief Executive Officer and shall provide such explanations of his actions as Employer's Chief Executive Officer may reasonably require. Subject to any absences due to vacation or illness, Employee shall devote substantially all of his business time, skill and attention to the performance of his assigned employment duties and shall be available to carry out such services at all reasonable times and places. Absent express written consent from Employer, moonlighting is prohibited. Moonlighting is defined as being employed with another company, or being self-employed while working for Employer. It is the opinion of Employer that moonlighting directly impacts an employee's quality of work and affects his or her ability to dedicate him or herself to Employer. If your circumstances are such that you feel the need to work a second job, or you would like to pursue your own business on the side, consult with Employer.

**Material Breach**. A failure to comply with the 2010 Confidentiality and IP Agreement must be material. The circumstances to consider in determining whether a failure to comply is material include:

1. the extent to which the injured party will be deprived of the benefit which he reasonably expected;
2. the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
3. the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
4. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances;
5. the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Joint Status Report

**Jury Question Number 25:** When AROG terminated Abby on February 21, 2017, did AROG terminate Abby for "Cause" in accord with the terms and conditions of the 2015 Employment Agreement?[179]

**Answer "Yes" or "No":** _____

**Termination Without Cause**. A "No" answer means that AROG terminated Abby **without cause** under the 2015 Employment Contract, which shall also mean that Abby was terminated without cause as it affects his LTIU units under the 2010 LTIU Plan.

**Termination With Cause**. A "Yes" answer means that AROG terminated Abby **for Cause** under the 2015 Employment Contract, which shall also mean that Abby was terminated for Cause as it affects his LTIU units under the 2010 LTIU Plan.

**Contractual Conditions of a for "Cause" Termination**: Under the 2015 Employment Contract, AROG can terminate Abby for Cause based on the following provision:

> **"Termination for Cause**. Employer may terminate this Agreement for Cause immediately upon notice to Employee. Upon termination for Cause, Employer shall pay to Employee all base salary and employment benefits that have fully accrued and vested, but not been paid as of the effective date of such termination. Employee's rights with respect to the Inventive Incentive Units, if any, shall be governed by the terms and conditions of the Plan. All other rights and benefits of Employee hereunder shall terminate, except for any right to the continuation of benefits otherwise provided by law.

> "Cause" means, with respect to any Participant that is a party to a written employment agreement with the Company or any of its Affiliates or Subsidiaries that is then in effect, "Cause" as defined in such employment agreement and, with respect to any other Participant, any one or more of the following acts or omissions by the Participant:

> (i)     breach of any material term of the Plan or an Award Agreement or any other agreement with the Company, its Affiliates or Subsidiaries;

> (ii)    material violation of the Company's policies and procedures, gross negligence or gross misconduct;

> (iii)   excessive absenteeism, persistent neglect of duty or failure to perform the duties of Participant's position to the satisfaction of the Company;

---

[179]    The Pattern Jury Charges holds that a jury instruction concerning termination for cause should include the text from the contract at issue: "If 'good cause' or a similar term, such as 'just cause' or 'proper cause,' is explicitly defined in the agreement," that provision in the agreement should be used and the PJC instruction on good cause termination "should not be submitted." PJC § 107.2. This is why Plaintiff proffers to include the full text of this provision within the jury instructions.

Joint Status Report

(iv)    fraudulent, disloyal or dishonest act committed in connection with Participant's employment, or conviction of or plea of nolo contendere to any criminal conduct against the Company;

(v)    alcohol or substance abuse; or conviction of or plea of nolo contendere to any felony or to any misdemeanor involving fraud, embezzlement, theft, or dishonesty."

**Defendant's Third Contract Claim**[180]
*Declaratory Judgment Action re: 2010 LTIU Plan*

There are two outstanding questions concerning the meaning of the 2010 LTIU Plan. It is your duty to interpret the following provisions of the 2010 LTIU Plan to resolve these two disputes: section 5, section 6, section 8, section 9, and section 10. In interpreting these provisions, you must decide their meaning by determining the intent of the parties at the time of making the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.[181]

The following provisions in the 2010 LTIU Plan are at issue:

## SECTION 5

**5.**    **Payment of Units.** Except for payments which may be made in the Administrator's discretion pursuant to Section 6 below, no payments shall accrue or be made in respect of any Units unless and until the Determination Date following the consummation of a Sale of the Company.

**A.**    **Sale of the ·Company;** Upon the Determination Date following the consummation of a Sale of the Company, each vested Unit shall entitle the holder thereof to receive .0000025% of the Available Funds on the Determination Date, subject to satisfaction of the eligibility conditions set forth in Section 5(B) below. No amounts shall be paid, distributed or accrued with respect to unissued or unvested Units. By way of example:

(i) If all 4,000,000 Units were issued, outstanding and fully vested on the date a Sale of the Company is consummated, and each Participant meets the eligibility requirements set forth in Section 5(B) below, such Units would entitle the holders thereof to receive, in the aggregate, 10% of all Available Funds on the Determination Date.

(ii) If the Company has granted a total of 2,000,000 Units under the Plan (and all of such Units are outstanding and fully vested and each such Participant meets the eligibility requirements set forth in Section 5(B)) and the Company has Available Funds of $1,000,000 on the Determination Date, the Company shall pay to the Participants holding the Units an amount equal to $0.025 per Unit and $50,000 in the aggregate for all Units.

---

[180]    There are three issues raised in AROG's declaratory judgment action concerning Plaintiff's current rights under the 2010 LTIU Plan. While Plaintiff does not contest that his "vested" units would have been "cancelled" if he was terminated for Cause, he disputes AROG's position on the other two interpretations of the 2010 LTIU Plan. Plaintiff intends to argue that these provisions are clearly delineated in the 2010 LTIU Plan and do not support Defendant AROG's interpretation of these provisions. To the extent that this Court reject's Plaintiff's argument and finds that there is a sufficient ambiguity created by the provisions at issue, Plaintiff proffers the jury instructions herein.

[181]    PJC § 101.8

All amounts payable under this Section 5 shall be paid in cash as soon as practicable following the Determination Date, but in no event later than 60 days following the end of the calendar year in which the Determination Date occurs. No payments under the Plan shall accrue interest from the Determination Date to the_ date of actual payment to the Participants. No payments shall be made in respect of any vested Unit that has previously been paid hereunder.

      **B.**    **Eligibility Requirements,** Notwithstanding anything herein to the contrary, and unless provided otherwise in an Award Agreement, in order for a Participant to be eligible to receive payment in respect of Units granted hereunder, such Participant shall have been continuously employed with the Company or an Affiliate or Subsidiary ( or in the case of non-employee Participants, the services of such Person have been continuously provided to the Company or an Affiliate or Subsidiary) from the Date of Grant through the Determination Date. For purposes of the Plan, employment or provision of services shall be considered as continuing uninterrupted (i) during any bona fide leave of absence approved in writing by the Company (such as those attributable to illness or maternity leave consistent with the Company's policies), (ii) after any termination of employment or provision of services where there is a simultaneous reemployment or reengagement of Participant's services by the Company or any of its Affiliates or Subsidiaries, and (iii) following a Participant's death. Any Participant who is not eligible for payment in respect of a Unit hereunder will forfeit his right to receive payment in respect of such Unit. Nothing in the Plan or in any Award Agreement shall be deemed to give any Participant the right to be retained in employment or other service by the Company or any of its Affiliates or Subsidiaries for any period of time.

## SECTION 6

    **6.**    **Public Offering.** Immediately following the consummation of a Public Offering, all or any portion of the vested Units held by the Participants may, at the option of the Administrator, be converted into Capital Securities with such conversion ratio as the Administrator shall determine based upon the Fair Market Value of the Company at the time of the Public Offering and subject to any restrictions or requirements as the Administrator may deem necessary or appropriate. If any vested Units held by the Participants are not so converted, the Administrator may elect to cancel all or any portion of such vested Units in connection with a Public Offering upon payment to the Participants of an amount equal to the Fair Market Value of such vested Units assuming a Sale of the Company occurred as of the date of such cancellation.

## SECTION 8

    **8.**    **Vesting Restrictions.**

    A.    Time Vesting. Unless otherwise provided in an Award Agreement, Units granted under the Plan shall vest as follows:

      On the first anniversary of the Date of Grant        20%

      On the second anniversary of the Date of Grant        40%

| | |
|---|---|
| On the third anniversary of the Date of Grant | 60% |
| On the fourth anniversary of the Date of Grant | 80% |
| On the fifth anniversary of the Date of Grant | 100% |

B.      Acceleration of Vesting. Unless otherwise provided in an Award Agreement, (i) all issued Units shall automatically become fully vested immediately prior to the consummation of a Sale of the Company or Public Offering; and (ii) upon the death of a Participant, such Participant's estate shall automatically become fully vested in all Units issued to such Participant.

## SECTION 9

9.      **Cancelation of Unvested Units.** Unless otherwise provided in an Award Agreement, if a Participate experiences a Termination of Service for any reason other than the Participant's death, no Units issued to such Participant may become vested after the date of such Termination of Service and all unvested Units held by such Participant shall automatically be cancelled as of such date.

## SECTION 10

10.      **Cancellation of Vested Units**

A.      **"Death, Disability or Termination without Cause.** If a Participant experiences a Termination of Service for any reason other than termination by the Company for Cause or resignation by such Participant, all vested Units held by such Participant (or his or her estate) shall remain outstanding until the first to occur of: (i) the tenth anniversary of the applicable Date of Grant (or such earlier date as may be provided in the Award Agreement) and (ii) the twentieth anniversary of the Adoption Date (as defined below); provided, that the Company may elect to cancel all or any portion of such vested Units within 18 months after the date of such Termination of Service upon payment to the Participant or his or her estate, as applicable, of an amount equal to the Fair Market Value of such vested Units assuming a Sale of the Company occurred as of the date of such cancellation.

* * *

C.      **Termination for Cause**. If a Participant experiences a Termination of Service due to termination by the Company for Cause, all vested Units held by such Participant shall be automatically cancelled on the date of such Termination of Service without further consideration.

Joint Status Report

**FIRST ISSUE OF INTERPRETATION**
**Potential Payout based on an "Assumed" Sale of the Company**.

In the event that Abby was terminated without cause, there is a factual dispute about whether Abby can recover under the 2010 LTIU Plan without an actual Sale of the Company that generates available funds to be paid out.

> **Defendants' Position**. According to Dr. Jain and AROG, they contend that Abby cannot be paid under the terms and conditions of the 2010 LTIU Plan following a termination without cause unless there is an actual Sale of the Company that makes funds available for distribution on the Determination Date. Dr. Jain and AROG rely on Section 5 of the 2010 LTIU Plan to support their position.

> **Plaintiff's Position**. In contrast, Abby contends that there are three potential triggers for a payment on his "vested" units after he is terminated without cause: (1) a Sale of the Company under Section 5; (2) a "Public Offering" under section 6; and (3) a cancellation of Abby's "vested" units within 180 days following his termination without cause. According to Abby, a payout under option 2 (Public Offering) would generate a payout in the form of public shares from the Public Offering or a payment based on an "assumed" Sale of the Company" based on the Fair Market Value of AROG at the time of the IPO. According to Plaintiff, AROG's Fair Market Value could be based on a prior independent valuation of AROG. Likewise, a payout under option 3 (Cancellation of Units after a termination without cause) would generate a payout based on an "assumed" Sale of the Company based on AROG's Fair Market Value.

**Jury Question No. 26.** In the event that Abby was terminated without cause, does the 2010 LTIU Plan permit Abby to receive payment based on an "assumed" Sale of the Company calculated in accord with the provisions of either Section 6 (Public Offering) or Section 10(a) (cancelation after a termination without cause)?

Defendants object to proposed Jury Question 26 because the Court has ruled that "Because the sale requirement did not occur during Ramachandran's employment, he was not entitled to payment." This Court has also ruled in dismissing Plaintiff's claim that even if he were terminated without cause and his LTIUs remained outstanding, AROG has the option to cancel the Units within 18 months and pay the holder fair market value. The Court found, "It is undisputed that AROG did not cancel Ramachandran's Units under this provision, and the time to do so has expired." Document 153, Page ID 3371, 3372

**Answer "Yes" or "No":** _____

**A "Yes" Answer.** An answer of "Yes" means that you accept Abby's interpretation of the 2010 LTIU Plan.

**A "No" Answer.** An answer of "No" means that you accept AROG's interpretation of the 2010 LTIU Plan.

## SECOND ISSUE OF INTERPRETATION

**Eligibility Requirement of Continue Employment.**

In the event that Abby was terminated without cause, there is a factual issue about whether Abby must be continuously employed by AROG to receive payment under the 2010 LTIU Plan.

> **Plaintiff's Position**. According to Abby, if he is terminated "Without Cause," his "vested" units shall remain outstanding until the first to occur: (1) the 10th anniversary of the Grant Date; or (2) the 20th anniversary of the Adoption Date. Abby also contends that, while these "vested" units remain outstanding, AROG has the option to cancel the units by paying the Fair Market Value of these vested units. As for Abby's "unvested units" that were granted to him but did not vest, Abby agrees that such unvested units granted to him shall automatically terminate under Section 9 of the 2010 LTIU Plan, even if he is terminated without cause. For Abby, while there is a continued employment requirement for "unvested" units granted under the Plan, there is no continued employment requirement for "vested" units. The vested units are controlled by section 10(a) of the 2010 LTIU Plan.

> **Defendant's Position**. AROG contends that Section 5(b) nullifies the provisions in Section 10(a) because AROG contends that there is a requirement of "continued employment" for "granted" units from the date the units are granted to the "Determination Date" after a Sale of the Company: to wit, AROG cites, "in order for a Participant to be eligible to receive payment in respect of Units granted hereunder, such Participant shall have been continuously employed with the Company...from the Date of Grant through the Determination Date." According to AROG, this provision effectually cancels Abby's LTIUs upon his termination without cause because his failure to remain continuously employed "forfeits" his right to recover under the 2010 LTIU Plan.

> **Plaintiff's Retort**. Abby contends that section 5(b) does not apply to "vested" units; it only applies to "granted units" that have not vested. According to Abby, once a "granted" unit "vests" under Section 8, the provisions associated with such vested units—including Section 6 and Section 10(a)—determine Abby's rights in such vested units.

**Jury Question No. 27:** In the event that Abby was terminated without cause, did his "vested" units awarded under the 2010 LTIU Plan "remain outstanding" pursuant to the terms and conditions of Section 10(a)?

<span style="color:red">Defendants object to proposed Jury Question 26 because the Court has ruled that "Because the sale requirement did not occur during Ramachandran's employment, he was not entitled to payment." This Court has also ruled in dismissing Plaintiff's claim that even if he were terminated without cause and his LTIUs remained outstanding, AROG HAD THE OPTION TO CANCEL THE Units within 18 months and pay the holder fair market value. The Court found, "It is undisputed that AROG did not cancel Ramachandran's Units under this provision, and the time to do so has expired." Document 153, Page ID 3371, 3372</span>

Joint Status Report

**Answer "Yes" or "No":** _____

 

**A "Yes" Answer**. An answer of "Yes" means that you accept Abby's position that his "vested" units awarded under the 2010 LTIU Plan "remained outstanding" under the 2010 LTIU Plan after he was terminated without cause.

**A "No" Answer.** An answer of "No" means that you accept AROG's position that Abby's "vested" units awarded under the 2010 LTIU Plan were effectively "forfeited" and "cancelled" by provision 5(b) of the 2010 LTIU Plan.

Joint Status Report

## EXHIBIT 15

**Plaintiff's Proposed Voir Dire and Jury Interrogatories.**

1. Does any potential juror know personally or has heard the names of any of the parties, attorneys, or witnesses in this case?

    a. The parties to this lawsuit are Abhijit Ramachandran, Dr. Vinay Jain, AROG Pharmaceutical, and Jain Investments, LLC.

    b. The attorneys in this case are John "Jack" Walsh and Jennifer Graf.

    c. The potential witnesses in this case are Edward McDonald, Taizoon Kokhler, Greg Fisher, Tyler Brous, Dr. John Eckhardt, Dr. Neil Shah, Karl Schwabauer, Edwin Flores, and Annemieke DeMaggio.

2. Has any potential juror or a member of their household worked for a law firm.

3. Has any potential juror or a member of their household

4. Has any potential juror or a member of their household been listed as an inventor on a U.S. Patent

5. Has any potential juror or a member of their household worked in human resources.

6. Has any potential juror or a member of their household owned or managed a company.

7. Has any potential juror or a member of their household been responsible for terminating employees at a company.

8. Has any potential juror or a member of their household started a lawsuit?

9. Has any potential juror or a member of their household

    a. Filed a patent

    b. Been listed as an inventor

    c. Been involved in a dispute about inventorship

    d. Been involved in a dispute involving patent fraud

    e. Been accused of patent fraud

10. Has any potential juror or anyone in that potential juror's household

    a. Been accused of any kind of fraud

    b. Made accusations against other for fraud

    c. Filed a lawsuit as a plan to assert a fraud claim

    d. Been sued by a party asserting a fraud claim

11. Has any potential juror or anyone in that potential juror's household

    a. Worked for an pharmaceutical company

b.  Been terminated from a job within the last year

c.  Worked for a startup company

d.  Worked for a technical company

e.  Worked for an entrepreneur

f.  Worked for an attorney or law firm?

g.  Had any experience, training, or education in law?

h.  Worked for an accountant or accounting firm?

i.  Had any experience, training, or education in accounting, including forensic accounting?

j.  Worked for a person or company that conducts valuations, business appraisals, or ascertains damages?

k.  Had any experience, training, or education in valuations, business appraisals, or ascertaining damages?

l.  Worked for a person or company that is involved with or analyzes product endorsements?

m.  Worked for a person or company that endorses a product?

12. Has any potential juror or a member of their household

a.  Owned or operated his or her own business?

b.  Been responsible for supervising or disciplining others?

c.  Been responsible for interpreting or setting or enforcing codes, standards, or regulations?

d.  Worked in or had any experience, training, or education in psychology, sociology, social work, counseling, or mental health professions?

13. Does any potential juror know anyone else on this jury panel?

14. Has any potential juror ever served on a jury before?

15. Does any potential juror have any vision, hearing, or health-related condition that may affect his or her jury service?

16. Does any potential juror have any ethical, political, religious, moral beliefs, or opinions that may affect his or her to serve impartially as a juror?

EXHIBIT 16

<u>Defendants' Proposed Voir Dire Questions</u>

**A. Knowledge of Parties, witnesses and counsel –**
1. The Plaintiff in this case is Abhijit Ramachandran.  Do any of you know Abhijit Ramachandran?  If so, how do you know him?  And for long have you known him?
   a. If so, who?
   b. If so, was it positive, negative or a neutral experience?
2. The Defendants in this case are Dr. Vinay Jain and AROG Pharmaceuticals, Inc..  Do any of you know Dr. Jain?  If so, how do you know him?  And for long have you known him?
   a. If so, who?
   b. If so, was it positive, negative or a neutral experience?
3. Have any of you, any family member, or close friend ever been employed by AROG?  If so, please explain.
4. Have any of you, any family member, or close friend ever been employed by Dava Oncology, LLC?  If so, please explain.
5. The attorney representing Abhijit Ramachandran is Jack Walsh; I, Jennifer Graf, along with co-counsel John Neuhoff Jr., we are representing the Defendants.  Has anyone had any dealings with any of the lawyers in this case?
6. Do any of you know:
   a. Tyler Brous
      i. If so, who?
      ii. If so, was it positive, negative or a neutral experience?
   b. Edwin Flores
      i. If so, who?
      ii. If so, was it positive, negative or a neutral experience?
   c. Greg Fisher
      i. If so, who?
      ii. If so, was it positive, negative or a neutral experience?
   d. Edward McDonald
      i. If so, who?
      ii. If so, was it positive, negative or a neutral experience?
   e. Dr. Neil Shah
      i. If so, who?
      ii. If so, was it positive, negative or a neutral experience?
   f. Charissa Shaghnessy?
      i. If so, who?
      ii. If so, was it positive, negative or a neutral experience?
   g. Richard Squires

       i.  If so, who?
      ii.  If so, was it positive, negative or a neutral experience?
  h.  Taizoon Khokhar
       i.  If so, who?
      ii.  If so, was it positive, negative or a neutral experience?
  i.  Karl Schwabauer
       i.  If so, who?
      ii.  If so, was it positive, negative or a neutral experience?
  j.  Bradley Parker
       i.  If so, who?
      ii.  If so, was it positive, negative or a neutral experience?

**B. Juror Responsibility and Knowledge**

Folks, jurors have certain rights.  It's important for you to exercise these rights when necessary.  So I need to ask about them.

**First,** you have the right to hear all the testimony.  Every word.  So if you don't hear something a witness says, will you all be comfortable raising your hand and telling the judge, "Your Honor, I did not hear what the witness said.  Could you ask her to repeat it?

**Second,** and even more important: You have the right to clearly understand the law.  You have the right to know what every other juror clearly and correctly understands the law.  You have the right to know that you are on a jury in which every juror is following the law. So during deliberations, if there's anything about the law you don't understand, or if there's any disagreement among you about the law, or if anyone is refusing to follow the law the judge gives you, will you be comfortable asking your foreperson to knock on the door and tell the bailiff you need the Judge to come explain that part of the law again?

Finally, us lawyers get ahead of ourselves sometimes because we've been to the Courthouse so often.  Does anyone have any questions about who any of the individuals are that are present today?

**C. Get to Know Each Other.**

Alright, now that we are through all that, you lucky folks who get selected for the jury, we will be spending a few days together, so I would like to spend a few minutes getting to know everyone a little bit…I'll break the ice…As I told you earlier my name is Jennifer Graf. I'm originally from Chicago, Illinois but moved to Texas almost 20 years ago.  I am a mother to three children aged 18, 13 and almost 2.  My oldest daughter left for college last

weekend, so the joke in our house is that we've been going though SAT and ABCs over the last couple of years.  Its interesting to say the least.

1. Does anyone on the jury have children currently living with them?
   a. We will return to this topic, as I am well aware of the troubles that can come up when trying to coordinate little people.

Back to me.  Unfortunately, it's not very exciting.  When I'm not lawyers and being a Mom, I really like to rest my mind by watching some TV, listening to music and cooking.  My guilty pleasures so to speak.

Now, My husband and I, when we are together, we all really like shows like the Bachelor/the Bachelorette.  Given we have an almost two year old, we watch a lot of Cocomelon and Spidey and His Amazing Friends.  I think I can sing every song on Cocomelon.  However, I cannot sing, so I will spare your ears by not singing.

2. Are any of you Bachelor/the Bachelorette fans?

When we are apart, I like cooking and home improvement shows?

3. Any of you watch House Hunters, Beat Bobby Flay, any show on the Food Network?

Being from Chicago, I am also a die hard Cubs fan.  I cried in 2016 when the Cubs finally won the World Series.  I relieve that night in my mind a lot.

4. Are any of you Cubs fans?
5. Do we have anyone from Chicago or the surrounding area?  Or outside the Metroplex?
6. Now, I haven't heard from everyone, so what about you guys, does anyone have any guilty pleasure shows they like to watch after a long day?

## D. Experience as Employee/Employer

1. Do any of you have work experience in or with (1) the medical field? (2) a drug company? (3) the pharmaceutical industry? (4) Human Resources or employee benefits?  If so, what is your experience?
2. Do any of you own your own business?
   a. How many people do you employ?
3. Have any of you worked in company management or a supervisory role?
   a. What was your role?
   b. Did you ever have to terminate someone who was not performing their job?

Joint Status Report

     c.  Did you ever have to discipline and employee or write them up for not performing their job duties?
         i.  What was the outcome, how did you react?
        ii.  Will that experience affect your ability to consider the evidence in this case?

4. Have any of you or someone close to you been fired, laid off, terminated or otherwise lost a meaningful job in the last few years?  If so, did you consider the circumstances to be improper or unfair?

5. Does anyone believe that that employment policies are not always applied equally among employees?  If yes, please explain.

6. Does anyone believe that employees who have been at a company for a long time deserve a bit of leniency when they violate company policies?  If yes, please explain.

7. Do any of you think that, in a dispute at work, employers generally do not give their employees enough of the benefit of the doubt?  If yes, please explain.

8. Have you or any of your family members or close friends been subject to treatment on the job that you considered to be unfair?  If yes, please explain.

9. Have you or any of your family or close friends ever been disciplined or discharged for violating a company policy or a work rule?  If yes, please explain.

10. Does anyone here feel that companies get away with too much in today's business world?  If yes, please explain.

11. Does anyone here think that people file lawsuits when they do not get what they want?

12. Does anyone here think that people cannot take responsibility for their action and blame others, and that sometimes leads to filing a lawsuit?

13. Has anyone filed a lawsuit before?  If so, please explain.  What was the nature and outcome of the dispute?

14. Has anyone ever filed a complaint at your workplace against your employer, or had a workplace complaint filed against you?  If so, please explain.

15. Has anyone here worked for a law firm?  Of so, which one(s)?  What is or was your job?  How would you describe your experience?

16. Do any of you believe that people should resolve problems without filing a lawsuit?

17. Do you think people turn to court often to resolve their problems?

**E.  Burden of Proof:**

Unlike a criminal case, in trials like this, jurors make their decisions on the basis of whether one side is more likely right than wrong.  Some folks think "more likely right that wrong" is not quite fair because it makes things a little too easy on one side or the other.

1. How many of you are a little closer to the folks who feel that 'more likely right than wrong' [hands] might be a little unfair, or a little too easy for one side or the other?

2. And how many of you might be a little closer to the folks who think it's OK?

3. And how many of you think you might be somewhere in the middle?
   a. Follow up individually

Now, I had to ask about this because in this case, you will be required to make all your decisions on the basis of whether one side is more likely right or wrong [hands].

We expect to show you far more than that.  But by the end of the trial, even if someone has doubts, and even if someone thinks we're only more likely right than wrong [hands] on a question, you will be required to decide that question in our favor.

All the attorneys and our Honorable Judge agree that you have to base all your decisions on whether one side is more likely right that wrong.

And Judge Starr will tell you that "more likely right than wrong is the law.

Then say: "So Mr._____ [choose a juror who had trouble with this], what trouble would you have, even a little making your decisions on the basis of just whether we're more likely right that wrong [hands], not whether we give you total proof?"

**F.  Damages**

Now, I believe that at the end of the day we will have shown you that we are more likely than not correct.

1. Do you have any opinion one way or the other about financially compensating someone for losses that that person has suffered?
2. Who thinks that the amount of money awarded in some lawsuits is way too large, such as people getting millions of dollars for spilled coffee?
3. Who here knows what punitive damages are?

A FEW FINAL WRAP UP QUESTIONS FOR EVERYONE:

**G.  Miscellaneous**
1. Is there any reason – be it religious, moral, personal, business, or other conviction that you may have – that might, in your opinion, prevent you from rendering a fair and impartial verdict based upon all of the evidence in this case?  If so, please explain.

Joint Status Report

2.  Do any of you have scheduling or child care concerns that the Court and the attorneys should know about?
3.  Is there anything else that the Court or the attorneys in this case should know about?
4.  People think of bias and prejudice as being evil and that's true of bias and prejudice based on race, creed, or se.  But let's look at this another way.  Everyone has biases from our experiences on which we base our decisions everyday.  For example, I really like mint chocolate chip ice cream.  I'm not the person to judge an ice cream contest because it's going to be impossible to convince me that vanilla or chocolate ice cream is better.  One of the purposes of voir dire examination is to seek the truth.  Please let us know about those matters that, even if you try your best, your experience, assumptions, attitudes, or ideology may still impact you ability to assure the Court that you can be completely fair and impartial.
5.  Does anyone have any bias or prejudice against doctors?  If so, please explain.
6.  Does anyone have any negative feelings about doctors?  If so, please explain.
7.  Does anyone have any bias or prejudice against Pharmaceutical companies?  If so, please explain.
8.  Does anyone have any negative feelings about Pharmaceutical companies?  If so, please explain.

## H.  AROG Questions

1.  Has anyone here ever been involuntary terminated from a job?  If so, can you please describe the circumstances of your termination?
2.  Have any of you ever served in a leadership, management or senior level employee at a job?  If so, please explain.
3.  Does anyone think that leadership, management or senior level employee is a more involved position that has additional job responsibilities than other employees may have?  If so, please explain.
4.  Does anyone sometimes have to work weekend or afterhours at your job?  If so, please explain.
5.  Does anyone have to check and respond to emails on weekends, afterhours or while on vacation or away from the office?  If so, please explain.
6.  Does anyone text or talk to other persons about work on weekends, after hours or while on vacation or away from the office?  If so, please explain.
7.  Has anyone here ever had a negative experience with AROG that might impact your ability to be a fair and impartial juror?
8.  Does anyone here believe that employees who have been at a company for a long time deserve a bit of leniency when they violate company policies or regulations?  If so, please explain.

Joint Status Report

9. Does anyone here think that, in a dispute at work, that employers generally do not give their employees enough of the benefit of the doubt?  If so, please explain.

10. Has anyone here ever been subject to treatment on the job that you considered to be unfair?  If so, please explain.

11. Has anyone here ever been involved in a serious dispute with your employer, either over salary, bonus, benefits or anything else?  If so, please explain.

12. Are any of you here currently responsible for hiring and firing employees at work?  If so, please explain.

13. Have any of you ever worked in human resources department or been responsible for that aspect of a business?  If yes, please explain.

14. Has anyone here ever been responsible for drafting or modifying employment policies?  If so, please explain.

15. Is there anyone here who may have difficulty viewing AROG, which is a corporation, and the plaintiff, Mr. Ramachandran, who is an individual, as equals in the eyes of the law?  If yes, please explain.

16. Do any of you do business with or closely associated with anyone that does business with AROG?

17. Are any of you familiar with AROG?  If so, please explain

18. Does anyone have a view of AROG that are such that it would be difficult for you to return a verdict for AROG.

19. Are any of you familiar with Dr. Jain? If so, please explain

20. Does anyone have a view of Dr. Jain that are such that it would be difficult for you to return a verdict for Dr. Jain.

21. Are any of you familiar with Abhijit Ramachandran? If so, please explain

22. Does anyone have a view of Abhijit Ramachandran that are such that it would be difficult for you to return a verdict against Abhijit Ramachandran. If so, please explain.

23. How many of you have ever been fired or laid off from a job unfairly?  If so, please explain

24. Have you or anyone close to you worked for a company where there have been allegations of wrongdoing by a corporate executive?  If so, please explain

25. Have any of you read or heard anything about AROG?  If so, please explain

26. Have any of you read or heard anything about Dr. Jain?  If so, please explain

27. Have any of you read of heard anything about Dava Oncology, LP?  If so, please explain

28. Have any of you read of or heard anything about Jain Investments, LLC?  If so, please explain

29. Have any of you read or heard anything about the drug Crenolanib?  If so, please explain

30. Do any of you believe that corporations often put profits over people?  If so, please explain

Joint Status Report

31. Do any of you believe that when an individual sues a company, the company should have to prove it did nothing wrong? If so, please explain

32. Have you or someone close to you ever found it necessary to sue your employer?  If so, please explain

33. Do any of you believe that if an employee goes to the trouble of filing a lawsuit, would you think it more likely than not that they have a valid claim?  If so, please explain

34. In general, would you ascribe to the theory, "Where there's smoke there's fire?" If so, please explain

35. Have you or someone close to you ever made a formal complaint at work?  If so, please explain

36. Has a subordinate at work ever complained to you about their compensation at work? If so, please explain

37. Have you or someone close to you ever been treated unfairly by your boss?  If so, please explain

38. Do you feel that employees bear ultimate responsibility for their work place conduct? If so, please explain

39. Do you think companies have an obligation to exhaust all ways of coaching under performing employees before firing them for cause?  If so, please explain

40. Have you ever been a party to an employment contract?  If so, please explain

41. Have any of you ever received stock options or any conditional interests as compensation from your employer?  If so, please explain.

42. Have you or anyone close to you have cancer?  If so, please explain

43. Do any of you have any opinion regarding cancer research in general?  If so, please explain.

44. Do any of you feel that an employer should not have a right to fire an employee for no reason at all?  If so, please explain

45. Dr. Jain, who is a Defendant in this lawsuit, is a wealthy man.  Do any of you have any negative feelings or resentment of wealthy people that might interfere with your ability to be fair and impartial in this case?  If so, please explain

46. Do any of you feel that an employer has the right to expect truthfulness from their employees regarding their duties for that employer?  If so, please explain

47. Has anyone ever made a prediction about something that didn't come true?  If so, please explain

48. Does anyone have a negative opinion about immigrants working in the United States?  If so, please explain.

49. The Plaintiff and one of the Defendant's, Dr. Jain, are form India.  Does anyone here have any experience with Indian people or their culture?  If so, please explain

50. Have any of you heard of clinical trials for a pharmaceutical drug?  If so, please explain

Joint Status Report

51. Have any of you had any experience with running a clinical trial for a pharmaceutical drug?  If so, please explain

52. Have you or anyone close to you been a part of a clinical trial for a pharmaceutical drug?  If so, please explain

53. Have you or anyone close to you ever had cancer?  If so, please explain

54. Have you or anyone close to you ever had a child that had cancer?  If so, please explain.

55. Have you or anyone close to you held a temporary academic student visa, formally known as the F-1 Nonimmigrant Student Visa?  If so, please explain

56. Have you or anyone close to you had a temporary extension of your student visa for Optional Practical Training which allows foreign students to stay in the United States and obtain practical, hands-in experience?  If so, please explain

57. Have you or anyone close to you ever obtained a temporary work visa referred to as an H-1B Visa? If so, please explain

58. Have you or anyone close to you ever applied for lawful permanent residency in the United States, which is commonly referred to as becoming a "Green Card" holder?  If so, please explain

59. Have you or anyone close to you ever sponsored someone for Permanent Residency commonly referred to as a Green Car?  If so, please explain

60. Have you or anyone close to you ever obtain a temporary work visa known as an "H4 Visa?"  If so, please explain.

61. Other than a divorce proceeding, how many of you have been a plaintiff in a lawsuit?  If so, please explain.

62. Other than a divorce proceeding, how many of you have been a defendant in a lawsuit?  If so, please explain.

63. Other than a divorce proceeding, how many of you have been a witness in a lawsuit?  If so, please explain.

<u>EXHIBIT 17</u>

<u>DEFENDANTS' TRIAL BRIEF</u>

**LEGAL ARGUMENTS**

    A.  <u>Ramachandran's Fraud Claim Against Defendants.</u>

To prove fraud in the inducement, Ramachandran must prove (1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury." *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 557 (Tex. 2019) citing *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018). "Because fraudulent inducement arises only in the context of a contract, the existence of a contract is an essential part of its proof." *Mercedes-Benz USA, LLC*, 583 S.W.3d at 557.

The burden is on the plaintiff to plead and prove all elements of his fraud claim. *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 571 (Tex. App.—Dallas 1989, no writ) citing *Citizens Standard Life Ins. Co. v. Gilley*, 521 S.W.2d 354, 356 (Tex.Civ.App.—Dallas 1975, no writ). Where, as here, the alleged fraud is based upon a promise to perform in the future, in addition to the above five elements, it is necessary to also prove facts of a sixth element:  that the promise was made with a then present intent not to perform. *Gillum*, 778 S.W.2d at 571 citing *New Process Steel Corp., Inc. v. Steel Corp. of Texas, Inc.*, 703 S.W.2d 209, 214 (Tex App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). Mere breach of an agreement is not enough in itself to establish that the speaker made the promise with no intention of fulfilling it.   *Gillum*, 778 S.W.2d at 571 citing *New Process Steel*, 703 S.W.2d at 214; *see William B. Roberts, Inc. v. McDrilling Co., Inc.*, 579 S.W.2d 335, 339-40 (Tex.Civ.App.—Corpus Christi 1979, no writ). Moreover, fraud will never be presumed. *Gillum*, 778 S.W.2d at 571

Joint Status Report

citing *Garcia v. Rutledge,* 649 S.W.2d 307, 312 (Tex.App.—Amarillo 1982, no writ); *William B. Roberts, Inc.,* 579 S.W.2d at 339.

>    3. *Ramachandran Must Prove a Material Misrepresentation was Made.*

The first element Ramachandran must establish is that Defendants made a misrepresentation that was material. *Barrow-Shaver Res. v. Carrizo Oil & Gas, Inc.,* 590 S.W.3d 471, 496 (Tex.2019); *Exxon Corp. v. Emerald Oil & Gas Co.,* 348 S.W.3d 194, 217 (Tex.2011); *Grohman v. Kahlig,* 318 S.W.3d 882, 888 (Tex.2010). To recover on a claim of fraud, a plaintiff must prove that a representation was false when made. *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.,* 88 F.3d 347, 359 (5th Cir. 1996). A false representation is material if it is important to the plaintiff in making a decision—that is, if a reasonable person would attach importance to and be induced to act on the information in determine whether to make a transaction. *Barrow-Shaver Res.,* 590 S.W.3d at 496; *Italian Cowboy Partners v. Prudential Ins.,* 341 S.W.3d 323, 337 (Tex.2011); *Chicago Auto Parts & Serv. v. Crockett,* 512 S.W.3d 560, 576 (Tex.App.—El Paso 2017, pet. denied); *see e.g., Lundy v. Masson,* 260 S.W.3d 482, 493 (Tex.App.—Houston [14th Dist.] 2008, pet. denied) (defendant's statement that plaintiff's business could use patented medical device was material misrepresentation); *Taylor Elec. Servs. v. Armstrong Elec. Sup.,* 167 S.W.3d 522, 527-28 (Tex.App-Fort Worth 2005, no pet.) (defendant's promise to meet delivery dates was a material misrepresentation).

A misrepresentation can be material even if it is not the plaintiff's only inducement for making a transaction, as long as the plaintiff relied on the misrepresentation. *Barrow-Shaver Res.,* 590 S.W.3d at 496; *Brush v. Reata Oil & Gas Corp.,* 984 S.W.2d 720, 727 (Tex.App.—Waco 1998, pet. denied); *Marburger v. Seminole Pipeline Co.,* 957 S.W.2d 82, 86 n.4 (Tex.App.—Houston[14th Dist.] 1997, pet. denied), *disapproved on other grounds, Hubenak v. San Jacinto Gas Transmission Co.,* 141

S.W.3d 172 (Tex.2004).  But a misrepresentation cannot be material if it is too vague or imprecise. *Samson Lone Star Ltd. P'ship v. Hooks*, 497 S.W.3d 1, 14 (Tex. App.–Houston [1st Dist.] 2016, pet. denied) (map that showed well at plus/minus 1,400 feet from boundary of lease and statement that well was 1,500 feet from boundary were not too imprecise to be material misrepresentations); *In re Media Arts Grp. Inc.*, 116 S.W.3d 900, 910 (Tex.App.–Houston [14th Dist.] 2003, no pet.) (employee's statement "don't worry about it" was too vague to be material misrepresentation that arbitration agreement would not be enforced).  A "[v]ague representations cannot constitute a material representation actionable under our laws." *Cadle Co. v. Davis*, No. 04-09-00763-CV, 2010 WL 5545389, at *8 (Tex.App.–San Antonio Dec. 29, 2010, pet. denied) (mem.op.) (citing *In re Media Arts Grp., Inc.*, 116 S.W.3d at 910); *Bank One, Tex., N.A. v. Little*, 978 S.W.2d 272, 280 (Tex.App.–Fort Worth 1998, pet. denied) (imprecise or vague representation constitutes mere opinion and is not actionable misrepresentation under DTPA); *Hedley Feedlot, Inc. v. Weatherly Trust*, 855 S.W.2d 826, 839 (Tex.App.–Amarillo 1993, writ denied) (imprecise statement not actionable misrepresentation under DTPA)).

### 2. An Expression of Opinion is Not a False Representation.

Generally, an expression of pure opinion is not considered a false representation.  *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337-38 (Tex. 2011); *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995); *BP Am. Prod. v. Marshall*,  288 S.W.3d 430, 443 (Tex.App.–San Antonio 2008), rev'd on other grounds, 342 S.W.3d 59 (Tex.2011); *O'Brien v. Daboval*,  388 S.W.3d 826, 840 (Tex.App.–Houston [1st Dist.] 2012, no pet.); *Sheehan v. Adams*, 320 S.W.3d 890, 899-900 (Tex.App.–Dallas 2012, no pet.).  To be a misrepresentation, a statement must

concern fact as opposed to mere opinion, judgment, probability or expectation. *Jeffcoat v. Phillips*, 534 S.W.2d 168, 171 (Tex.App.–Houston [14th Dist.] 1976, writ ref'd n.r.e).

Opinions and beliefs reside in an inner sphere of human personality and subjectivity that lies beyond the reach of the law and is not subject to its sanctions. *Presidio Enterprises, Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986). Actions for fraud or misrepresentation must be based on objective statements of fact, not expressions of personal opinion. *Id.* The law wisely declines to tread in the latter area because, in some deep sense, "everyone is entitled to his own opinion." *Id.* "Chacun à son goût" and "De gustibus non est disputandum" are time-honored expressions of this principle. *Id.*

"Whether a statement is an actionable statement of 'fact' or merely an innocuous statement of 'opinion' often depends on the circumstances in which a statement is made." *Id. citing Transport Ins.*, 898 S.W.2d at 276. Relevant circumstances include "the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future." *Id.*

An actionable representation is one concerning a material fact; a pure expression of opinion will not support an action for fraud. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983). In particular, an expression of opinion about monetary value is not a representation of fact which gives rise to an action for fraud. *See McCollum v. P/S Invs., Ltd.*, 764 S.W.2d 252, 254 (Tex.App.–Dallas 1988, writ denied); *Cravens v. Skinner*, 626 S.W.2d 173, 177 (Tex.App.–Fort Worth 1981, no writ); *Morris v. Leonard*, 441 S.W.2d 877, 881 (Tex.App.–Fort Worth 1969, writ ref'd n.r.e.), *cert. denied*, 402 U.S. 974, 91 S.Ct. 1667, 29 L.Ed.2d 139 (1971).

The courts have weighed in on whether the statements are false or are mere puffery or opinion.  Examples of representations that can amount to mere puffery or opinion include claims that an investment is "low risk" and will "produce large revenues for a long time," that a settlement is "top dollar," and that a property is "superb," "super fine," and "one of the finest little properties in the City of Austin." *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 889 (Tex. App.—Austin 2008, no pet.) citing *Paull v. Capital Res. Mgmt., Inc.*, 987 S.W.2d 214, 218 (Tex. App.—Austin 1999, pet. denied); *Faircloth*, 898 S.W.2d at 276; *Italian Cowboy*, 896 S.W.2d at 163. Likewise, using "broad, and vague, commendatory language comparing [one's] goods favorably with others, or praising them as good, proper, sufficient, and the like" amounts to mere sales talk, or puffery, not a statement of material fact. W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 109 (5th ed.1984) (internal quotation marks and citations omitted).  Statements about projected location of small magnets over an indefinite amount of time is so indisputably speculative that it necessary an expression of pure opinion rather than of existing fact.  *P.M.I. Services N. Am., Inc. v. Enduro Pipeline Services, Inc.*, No. EP-16-CV-442-PRM, 2018 WL 8131232, at *6 (W.D. Tex. May 18, 2018).

3.  <u>A Prediction About the Future is an Expression of Opinion is Not a False Representation.</u>

A prediction about the future is an expression of opinion and not actionable.  *Hoffman v. L & M Arts*, 838 F.3d 568, 579 (5th Cir. 2016).  "Pure expressions of opinion are not representations of material fact, and thus cannot provide a basis for a fraud claim." *Italian Cowboy*, 341 S.W.3d at 337–38.  Because "[a] prediction, or statement about the future, is essentially

Joint Status Report

an expression of opinion," future predictions are generally not actionable. *Presidio Enters.*, 784 F.2d at 679-680.

Here, Ramachandran alleges that his fraud claim is predicated on statements attributed to Dr. Jain that he "would garner a piece of the upside associated with the financial growth of AROG." [Dkt. No 46 at ¶ 63]. The alleged misrepresentations by Dr. Jain relate to promises of future performance pursuant to the 2010 LTIU Plan. A fraud claim based on a promise of future performance is not actionable unless the claimant produces evidence that the defendant made the alleged promise with no intention of performing at the time it was made. S*ee, e.g., Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998). As such, to recover on his fraud claim, Ramachandran must show that AROG did not issue 250,000 Investment Units pursuant to the AROG LTIU Plan; it is undisputed that AROG issued Ramachandran all of the LTIU's he was promised in the following awards: (1) January 28, 2011, wherein Ramachandran was awarded 5,000 Units; (2) September 16, 2011, wherein Ramachandran was awarded 10,000 Units; (3) July 30, 2012, wherein Ramachandran was awarded 185,000 Units, and (4) July 30, 2014, wherein Ramachandran was awarded 50,000 Units.  Given Ramachandran received everything he was promised by Dr. Jain, Plaintiff's fraud claim must fail because he cannot demonstrate that any statement Dr. Jain made was false. A promise performed cannot be false. It's a nonsensical argument.

    4.   *Ramachandran Must Prove that the Defendants Made the Statement with Knowledge of its Falsity or was Made Without Knowledge of Its Truth.*

Ramachandran must prove that the Defendants made the statement that Plaintiff "would garner a piece of the upside associated with the financial growth of AROG, which included the

Joint Status Report

growth associated with the development of the Crenolanib Cancer Drug, via AROG's issuance of 250,000 Investment Units pursuant to the AROH LTIU Plan" with knowledge of its falsity or asserted without knowledge of its truth. *Mercedes-Benz,* 583 S.W.3d at 557 citing *Anderson v. Durant,* 550 S.W.3d 605, 614 (Tex.2018). This element requires scienter. *Rhine v. Priority One Ins. Co.,* 411 S.W.3d 651, 659 (Tex. App. 2013).

A defendant makes a misrepresentation "knowingly" when the defendant is aware of its falsity or understands it is false. *JJJ Walker, LLC v. Yollick,* 447 S.W.3d 453, 461-62 (Tex.App.-Houston [14th Dist.] 2014, pet. denied) (defendant made misrepresentation knowingly because he witnesses board's approval of plan to violate agreement); *see also Landers v. Aurora Loan Services, LLC,* 434 S.W.3d 291, 296 (Tex. App.—Texarkana 2014, no pet.) (one agent's knowledge of falsity cannot be imputed to other agent who makes representation but has no knowledge of falsity).

"Under the 'reckless' standard, the speaker must have known he did not have sufficient information or basis to make the statement, but made it anyway as a positive assertion and with the intent it be relied upon." *Forgetaboutit, Inc. v. Warner,* No. 09-04-503 CV, 2005 WL 3219578, at *2 (Tex. App. Dec. 1, 2005) (citing *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 527 (Tex.1998)); *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992); *Trenholm,* 646 S.W.2d at 933; *Custom Leasing, Inc. v. Texas Bank & Trust Co.,* 516 S.W.2d 927, 933 (Tex.1974). In other words, a representation is made recklessly when the defendant knows it does not have sufficient information or basis to support the representation or when the defendant realizes it does not know whether the representation is true. *Johnson & Higgins,* 962 S.W.2d at 527; *Trenholm,* 646 S.W.2d at 933; *see, e.g., Stone v. Lawyers Title Ins.,* 554 S.W.2d 183, 188 (Tex.1977) (title company was reckless in disregarding title opinion and relying on owner's statement regarding easement). A

Joint Status Report

representation is not made recklessly solely because the representation is later found to be wrong. *Landers,* 434 S.W.3d at 297.

Ramachandran's allegations concern future performance. Ramachandran has not and cannot produce any evidence that at the time that Dr. Jain made the alleged representations in question, such representations were either known to be false when made or were asserted without knowledge of their truth. For this reason, Ramachandran's fraud claim should fail.

> 5. *Ramachandran Must Show Actual and Justifiable Reliance on the Statement.*

> 2. <u>It is Not Actual and Justifiable Reliance for Ramachandran to Rely on Oral Misrepresentations Regarding a Contract's Unambiguous Terms.</u>

To prevail on a fraud claim, a "plaintiff [must] show actual and justifiable reliance." *Mercedes-Benz USA,* 583 S.W.3d at 558 citing *Grant Thornton LLP v. Prospect High Income Fund,* 314 S.W.3d 913, 923 (Tex. 2010). "[A] party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." *Nat'l Prop. Holdings, L.P. v. Westergren,* 453 S.W.3d 419, 424 (Tex. 2015). It is well-established that "[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." *Westergren,* 453 S.W.3d at 424–25 citing RESTATEMENT (SECOND) OF TORTS § 541 (1977). Thus, as Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms. *Westergren,* 453 S.W.3d at 424–25; *see, e.g., Thigpen v. Locke,* 363 S.W.2d 247, 251 (Tex.1962) ("In an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests.... [A] failure to exercise reasonable diligence is not excused by mere confidence

Joint Status Report

in the honesty and integrity of the other party.") (citation omitted). This is particularly true when the party had a reasonable opportunity to review the written agreement but failed to exercise ordinary care to do so. *Westergren*, 453 S.W.3d at 425 citing *Tex. & Pac. Ry. Co. v. Poe*, 131 Tex. 337, 115 S.W.2d 591, 592 (1938) (holding that evidence was legally insufficient to support a finding of fraud where party who relied on oral statement that release was a receipt had an opportunity to read the document which plainly identified itself as a release); *see also Thigpen*, 363 S.W.2d at 251.

Instead of excusing a party's failure to read a contract when the party has an opportunity to do so, the law presumes that the party knows and accepts the contract terms. *Westergren*, 453 S.W.3d at 425 citing *See, e.g., Poe*, 115 S.W.2d at 592; *Indem. Ins. Co. of N. Am. v. W.L. Macatee & Sons*, 101 S.W.2d 553, 556 (1937); *cf. In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 232 (Tex. 2008); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 133–34 (Tex. 2004); *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505 (Tex.1993).   Failing to read a release and instead rely on defendant's representations because he did not have his glasses and was "in a hurry" was not justifiable. *Westergren*, 453 S.W.3d at 425.

It is not the courts' role "to protect parties from their own agreements." *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 810–11 (Tex.2012). Thus, as the United States Supreme Court explained long ago:

> It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission.

Joint Status Report

*Upton v. Tribilcock,* 91 U.S. 45, 50, 23 L.Ed. 203 (1875); *see also Indem. Ins.,* 101 S.W.2d at 556 ("One is presumed to intend what he does or undertakes to do by the terms of a written instrument voluntarily signed by him.").

"Reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." *Mercedes Benz, 583 S.W.3d at 557.*  In *Mercedes Benz,* Plaintiff asserted that it was fraudulently induced to sign an agreement with Mercedes Benz after representations were made by Mercedes Benz that "that Carduco could relocate to McAllen, Texas as the exclusive new Mercedes-Benz dealership in the region and that MBUSA was not planning to put another dealer in the McAllen Area." Carduco alleges that after these representations he signed a dealer agreement with Mercedes-Benz that identified Harlingen as the dealership location and prohibited plaintiff from changing locations without Mercedes Benz consent.  *Id.*  After signing the agreement, Mercedes Benz entered into a dealer agreement with a third-party for a dealership in Harlingen.  *Id.*  The court held that because Cardduco's claim of fraudulent inducement is directly contradicted by the contract's terms, there could be no justifiable reliance as a matter of law.

Courts have found direct contradiction even when the terminology appearing in the representation and the writing are not exactly the same. *See, e.g., Mikob Props., Inc. v. Joachim,* 468 S.W.3d 587, 599 (Tex. App.–Dallas 2015, pet. denied) (holding a representation that a settlement agreement covered all parties was directly contradicted by the agreement explicitly listing some defendants while remaining silent about one, thus, barring the unlisted defendant from establishing justifiable reliance). For example, in *Playboy Enterprises Inc. v. Editorial Caballero S.A. de C.V.,* a company that Playboy magazine had licensed to distribute a Spanish-language version of the

Joint Status Report

publication sued Playboy for breach of contract and various business torts, including fraud. 202 S.W.3d 250, 256–57 (Tex. App.–Corpus Christi 2006, pet. denied). One of the alleged representations was that "renewal" of the parties' license agreement would be automatic. *Id.* at 257. The court did not hesitate to acknowledge a direct contradiction since the contract stated the licensee would have the option "to request negotiations concerning an extension of the license" if the licensee was in full compliance with the agreement. *Id.* at 258. Similarly, it held that saying it would not "be a problem to distribute or sell 150,000 copies per month" was "directly contradicted" by the agreement's provision that the number of copies the licensee would be allowed to distribute "will not exceed one-hundred-fifty thousand (150,000) per issue." *Id.* at 257–58. Though the representations and contractual provisions did not involve precisely the same terms, the *Playboy Enterprises* court nevertheless held that the alleged misrepresentations the licensee complained of were "directly contradicted by the express, unambiguous terms of the License Agreement," precluding justifiable reliance as a matter of law. *Id.*

Similarly, whether reliance is justifiable, the court "must inquire whether, 'given a fraud plaintiffs individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part.' *O'Brien*, 388 S.W.3d at 842–43. A plaintiff may not justifiably rely on a representation if there are 'red flags' indicating such reliance is unwarranted. *Mercedes-Benz*, 583 S.W.3d at 558 citing *JPMorgan Chase Bank, N.A., v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 655 (Tex.2018).

A "failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." *Thigpen*, 363 S.W.2d at 251 (citation omitted). Accordingly, a plaintiff may not "blindly rely on a representation by a defendant" when the plaintiff's knowledge,

Joint Status Report

experience, and background alert it to investigate the defendant's representations before acting in reliance on those representations. *See Orca Assets*, 546 S.W.3d at 654;  *Barrow-Shaver*, 590 S.W.3d at 497.

In *Orca Assets*, the court determined whether a mineral interest lessee's reliance on extra-contractual representations by the lessor's agent was justifiable. *Id.* at 650.  The court found that Orca should have been alarmed by the "negation-of-warranty provision's direct contradiction of the representation upon which Orca claim[ed] to have relied." *Id.* at 658. This should have alarmed Orca, we explained, because "Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." *Id.* (quoting *Westergren*, 453 S.W.3d at 424–25. Written agreements, relative to oral agreements, serve a purpose under the law to "provide greater certainty regarding what the terms of the transaction are and that those terms will be binding, thereby lessening the potential for error, misfortune, and dispute." *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.–Houston [14th Dist.] 2003, pet. denied).

Finally, Texas courts have consistently held that when a person makes his own investigation of the facts, he cannot, as a matter of law, be said to have relied upon the misrepresentations of others. *P.M.I. Services N. Am., Inc.*, No. EP-16-CV-442-PRM, 2018 WL 8131232, at *8 citing *Laughlin v. Fed. Deposit Ins. Corp.*, 657 S.W.2d 477, 483 (Tex. App.–Tyler 1983). In other words, if a party substantially relies upon its own investigation and knowledge, courts should not find actual reliance. *Id.*

Here, Ramachandran cannot show that he relied on Defendants' representations and the reliance was actual and justified;.   indeed, the terms of the Plan are unambiguous, Ramachandran

possessed a copy of the Plan, any alleged representation of the Plan by Dr. Jain did not contradict the terms of the plan.  Therefore, his fraud claim should fail

      6.  *Ramachandran Must Show That He Suffered Damages.*

      Ramachandran cannot prove he suffered any damages from Dr. Jain's alleged fraud.  Mr. Karl Schwabauer opined that Plaintiff's fraud damages should be measured under a benefit of the bargain analysis.  He opines that the benefit of the bargain damages are $3,500,000, which is the difference between the value of the LTIUs bargained for and the value of the LTIUs Plaintiff actually received.  [*Id.*].    Mr. Schwabauer acknowledges that Plaintiff received 250,000 LTIUs and that under the terms and conditions of the LTIU, AROG had the right to cancel Plaintiff's units so long as AROG paid Plaintiff the Fair Market Value of those units **assuming** a Sale of the Company at the time of cancellation.  [*Id.* emphasis added].  It is undisputed that there was no sale of AROG in 2017.  The Court has previously ruled that there has been no sale of AROG.  [Dkt. No. 153 at p. 7].  The Court specifically held that "[t]here is no indication that the qualifying sale will happen soon or ever." *Id.* at p. 8]. Furthermore, the Court ruled "there is likely no state of the world where Ramachandran will be entitled to a payment related to the Plan. [*Id.* at p. 8 footnote 25].  Moreover, the Court has also ruled that "[i]t is undisputed that AROG did not cancel Ramachandran's Units" under the provisions of the 2010 LTIU plan whereby AROG has the option to cancel Units for employees terminated without cause within 18 months of such termination and pay the holder the fair market value of such cancelled units and that "the time to do so has expired.  [*Id.* at 7].  For these reasons, given that there was no sale of AROG as Ramachandran's own expert admitted was

a condition to any fraud or benefit of the bargain damages, Ramachandran has not suffered any damages for fraud.

## B.  <u>Texas Law Does Not Recognize a Claim For Fraudulent Breach Of Contract.</u>

Ramachandran's fraud claim is improperly premised on a purported breach of contract and Texas law does not recognize a claim for "fraudulent breach of contract." *Bodnar v. Impression Bridal, Inc.*, No. H-09-2493, 2010 WL 346132, at *6 (S.D. Tex. Jan. 22, 2010); *see also Formosa Plastics Corp.*, 960 S.W.2d at 48  (noting that the mere failure to perform, standing alone, is not evidence of fraudulent intent). "Indeed, an unfulfilled promise does not, standing alone, constitute fraud; otherwise, every breach of contract would amount to fraud." *Kajima Intern., Inc. v. Formosa Plastics Corp., USA*, 15 S.W.3d 289, 293 (Tex. App.—Corpus Christi 2000, pet. denied). "If [an] action depends entirely on pleading and proving the contract in order to establish a duty, the action remains one for breach of contract only, regardless of how it is framed by the pleadings." *Coachmen Indus., Inc. v. Willis of Illinois, Inc.*, 565 F. Supp. 2d 755, 772 (S.D. Tex. 2008) (quoting *OXY USA, Inc. v. Cook*, 127 S.W.3d 16, 20 (Tex. App.—Tyler 2003, pet. denied)).

Here, Ramachandran's fraud claim depends entirely on the existence, performance and breach of the LTIU Plan. Therefore, Ramachandran is improperly attempting to assert a claim for fraudulent breach of contract, which is not recognized under Texas law.

## C.  <u>Ramachandran's Fraud Claim Is Barred By The Merger Clause In His 2015 Employment Contract.</u>

Ramachandran's fraud claim is barred due to the merger clause in Ramachandran's 2015 Employment Contract – a contract that is repeatedly referenced in his Third Amended Petition and in the fraud claim itself. [Dkt. No. 46 at ¶ 63]. The merger clause states as follows:

> Merger. This Agreement shall constitute the entire agreement between the parties, supersede any and all other agreements, either oral or written, between the parties hereto with respect to the subject matters thereof and contain all of the covenants and agreements between the parties with respect thereto. Any and all prior agreements, understandings, or commitments between Employer, its predecessors, parents, subsidiaries or affiliates, and Employee with respect to any such matter shall be hereby suspended and revoked as of the Effective Date of this Agreement, except for retention bonus eligibility as provided in Section 4.b. of this Agreement. [Apdx. 00087-00093 at ¶ i.].

As noted above, Ramachandran's fraud claim is nothing but a breach of contract claim in disguise because he essentially complains that AROG did not perform as supposedly promised under its Long Term Incentive Plan. However, to the extent that Ramachandran contends there were extra-contractual representations or assurances that support a fraud claim independent of the contracts at issue, the merger clause forecloses any claim based on such extra-contractual representations and assurances. *See, e.g., Petrobras Am. Inc. v. Union Oil Co. of Cal.*, 177 Fed. Appx. 460, 462 (5th Cir. 2006) ("merger clause is also fatal to Petrobras' promissory fraud, negligent misrepresentation and detrimental reliance claims because it renders Petrobras' reliance on extra-contractual representations unreasonable as a matter of law"); *U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 402–03 (5th Cir. 2000) (holding that a merger clause in the parties' primary agreement precluded a fraud claim); *Freedom Equity Group, Inc. v. MTL Ins. Co.*, No. 01-14-00210-CV, 2015 WL 1135186, at *3 (Tex. App.—Houston [1st Dist.] Mar. 12, 2015, no pet.) ("alleged oral promises that are contradicted by the unambiguous terms of the parties' written agreement was unreasonable and unjustified as a matter of law").

Joint Status Report

D.  <u>Ramachandran's Fraud Claim is Nothing More Than Breach of Contract Recast as a
Fraud Claim.</u>

Ramachandran claims Defendants promised the issuance of 250,000 Investment Units
pursuant to the AROG LTIU Plan.  As discussed above, Defendants complied with both of these
contractual obligations. Given Defendants contractual compliance, Ramachandran tries to recover
millions from Defendants based on fraud.

Ramachandran's fraud claim is fatally flawed. Plaintiff claims that sometime in 2012 Dr. Jain
induced him to remain with AROG with promises of 185,000 long term incentive units and a two
year employment agreement that would address Plaintiff's concern about the vulnerability of at will
employment while working under an H-1B visa that required employer sponsorship. It is undisputed
that AROG delivered on those promises. In July 2012, Ramachandran was given a two-year
employment agreement and a written Award Agreement granting him 185,000 long term incentive
units subject to the terms and conditions of the Plan.  Moreover, it is undisputed that AROG fully
performed the 2012 Employee Agreement and provided Ramachandran compensation above and
beyond what was required in the 2012 agreement. It is likewise undisputed that Ramachandran
bargained for new written employment agreements again in 2014 and 2015.  It also undisputed that
Ramachandran negotiated for additional LTIUs in July 2014 when AROG issued Ramachandran
another 50,000 long term incentive units as part of his Employment Agreements.  The fact that
Ramachandran was given three written employment agreements and two written Award Agreements
is significant because one of the first hallmarks of fraud is a defendant's "intense dislike for written
agreements." *Green v. Allied Interests*, 963 S.W.2d 205, 209 (Tex. App – Austin 1998) for the

proposition that dislike of written agreements is evidence of fraudulent intent). Thus, AROG's entry into multiple written agreements as promised flatly rebuts any inference of fraudulent intent based on a dislike of written agreements. Indeed, Ramachandran was given exactly what he was promised. And even when AROG decided nearly five years later to part ways with Ramachandran, he was still offered five months of paid leave to find a new job without threat to his immigration status. Ramachandran further describes that when Dr. Jain authorized the issuance to Ramachandran of 185,000 units in addition to the 15,000 units awarded previously, Dr. Jain explained that, if the company increased in value and could be sold upon entry into Phase III clinical trials, Ramachandran could be a millionaire.  In that regard, Ramachandran does not describe any contractual promise, but merely an explanation of what could happen in the future. Even Ramachandran uses the subjunctive word "could" to describe the theoretical future value of the long-term incentive units. "[Abhijit] agreed to remain at AROG through its development stage because he believed Dr. Jain's promise that he could be a millionaire if he could get AROG into Phase III."  It is undisputed that Ramachandran did not become a millionaire, but that is not due to the breach of any contract on the part of AROG or fraud. First, as explained above and ruled on by the Court, the Plan is clear that any payout from Available Funds as a matter of right with respect to Ramachandran's long term incentive units occurs only upon the Determination Date following the consummation of a Sale of the Company. [LTIU Plan]. Moreover, Section 5(B) of the Plan states that continuous employment as an absolute eligibility requirement that states as follows:

> Notwithstanding anything herein to the contrary and unless provided otherwise in an Award Agreement, in order for Participant [Abhijit] to be eligible to receive payment in respect of Units granted hereunder, such Participant [Abhijit] shall have been continuously employed with the Company or an Affiliate or Subsidiary (or in the case of non-employee Participants, the services of such Person have been continuously provided to the Company or an Affiliate or Subsidiary) from the Date of Grant through the Determination Date.

Joint Status Report

Furthermore, the Plan states that, "Nothing in the Plan or in any Award Agreement shall be deemed to give any Participant the right to be retained in employment . . . for any period of time." Thus, there was no promise that Ramachandran would become a millionaire. He was only promised units that could make him a millionaire if AROG increased in value and there was a Sale of the Company that generated Available Funds that Ramachandran remained eligible to receive. AROG delivered on the promised award of long-term incentive units. Beyond that, AROG had no further obligations absent the consummation of a Sale of the Company. That there has never been a Sale of the Company to date may be a source of disappointment for Ramachandran, but disappointment alone is not actionable in fraud.

Joint Status Report